**Nos. 22-56220, 23-55069**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Mark McDonald and Jeff Barke,

*Plaintiffs-Appellants*,

v.

Kristina D. Lawson, et al.,

*Defendants-Appellees.*

AND

Michael Couris, et al.,

*Plaintiffs-Appellants*,

v.

Kristina D. Lawson, et al.,

*Defendants-Appellees.*

## MCDONALD APPELLANTS' OPENING BRIEF

Daniel R. Suhr
dsuhr@libertyjusticecenter.org
Reilly Stephens
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Phone: 312-637-2280
*Attorneys for McDonald Appellants*

Mariah Gondeiro, Esq.
mgondeiro@faith-freedom.com
Julianne E. Fleischer, Esq.
jfleischer@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 600-2733
Facsimile: (951) 600-4996

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT .................................................... 2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................... 3

ADDENDUM .................................................................................... 3

STATEMENT OF THE CASE ............................................................ 4

    A. AB 2098 ................................................................................ 4

    B. The McDonald Appellants' Lawsuit ...........................................5

SUMMARY OF ARGUMENT ............................................................ 9

STANDARD OF REVIEW ............................................................... 14

ARGUMENT .................................................................................. 15

  I.  AB 2098 regulates "information" and "advice," not "treatment." . 15

  II. AB 2098 fails strict scrutiny because it abridges the First
      Amendment right of doctors to speak honestly and candidly with
      their patients. ................................................................. 29

  III. AB 2098 is void for vagueness because it fails to provide
       physicians adequate notice of what will or will not violate the law.
       51

  IV. The McDonald Appellants satisfy the remaining preliminary
       injunction factors ............................................................ 51

  V.  This Court has jurisdiction over the consolidated appeals. .......... 53

CONCLUSION ............................................................................... 55

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(g) ........ 57

STATEMENT OF RELATED CASES ............................................... 58

CERTIFICATE OF SERVICE .......................................................... 59

STATUTORY ADDENDUM ....................................................... A-001

i

## TABLE OF AUTHORITIES

**Cases**

*All-Options, Inc. v. Atty. Gen. of Indiana*, 546 F. Supp. 3d 754 (S.D. Ind. 2021) ................................................................................................ 18

*Am. Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749 (9th Cir. 2019) ........................................................................ 14, 52, 53

*Ashcroft v. ACLU*, 535 U.S. 564 (2002) .................................................. 11

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) .................................................. 33

*Baltimore Contractors, Inc. v. Bodinger*, 348 U.S. 176 (1955) .............. 54

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217 (2000) ................................................................................................................ 30

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ............................................ 34

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) ....................... 33, 39

*Carson v. Am. Brands*, 450 U.S. 79 (1981) ............................................ 54

*CDK Glob. Ltd. Liab. Co. v. Brnovich*, 16 F.4th 1266 (9th Cir. 2021) ... 14

*Chandler v. Judicial Council of Tenth Circuit*, 398 U.S. 74 (1970) ....... 55

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U. S. 520 (1993) ... 12

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ........................................ 33

*Cohen v. California*, 403 U.S. 15 (1971) ................................................. 15

*Cohens v. Virginia*, 6 Wheat. 264 (1821) ................................................ 55

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ...................................... 9

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ................. 26

*Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003) .......................... 54

*Edge v. City of Everett*, 929 F.3d 657 (9th Cir. 2020) ............................ 45

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020) ............ 34

*Fla. Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ................................. 16

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) ........................................... 36

*Herrera v. City of Palmdale*, 918 F.3d 1037 (9th Cir. 2019) .................. 53

*Høeg v. Newsom*, No. 2:22-cv-01980 WBS AC, 2023 U.S. Dist. LEXIS 13131 (E.D. Cal. Jan. 25, 2023) .......................................... 8, 44, 48, 49

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ..................... 10, 21

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) ..................................................................................................... 28

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) ................................. 28

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019) ...................................... 44

*McCullen v. Coakley*, 573 U.S. 464 (2014) ....................................... 31, 35

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*") ...................................................................................... *passim*

*National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043 (9th Cir. 2000) .......... 29

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020) ............................................................................ 31

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992) .................... 11, 33

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ............ 30, 31, 33, 40

*Reno v. ACLU*, 521 U.S. 844 (1997) ............................................... 45

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ................................... 33, 34

*Rumsfeld v. F. for Acad. & Instit. Rts., Inc.*, 547 U.S. 47 (2006) ........... 30

*Snyder v. Phelps*, 562 U.S. 443 (2011) .......................................... 35

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ........................... *passim*

*Stanley v. Georgia*, 394 U.S. 557 (1969) ........................................ 18

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ..................................... 41

*Texas v. Johnson*, 491 U.S. 397 (1989) ....................................... 11, 35

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) ...................... 40

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) .................... 8, 10, 19

*United States v. Alvarez*, 567 U.S. 709 (2012) .................... 28, 35, 41, 55

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) .............. 40

*United States v. Stevens*, 559 U.S. 460 (2010) ................................. 36

*United States v. Swisher*, 811 F.3d 299 (9th Cir. 2016) ..................... 28

*United States v. Williams*, 553 U.S. 285, 304 (2008) ......................... 44

*United States v. Wunsch*, 84 F.3d 1110 (9th Cir. 1996) ...................... 43

*Victory Processing, LLC v. Fox*, 937 F.3d 1218 (9th Cir. 2019) .. 31, 37, 40

*Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950 (9th Cir. 2009) ................................................................................ 39, 42

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) ............................................................................... 45, 47

*Ward v. Thompson*, No. 22-16473, 2022 U.S. App. LEXIS 30270 (9th Cir. Oct. 22, 2022) .................................................................. 14

*Whitney v. California*, 274 U.S. 357 (1927) .................................... 42

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................... 14

*Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017) .. 24

*Wooley v. Maynard*, 430 U.S. 705 (1977) ....................................... 30

**Statutes**

Cal. Bus. & Prof. Code § 2234 ..................................................... 4

Cal. Bus. & Prof. Code § 2270 ................................................ *passim*

## Other Authorities

Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* (2016) ...............................................26

Alexandra Ellerbeck, *Some doctors spreading coronavirus misinformation are being punished*, The Wash. Post (Dec. 6, 2021), https://tinyurl.com/4jkpt94y.........................................................39, 46

Assembly Floor Analysis, Concurrence in Senate Amendments to AB 2098 (Aug. 30, 2022), https://tinyurl.com/bdftnaek ............................37

California Medical Association (@CMAdocs), Twitter (May 11, 2022, 2:10 PM), https://tinyurl.com/dw8v9hb4................................................37

Diana Herrera-Perez et al., *A Comprehensive Review of Randomized Clinical Trials in Three Medical Journals Reveals 396 Medical Reversals*, in Meta-Research, A Collection of Articles (Peter A. Rodgers ed., 2019) ....................................................................26

Eugene Volokh, *Speech As Conduct*, 90 Cornell L. Rev. 1277 (2005) ....23

*Feb. 10-11 Meeting Minutes*, Med. Bd. of Cal. (Feb. 10, 2022), https://tinyurl.com/46pejy3w................................................................36

Letter from William Prasifka to Hon. Evan Low, Md. Bd. of Cal. (June 1, 2022), https://tinyurl.com/tyuhk7mf ............................. 21, 45, 46, 48

Senate Rules Committee, Office of Senate Floor Analyses, Third Reading AB 2098 (Aug. 13, 2022), https://tinyurl.com/bdftnaek ....9, 36

Vinay Prasad & Adam Cifu, *Medical Reversal: Why We Must Raise the Bar Before Adopting New Technologies*, 84 Yale J. Biology & Med. 471 (2011) .........................................................................................26

## INTRODUCTION

Is a doctor's "conveyance of information" and "advice" about COVID-19 more like a doctor's "recommendation" about the possible use of medical marijuana or more like a psychotherapist's use of "talk therapy" to treat a mental health condition? That is the question at the crux of this appeal regarding the constitutionality of California Assembly Bill 2098 ("the Act"), codified at Cal. Bus. & Prof. Code § 2270. The Act creates a new offense for which doctors can have their medical license revoked. If the Act regulates speech akin to a doctor's verbalized "recommendations," then it falls within the ambit of the Free Speech Clause, triggering strict scrutiny. If the Act regulates medical treatment delivered through speech, then current precedent labels it professional conduct, triggering rational basis scrutiny.

The Act governs a doctor's verbalized "advice" and "conveyance of information" concerning COVID-19. Advice and information are more like a "recommendation" than a treatment—one cannot treat a virus with pure speech—so the first principle should govern. As a result, this Court should reverse the District Court and issue a preliminary injunction.

1

Plaintiffs-Appellants Mark McDonald and Jeff Barke (the "McDonald Appellants") submit this opening brief to vindicate their rights under the First and Fourteenth Amendments. In denying the McDonald Appellants' Motion for Preliminary Injunction, the District Court erred on several fronts. It treated the speech regulated by the Act as conduct, applying only rational basis to the pure communication of information. Because it concluded the speech was conduct, it did not address the fact that the prohibitions are content-based and viewpoint-discriminatory. And to justify its construction, it misconstrued the Act's text, introducing limitations and clarifications not found in the law.

This Court should reverse the decision below, find that the McDonald Appellants are likely to succeed on the merits of their speech and vagueness claims, and find that the other preliminary injunction factors support reversal.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331 because the McDonald Appellants' claims arise under the First and Fourteenth Amendments to the Constitution and therefore present federal questions, and had jurisdiction under 28 U.S.C. § 1343 because relief is

2

sought under 42 U.S.C. § 1983.

On December 29, 2022, the McDonald Appellants filed a timely Notice of Appeal (ER-115) from the District Court's December 28, 2022 Order (ER-003) denying the McDonald Appellants' Motion for Preliminary Injunction. This Court has jurisdiction under 28 U.S.C. § 1292.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. The Supreme Court has recently reiterated that professional speech is fully protected under the First Amendment. The Ninth Circuit has carved out an exception for medical treatment delivered through speech. Does AB 2098 abridge physicians' freedom of speech by regulating the conveyance of disfavored advice and information about Covid-19, which is a virus that cannot be treated by verbal conversation?

2. AB 2098 is grammatically incomprehensible and defines an offense by using a term, "the scientific consensus," that lacks a definition and reflects a dynamic standard. Is AB 2098 void for vagueness under the Due Process Clause because it fails to provide regulated physicians adequate notice of the speech it covers?

## ADDENDUM

The relevant California statutes are attached in an Addendum at the end of this brief.

## STATEMENT OF THE CASE

### A. AB 2098

AB 2098 makes it "unprofessional conduct" for any California physician to make any statement to his or her patients that the Medical Board of California considers "misinformation" about COVID-19. Section 2 of the Act is the substantive provision:

> 2270. (a) It shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.
>
> (b) For purposes of this section, the following definitions shall apply:
>
> > (1) "Board" means the Medical Board of California or the Osteopathic Medical Board of California, as applicable.
> >
> > (2) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.
> >
> > (3) "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.
> >
> > (4) "Misinformation" means false information that is contradicted by contemporary scientific consensus contrary to the standard of care.

4

> (5) "Physician and surgeon" means a person
> licensed by the Medical Board of California or
> the Osteopathic Medical Board of California
> under Chapter 5 (commencing with Section
> 2000).

The Act therefore declares it "unprofessional conduct" for a doctor to

"disseminate"—that is, speak—"misinformation," as judged by the State

of California, to his or her patients regarding COVID-19. A single such

act can now result in the termination of a doctor's license to practice.

*See* Cal. Bus. & Prof. Code § 2234. It entered into force on January 1,

2023.

### B. The McDonald Appellants' Lawsuit

Plaintiffs-Appellants Dr. Mark McDonald, M.D. and Dr. Jeff Barke,

M.D. are licensed physicians in California. (ER-004). Dr. McDonald

primarily practices psychiatry in the Los Angeles area. He discusses

issues pertaining to COVID-19 with his patients and sometimes renders

general medical advice and treatment within the scope of his

competence. (ER-047). Dr. Barke is board certified in family practice

and maintains a concierge medical practice in the Newport Beach area.

(ER-054). As demonstrated in their declarations (ER-046, -053), during

the past two years both McDonald Appellants regularly provided their

best medical advice to their patients regarding masking, testing, treatment, and vaccination for COVID-19. (ER-004). The information, recommendations, and prescriptions they provided were based on research and data and in line with protocols developed and published by other doctors. (ER-048, -055). Though some of their recommendations required a prescription (such as treatment by ivermectin), many concerned over-the-counter products such as masks, vaccines, and natural supplements. *Id*.

The McDonald Appellants' provide advice that is in the best interests of their clients but at times at odds with the State of California or the Centers for Disease Control. (ER-004). The McDonald Appellants intend to continue providing superior and tailored medical advice to their patients, even if it contradicts with the views of some government officials and even though AB 2098 now puts their licenses at risk for doing so. (ER-051, -057). The McDonald Appellants also stay up to date on current medical science and research by taking continuing medical education classes, reading journals, and talking with colleagues, but they cannot continue their practices governed by vague terms like "misleading information" or "contemporary scientific consensus," which

provide them no notice of what speech will or will not threaten their livelihood. *Id*. The Medical Board began an investigation of Dr. McDonald prior to AB 2098's enactment, not for any treatment or advice he has given a patient, but for expressing his views on these matters of public concern on his own social media pages. (ER-005).

The McDonald Appellants filed this case on October 4, 2022, and then an initial motion for preliminary injunction two days later. (ER-064, -065). After briefing and argument, the district court dismissed their claims for lack of standing on November 21, 2022, but granted leave to refile with more specific allegations. (ER-044). The McDonald Appellants filed an amended complaint and a second motion for preliminary injunction, along with a request for the motion to be decided on an expedited basis due to AB 2098's January 1, 2023 effective date. (ER-128, -129). After an expedited hearing on December 16, 2022, the lower court denied Appellants' second request for a preliminary injunction on December 28. (ER-032). The McDonald Appellants filed a notice of appeal on December 29, 2022. (ER-115).

In its opinion, the lower court found that the new allegations in the McDonald Appellants' Amended Complaint established standing but

held that the McDonald Appellants were unlikely to succeed on the merits of either their free speech or vagueness claims. (ER-032). As to speech, the court held that AB 2098's restrictions were considered a regulation on conduct, not speech, under *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), and found the Appellees satisfied rational basis review. (ER-026). As to vagueness, the lower court held that the statute was sufficiently clear under its interpretation, as covering only false information contrary to the scientific consensus. (ER-017).

The Eastern District of California recently issued an injunction in a pair of consolidated cases challenging AB 2098 on similar grounds. *Høeg v. Newsom*, No. 2:22-cv-01980 WBS AC, 2023 U.S. Dist. LEXIS 13131 (E.D. Cal. Jan. 25, 2023). The district court in that case did not reach the plaintiffs' free speech arguments, instead ruling that AB 2098 was unconstitutionally vague for reasons consistent with the McDonald Appellants' arguments before this court. *Id.* That same day, this court ordered this case be consolidated with *Couris v. Lawson*, No. 23-55069, an appeal from the Southern District of California raising similar claims as the McDonald Appellants.

8

## SUMMARY OF ARGUMENT

The McDonald Appellants are likely to succeed on the merits of their First Amendment and due process claims, or at minimum, raise serious questions sufficient to justify an injunction. AB 2098 is at minimum unconstitutionally overbroad because it directly restricts substantial amounts of pure speech, which in this context is not a medical treatment. The law discriminates based on content and viewpoint, is subject to strict scrutiny, and has no goal other than suppression of expression. The law is also void for vagueness because it leaves crucial terms undefined, which is especially problematic when regulating speech.

In ruling to the contrary, the district court erred in classifying medical "advice" as "treatment," a conclusion that is incompatible with this Court's ruling in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002). This Court should reverse and find that the McDonald Appellants have met the burden necessary to secure preliminary injunctive relief.

The key question in this case is whether the law regulates professional speech, which is entitled to the fullest protection of the First Amendment, or medical treatment, which is conduct that does not

fall within the ambit of the First Amendment under current Ninth Circuit precedent.[1] Though the law tries to disguise itself as a conduct regulation by defining "dissemination" to mean "the conveyance of information" "to a patient" "in the form of treatment or advice," information is not a "treatment" for COVID-19. Thus, "the conduct triggering coverage under the statute consists of communicating a message," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010), and the law requires no nexus with any COVID-19 treatment—indeed, it does not require that any treatment be administered at all. Such pure professional speech is "entitled to the strongest protection our Constitution has to offer." *Conant*, 309 F.3d at 637 (cleaned up).

---

[1] A legislative committee's analysis acknowledged: "A key factor in determining whether a statute like the one proposed in this bill violates the First Amendment is whether the law would in fact regulate professional *speech* as opposed [sic] professional *conduct*." Senate Rules Committee, Office of Senate Floor Analyses, Third Reading AB 2098, at 4–5 (Aug. 13, 2022), https://tinyurl.com/bdftnaek.

That current Ninth Circuit precedent is *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022). This Court recently declined an opportunity to revisit *Tingley* en banc, over the dissent of five judges. No. 21-35815 (Order, Jan. 23, 2023). *Tingley* may now be the subject of a certiorari petition. Though Appellants believe *Tingley* is easily distinguishable, for the reasons argued above, if this panel concludes otherwise, Appellants reserve the right to argue that *Tingley* was wrongly decided in any future en banc or certiorari proceedings in this case.

Since AB 2098 covers speech, it necessarily follows the law is a violation of the First Amendment. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Yet this is the precise goal of AB 2098: to threaten the license and livelihood of a physician or surgeon who, in the State's view, conveys information or advice on a particular topic—COVID-19—that expresses a particular viewpoint contrary to that of the State. *Id*.

AB 2098 therefore "on its face burdens disfavored speech by disfavored speakers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011). Where a state expressly targets one set of disfavored views, there can be no question that "official suppression of ideas is afoot." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 390 (1992). Because the Act is a content- and viewpoint-based regulation of speech, it is subject

11

to the strictest scrutiny under the First Amendment.

The State responds by arguing that its law is necessary to combat the epidemic of COVID-19. Yet "[t]hose who seek to censor or burden free expression often assert that disfavored speech has adverse effects." *Sorrell*, 564 U.S. at 577. But suppressing speech that the government considers harmful is never a legitimate government interest.

And because the Act leaves unregulated wide swaths of identical speech—including the public social media commentary on which the law's findings focus—the Board cannot show that the law promotes a compelling government interest or is narrowly tailored to such an interest. *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U. S. 520, 547 (1993) ("A law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited.").

In addition to violating the First Amendment, AB 2098 is also void for vagueness under the Fourteenth Amendment's Due Process Clause. It leaves critical terms undefined, and the definitions it does provide further muddy the waters. For instance, the statute defines "misinformation" as "false information that is contradicted by

contemporary scientific consensus contrary to the standard of care." Beyond the incomprehensible reference to a "consensus contrary to the standard of care," the text leaves unclear the definition of and relation between "false information" and "contemporary scientific consensus." How are ever-changing scientific hypotheses determined to be "false," and how are courts to determine the "contemporary" (when?) "consensus" (among whom?). And when is information accurate but "misleading"? AB 2098 leaves the physician in the dark on all these points, further limiting speech protected by the First Amendment and inhibiting the patient's receipt of candid medical advice.

The State's effort to require physicians to parrot the government's official views contradicts the First Amendment, which protects the search for truth. Sometimes the majoritarian consensus might be right. Sometimes, as with lobotomies, eugenic sterilizations, and the Johnson & Johnson vaccine, it will be wrong. But the First Amendment protects speech for its own sake, whether the State thinks it is right or wrong, good or bad. That is the point. The State is not the arbiter of truth and may not use its police powers to enforce a monopoly on truth.

## STANDARD OF REVIEW

This Court "review[s] the denial of a preliminary injunction for abuse of discretion, but [it] review[s] the district court's underlying legal conclusions *de novo*." *CDK Glob. Ltd. Liab. Co. v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021). A plaintiff is entitled to a preliminary injunction on showing that (1) he is "likely to succeed on the merits," (2) he is "likely to suffer irreparable harm," (3) "the balance of equities tips in his favor," and (4) the requested injunction "is in the public interest." *Am. Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

But when First Amendment rights are at risk, the analysis essentially reduces to a single question: whether the plaintiff is likely to succeed on the merits. And even there, the question is more precisely whether the plaintiff has raised a serious question as to the merits. *Ward v. Thompson*, No. 22-16473, __ F.4th __, 2022 U.S. App. LEXIS 30270, at *2 (9th Cir. Oct. 22, 2022). This is because even the brief loss of First Amendment rights causes "irreparable injury" and tilts "the balance of hardships . . . sharply in [the plaintiff's] favor," and "it is

14

always in the public interest to prevent the violation of a party's constitutional rights." *Am. Bev. Ass'n*, 916 F.3d at 758 (cleaned up).

## ARGUMENT

## I.   AB 2098 regulates "information" and "advice," not "treatment."

AB 2098 punishes the "conveyance of information" and the giving of "advice" about COVID-19 by doctors when that information or advice is contrary to the scientific consensus and standard of care. In this case, because we are dealing with a virus rather than a mental health condition, the law is a regulation of speech, not treatment. The "only 'conduct' which the State [seeks] to punish" is "the fact of communication." *Cohen v. California*, 403 U.S. 15, 16 (1971). "The government's policy in this case seeks to punish physicians on the basis of the content of doctor-patient communications." *Conant*, 309 F.3d at 637.

1. The dissemination of information by doctors is protected speech.

As a general matter, the "dissemination of information [is] speech within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 570. And professional speech, no less than the speech of anyone else, is covered by the First Amendment: "[s]peech is not unprotected merely

because it is uttered by 'professionals.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("*NIFLA*"). "To the contrary, professional speech may be entitled to 'the strongest protection our Constitution has to offer.'" *Conant*, 309 F.3d at 637 (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)).

In *NIFLA*, the Supreme Court explained that "[a]s with other kinds of speech, regulating the content of professionals' speech poses the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." 138 S. Ct. at 2374 (cleaned up). This is, of course, precisely what is happening here: government is trying to suppress unpopular ideas and information that are contrary to its preferred approach to handling the pandemic. This is contrary to *NIFLA's* view that "[d]octors help patients make deeply personal decisions, and their candor is crucial." *Id.* (cleaned up). AB 2098 is typical of other efforts "[t]hroughout history [wherein] governments have manipulated the content of doctor-patient discourse to increase state power and suppress minorities." *Id.* (cleaned up).

As the CEO of the American Medical Association recently testified about an abortion law, "[g]overnment manipulation of doctor-patient

discourse has a dark past and should not be taken lightly." Declaration of Dr. James L. Madara, MD ¶ 10, *Am. Med. Ass'n v. Stenehjem*, No. 1:19-cv-00125-DLH-CRH, ECF No. 6-5 (D.N.D. June 25, 2019). "The ability of physicians to have open, frank, and confidential communications with their patients is a fundamental tenet of high quality medical care." *Id.* ¶ 13. A law regulating physician speech to patients "dangerously interferes with this collaborative effort and thus undermines the patient/physician relationship." *Id.* ¶ 14; *see id.* ¶ 20 (explaining that under the Code of Medical Ethics, "Patients should be able to expect that their physicians will provide guidance about what they consider the optimal course of action for the patient based on the physician's objective professional judgment."); *id.* ¶ 30 ("Informed consent" "is not an open-ended space for the government to script one-size-fits-all messages to groups of patients to further a political agenda.").

In instances such as these, "when the government polices the content of professional speech, it can fail to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *NIFLA*, 138 S. Ct. at 2374 (cleaned up). "Professionals might have a host of

good-faith disagreements, both with each other and with the government, on many topics in their respective fields." *Id.* at 2374–75. "Doctors and nurses might disagree about" any number of medical issues, "and the people lose when the government is the one deciding which ideas should prevail." *Id.* at 2375. Indeed, "[a]n integral component of the practice of medicine is the communication between a doctor and a patient," and "[p]hysicians must be able to speak frankly and openly to patients." *Conant*, 309 F.3d at 636.[2] To ban physicians "from communicating to patients sincere medical judgments would disable patients from understanding their own [health] situations" and even from fully "participat[ing]" in public "debate[s]." *Id.* at 634–35 (cleaned up). Though doctors are the ones whose free-speech rights are impacted, it is patients who are the ultimate losers because they no longer get their doctors' candid medical advice. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas.").

---

[2] *Accord All-Options, Inc. v. Att'y Gen. of Indiana*, 546 F. Supp. 3d 754, 764 (S.D. Ind. 2021). ("speech is fundamental to the physician-patient relationship because '[d]octors help patients make deeply personal decisions.'").

2. AB 2098 does not fit into the exception for medical treatment created by this Court in *Tingley*.

The district court erred in interpreting the Act as a limited regulation of professional conduct, citing *Tingley*. *Tingley* did say that "substantive regulations on medical treatments" may give rise to "tolera[ble]" content-based "restriction[s] on speech." *Tingley*, 47 F.4th at 1080–81. But *Tingley* also specifically cautioned against creating "too broad" a category of speech exempt from the First Amendment and limited its holding to those speech restrictions that "regulate what medical treatments licensed health care providers could practice." *Id.*

The analogy to *Tingley* fails for four reasons. First, *Tingley* says that California does "not lose the power to regulate the safety of medical treatments performed under the authority of a state license merely because those treatments are implemented through speech rather than through scalpel." 47 F.4th at 1063. AB 2098 regulates many speech statements that are not even arguably "medical treatment." Rather, it regulates "all interactions a client has with a [doctor], 'regardless of whether a medical procedure is ever sought, offered, or performed.'" *NIFLA*, 138 S. Ct. at 2373. AB 2098 prohibits a doctor's conveyance to

19

his patient of "false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines." § 2270(a). Thus, to relay information about the origin of the virus (to blame the Chinese lab, for instance), in a conversation with a patient could be "misleading information." To downplay the risks of the virus to an uninfected individual patient at a time when the government is urging a crisis mentality could be "false or misleading information." To provide information about masking that doubts its effectiveness at stopping the spread could be "false or misleading information." Any of these circumstances arises before or outside any possible medical treatment of or vaccination against the virus. To label such speech as "conduct" because it is delivered by a doctor is far afield from the direct "talk therapy" in *Tingley*.

Second, the law's definition of misinformation as "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice," § 2270(b)(3), fails its attempt to evade the First Amendment. Even on its own terms, the relevant "conveyance of information" goes beyond "treatment" to include speech in the form of

"advice." And this Circuit has squarely held that such "advice" is pure speech. As it explained in *Conant*, to "treat" a patient by *recommending* marijuana is merely to engage in "the dispensing of information"— protected speech. 309 F.3d at 635; *see id.* at 636 ("a doctor's recommendation does not itself constitute illegal conduct"). Here, too, "the conduct triggering coverage under the statute consists of communicating a message." *Holder*, 561 U.S. at 28. The District Court erred when it basically read "advice" out of the statute.

Third, California cannot show that "the conveyance of information" is a "treatment" for COVID-19. In *Tingley,* "psychotherapy" could be regulated because "words" were used "to treat" the relevant condition. *Tingley,* 47 F.4th at 1082. Here, by contrast, the law does not regulate a treatment. COVID-19 is impervious to words. A doctor might *advise* the patient to drink fluids, take vitamins or supplements, or consume a pharmaceutical, but none of that advice is the actual *treatment* for the virus delivered by speech in the way that the disfavored mental health treatment was delivered in *Tingley*. Put differently, the Act does not regulate treatment—it does not, for example, prevent a doctor from prescribing ivermectin or hydroxychloroquine for COVID-19. It

21

regulates doctors' *speech* about ivermectin or hydroxychloroquine, in the form of advice which suggested they might be helpful (or so one might assume; the statute is so vague that one cannot say for certain whether those two drugs are currently in or out).

In *Tingley*, by contrast, the care was *delivered* via speech (verbal counseling therapy)—that is, the care itself *was* speech. In that narrow instance, care delivered as speech is still care. But a doctor telling their patients, *inter alia*, that the data on masking isn't as impressive as the CDC claims, or that they've seen some adverse event reports from the vaccines that concern them, are not actual treatment of COVID-19— those statements are simply advice based on the doctor's best judgment, in the real world where facts are fluid. Unlike with conversion therapy, words have no effect on a patient's COVID-19 symptoms; one cannot verbally counsel away a virus.

Fourth, *Tingley* justified its regulation of the mental health treatment exception based on the reality that "treatment can result in physical and psychological harm to their patients." *Tingley*, 47 F.4th at 1083. Not only does this law reach far beyond "treatment," but it lacks any nexus to any patient harm. Indeed, during the drafting process, the

22

legislators considered adding a "harm" component, and the Medical Board specifically opposed it, and it was not ultimately added. Letter from William Prasifka to Hon. Evan Low, Md. Bd. of Cal., at 2 (June 1, 2022), https://tinyurl.com/tyuhk7mf. A doctor's patients could experience the best outcomes in the state, or like many of us ignore their doctor all together, and the doctor's liability under the Act would be the same.

3. The appropriate framework for this case is *Conant*, because it concerns verbal advice and information like recommendations.

Rather than *Tingley*, the proper framework for this case is found in *Conant*, where the law "prohibited doctors from recommending the use of marijuana to patients." *Tingley*, 47 F.4th at 1073. In *Conant* this Court "distinguished prohibiting doctors from treating patients with marijuana—which the government could do—from prohibiting doctors from simply recommending marijuana." *Tingley*, 47 F.4th at 1072. AB 2098 does not outlaw *treating* patients with, say, ivermectin; it outlaws *recommending* to patients that some studies have found that drug effective to treat COVID-19, in the same manner a doctor in *Conant* might recommend to a patient that some studies have found marijuana

23

effective at treating glaucoma. Since AB 2098 restricts what a doctor can verbally recommend to a patient, it clearly violates the holding of *Conant*.

More broadly, trying to evade the First Amendment by calling speech itself conduct "is a dubious constitutional enterprise" that "is unprincipled and susceptible to manipulation." *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1308-09 (11th Cir. 2017) (en banc) (cleaned up). "When the government restricts professionals from speaking to their clients, it's restricting speech, not conduct," and "the impact on the speech is the purpose of the restriction, not just an incidental matter." Eugene Volokh, *Speech As Conduct*, 90 Cornell L. Rev. 1277, 1346 (2005).

4. The District Court's attempted narrowing construction does not change this analysis or conclusion.

The District Court tried to impose a narrowing construction on the statute which is unsupported by the text or by constitutional doctrine. The district court stated that "AB 2098 regulates . . . only the information underlying the covered medical professional's advice rather than their particular opinion," (ER-021), and said that it "does not

24

prohibit a licensed professional from engaging in discussions about treatment, recommendations to obtain treatment, and expressing a particular medical opinion. It only requires that those discussions, recommendations, and opinions must not be based on, or communicate as though they were settled scientific facts, false information." (ER-021).

But these limitations are nowhere to be found in the statute's text. AB 2098 includes no requirement that statements the Board deems to be false be communicated "as if they were settled scientific facts"; a doctor runs afoul of the statute by simply conveying the information at all. If a doctor told a patient, "in my opinion, the benefits of vaccination are not worth the side effects for a healthy teenage male like yourself," that statement would not be saved by the prefatory "in my opinion." The doctor is still speaking advice concerning the prevention of COVID, and still fueling the "vaccine hesitancy" the law seeks to combat by providing information that is contrary to the government's version of the contemporary scientific consensus.

Similarly, the district court's attempt to recharacterize the law as a prohibition on false statements of *fact* should fail even if the text

supported it (which it does not). (ER-021). First, the text of the Act

specifically applies to "false or misleading" information, § 2270(a), so

accurate information presented in a misleading way (misleading, that

is, in the State's view) is still covered. Also, the Act defines

"misinformation" as "false information that is contradicted by

contemporary scientific consensus contrary to the standard of care." *Id.*

§ 2270(b)(4). Again, the law is vague here, but it seems like false

information is information that is contradictory to the contemporary

scientific consensus and the standard of care. Yet much that the

government may say is "contrary to the contemporary scientific

consensus" or "standard of care" is in fact true information, or at least

not established to be false, or at least not false according to some

outside the government. Plus, while the definition of "misinformation"

requires that the information be "false," it does not require that the

false information be stated as fact.

There is no reason to think (and ample reason to doubt) that the

medical "consensus" at any time reflects scientific *fact*. "Science is not

an encyclopedic body of knowledge about the universe. Instead, it

represents a process for proposing and refining theoretical explanations

about the world that are subject to further testing and refinement."

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993) (quoting

Brief for American Association for the Advancement of Science et al. as

Amici Curiae 7–8). Medical knowledge is no different.

Medical advice implicates a mix of fact and opinion or judgment, and

many of the relevant issues—particularly involving a recent, ever-

evolving virus with new vaccines—are not matters of established "fact."[3]

The nature of science is that knowledge evolves and changes. Medical

"[r]eversal is not a rare occurrence." Vinay Prasad & Adam Cifu,

*Medical Reversal: Why We Must Raise the Bar Before Adopting New*

*Technologies*, 84 Yale J. Biology & Med. 471, 472 (2011) (collecting

many examples); *see also* Diana Herrera-Perez et al., *A Comprehensive*

*Review of Randomized Clinical Trials in Three Medical Journals*

*Reveals 396 Medical Reversals*, in Meta-Research, A Collection of

Articles (Peter A. Rodgers ed., 2019). Many once-"consensus" medical

views, including the need for lobotomies and eugenic sterilizations, are

---

[3] Indeed, lawyers know well that, while certain narrow questions are
sometimes clear, anything truly important is a matter of professional
judgment: whether a contract actually formed from a meeting of the
minds, what searches are reasonable under the Fourth Amendment—
one can give clients probabilities, but rarely certainty.

no longer accepted. *See* Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* 66 (2016) ("The most important elite advocating eugenic sterilization was the medical establishment," "with near unanimity"; "every article on the subject of eugenic sterilization published in a medical journal between 1899 and 1912 endorsed the practice"). We have seen this, of course, in the context of COVID-19, as public-health advice has evolved over time.

But even if some information that the McDonald Appellants convey turns out to be false, "[t]he First Amendment recognizes no such thing as a 'false' idea." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 51 (1988). Even purportedly false "facts" are not outside the First Amendment's protection. *See United States v. Alvarez*, 567 U.S. 709, 722 (2012); *United States v. Swisher*, 811 F.3d 299, 317 (9th Cir. 2016). The "general rule that the speaker has the right to tailor the speech[] applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). The Board has no more right to regulate statements of fact than it does statements of opinion or judgment. This reflects the simple reality that we do not trust the

government to decide or declare what is "true" and then enforce that "truth" by suppressing contrary speech.

In sum, AB 2098 restricts speech, the "conveyance of information" and "advice," § 2270(b)(3), not medical treatment or medical conduct.

## II. AB 2098 fails strict scrutiny because it abridges the First Amendment right of doctors to speak honestly and candidly with their patients.

1. AB 2098 is subject to strict scrutiny: it is a content-based, viewpoint-based regulation of speech.

Having established that AB 2098 regulates speech, not treatment, the rest of the case flows easily and obviously from that point.[4] The

---

[4] Even if the Court concludes that the law is subject to rational basis scrutiny because it regulates medical conduct that is delivered via speech, the Court should separately consider whether the law is subject to strict scrutiny because it is a content-based and viewpoint-discriminatory regulation of speech. That is the course this Court took in *National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043 (9th Cir. 2000). In that case, a forerunner to *Pickup* and *Tingley*, this Court concluded that psychotherapy could be regulated as medical practice under rational basis review because it was delivered exclusively via speech. *Id.* at 1053-54.

However, after reaching that conclusion, this Court separately analyzed whether the regulation would nevertheless be subject to strict scrutiny as a content- or viewpoint-based regulation. *Id.* at 1055. In that instance, the Court concluded that rational basis still applied because the law was content- and viewpoint-neutral. In this instance, by contrast, the law is obviously content-based and not viewpoint neutral, and therefore strict scrutiny should apply.

29

First Amendment protects "the right to speak freely." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Put another way, the government violates a speaker's First Amendment rights by "interfer[ing] with the [speaker's] ability to communicate its own message." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 64 (2006). Under the First Amendment, "minority views are treated with the same respect as are majority views." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

On its face, AB 2098 discriminates based on speech's content and viewpoint. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert,*

---

Perhaps phased differently, *NAAP* created a two-step test for reviewing regulations of medical speech: the law must regulate only a speech-based therapy, and the law must be content and viewpoint neutral, in order to receive rational basis review. Appellants obviously disagree with the first prong of that test (and point out that *NAAP* was decided prior to *NIFLA*), but even accepting it as correct, the California law here would still fail the second prong. AB 2098 is not content and viewpoint neutral, and therefore should be subject to strict scrutiny on that basis under *NAAP*, even if the Court first determines that the law regulates only speech-based medical practice.

*Ariz.*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163; *see also Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019) ("[A] law is content-based because it explicitly draws distinctions based on the message a speaker conveys."). One simple way of determining whether a restriction is content-based is by considering whether the law "requires authorities to examine the contents of the message to see if a violation has occurred." *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1073 (9th Cir. 2020) (cleaned up); *see McCullen v. Coakley*, 573 U.S. 464, 479 (2014).

"Government discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination." *Reed*, 576 U.S. at 168 (cleaned up). The Supreme Court has strongly condemned viewpoint discrimination: "Those who begin coercive elimination of dissent soon find themselves exterminating dissenters." *Barnette*, 319 U.S. at 641.

Here, AB 2098 discriminates based on both content and viewpoint.

The law cannot be applied except by reference to the content of a physician's speech: it only punishes doctors for dissenting about COVID-19; not for recommending unproven weight-loss diets or cancer cures, not for suggesting same-sex attractions could be reversed by prayer—the Act only applies where the *content* of the physician's speech is "related to COVID-19."

Unless a physician's speech parrots the Board's view of the "contemporary scientific consensus," the physician risks loss of license and livelihood. And the Act implicates at least two other forms of content and viewpoint discrimination. It leaves supposed misinformation about other diseases—from the flu to smallpox— unregulated. And it regulates only certain information about COVID-19: that which the State considers to be "false" or "misleading" and/or "contradicted by contemporary scientific consensus."

The express purposes of the Act confirm that it discriminates based on content and viewpoint. According to the legislature's findings, the law's purpose is to stamp out what the State considers to be "inaccurate information." Bill § 1(e). Particularly "[g]iven the legislature's expressed statement of purpose, it is apparent that [the law] imposes burdens that

are based on the content of speech and that are aimed at a particular viewpoint." *Sorrell*, 564 U.S. at 565.

Because California's law is content-based and viewpoint-based, it is "subject to strict scrutiny" and "presumptively unconstitutional." *Reed*, 576 U.S. at 163, 165.

2. AB 2098 fails strict scrutiny.

To survive strict scrutiny—"the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)— California must prove that the Act "furthers a compelling interest and is narrowly tailored." *Reed*, 576 U.S. at 171 (cleaned up). The State bears the burden of establishing this both on the merits and to defeat a request for preliminary injunction. *Ashcroft v. ACLU*, 542 U.S. 656, 660-61, 666 (2004). The State must "specifically identify an 'actual problem'" and show that restricting "speech [is] actually necessary to the solution." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up). "Content-based regulations are presumptively invalid." *R.A.V.*, 505 U.S. at 382.

First, the State must show that its law "plainly serves compelling state interests of the highest order" and is "unrelated to the suppression

33

of expression." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984). "A law does not advance 'an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) (cleaned up).

AB 2098 fails strict scrutiny at the outset because it serves no legitimate interest at all and instead is solely concerned with "the suppression of expression." *Jaycees*, 468 U.S. at 624. Arguments about informational harm are irrelevant as a matter of law, for censorship cannot be justified on the plea that bad ideas cause harm—unless that risk of harm rises to the high and immediate urgency defined by the "clear and present danger" test. *See Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969) (per curiam) (holding advocacy of armed resistance not sufficient to justify punishment for speech). That test is not implicated here. Indeed, the Act does not require any showing of risk or harm at all—a physician's license could be at risk even if her advice *helped* the patient.

It is just as clear that California does not have a legitimate interest in preventing the dissemination of ideas about personal, philosophical,

34

scientific, and medical topics on the grounds that such ideas are (or believed by the Board to be) false or contrary to the majority's view. The "bedrock principle underlying the First Amendment . . . is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson*, 491 U.S. at 414; *see, e.g.*, *McCullen*, 573 U.S. at 476 ("[T]he First Amendment's purpose" is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail."); *Alvarez*, 567 U.S. at 729 ("Truth needs neither handcuffs nor a badge for its vindication."); *Snyder v. Phelps*, 562 U.S. 443, 458, (2011) ("[S]peech cannot be restricted simply because it is upsetting or arouses contempt."); *Hurley*, 515 U.S. at 574 ("[T]he point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful."); *Conant*, 309 F.3d at 637 (noting that the state lacks power to paternalistically regulate speech between doctor and patient to prevent individuals from making "bad decisions").

Even if some interest unrelated to speech suppression were at stake, AB 2098 still would be vastly overbroad. It prohibits even a simple conversation if that conversation includes a doctor's expression of a

viewpoint of which the State disapproves, whether that conversation leads to any treatment, or any action at all. The law is thus sweepingly overbroad with respect to any legitimate governmental interest. *See United States v. Stevens*, 559 U.S. 460, 473 (2010) (a law is overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep" (cleaned up)).

Further, the law is underinclusive with respect to its claimed goals. If a statute is underinclusive, this negates the legitimacy of the law in at least two ways. First, the poor fit between the law and the alleged harm "raises serious doubts about whether [the government] is, in fact, serving, with this statute, the significant interests which [it] invokes" to justify the law. *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989). Second, as discussed next, underinclusivity contradicts any claim that the law is "narrowly tailored" to the harm it purports to address. *Brown*, 564 U.S. at 799–804.

The Act is severely underinclusive in serving any supposed legitimate government purpose. According to the bill's findings, it purportedly seeks to "combat[] health misinformation and curb[] the spread of falsehoods." Act § 1(g). Even if this were a legitimate basis for

governmental censorship, California permits all sorts of "health misinformation." The examples are endless, but take one specifically raised by the California Senate's Floor Analysis, which noted that the law only covers physicians and surgeons, and "does not . . . include other healthcare professionals which have also been reported as spreading misinformation and disinformation," including "licensed doctors of chiropractic who were advertising that chiropractic care can help patients reduce their risk of COVID-19 infection." Senate Rules Committee, Third Reading AB 2098, at 4–5. The analysis found it "unclear why only one category of professional would be specified through statue designating their activities as unprofessional conduct." *Id.* at 5. After all, many patients today may not be seen by a physician, but by a physician's assistant, nurse, or other practitioner. So the same information can be disseminated "by all but a narrow class of disfavored speakers." *Sorrell*, 564 U.S. at 573. The law censors only the physician's or surgeon's speech, "leav[ing] consumers open to an unlimited proliferation of" the same information given by others. *Victory Processing*, 937 F.3d at 1229.

The bill is also underinclusive in what speech it regulates. This bill

was spurred by alarm, as expressed by the President of the Medical Board of California, over a supposed "increase in the dissemination of health care related misinformation and disinformation on social media platforms, in the media, and online."[5] The California Medical Association agreed and sponsored Assembly Bill No. 2098, which would become the Act.[6]

According to the bill's legislative findings, "[t]he spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence," and "some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals." Bill § 1(d), (e). The official analysis offered for the bill also focused on public dissemination, recounting one licensed doctor who "has engaged in multiple campaigns" related to COVID publicly, yet her "license remains active."[7] The legislative analysis highlighted "the dissemination of

---

[5] *Feb. 10-11 Meeting Minutes*, Med. Bd. of Cal. (Feb. 10, 2022), https://tinyurl.com/46pejy3w.
[6] California Medical Association (@CMAdocs), Twitter (May 11, 2022, 2:10 PM), https://tinyurl.com/dw8v9hb4.
[7] Assembly Floor Analysis, Concurrence in Senate Amendments to AB 2098, at 4 (Aug. 30, 2022), https://tinyurl.com/bdftnaek.

misinformation and disinformation" through "media coverage and the prevalence of social media."[8] Yet the bill was amended to contract its coverage to only doctor-patient conversations. So it does not actually address the supposed harm it set out to stop.

Finally, when the government invokes "abstract" interests, it "must demonstrate," at the very least, "that the recited harms are real, not merely conjectural, and that the [censorship] will in fact alleviate these harms in a direct and material way." *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 962 (9th Cir. 2009) (cleaned up); *see Brown*, 564 U.S. at 799 (government must "specifically identify an 'actual problem'"). It cannot do that. Its legislative examples, again, were about public speech, not doctor-patient conversations. The Medical Board of California told the legislature that "[o]ftentimes, complaints received by the Board pertaining to COVID-19 are made by a member of the public and not the patient of the physician." Letter, Md. Bd. of Cal., *supra*, at 2. One survey by the Federation of State Medical Boards, the umbrella organization for state medical boards, found that less than 20% of boards had taken any related actions. Alexandra Ellerbeck,

---

[8] *Id.*

*Some doctors spreading coronavirus misinformation are being punished*, The Wash. Post (Dec. 6, 2021), https://tinyurl.com/4jkpt94y.

The State will be unable to show that its law advances a compelling government interest, which is fatal to the analysis of a law that discriminates both on content and viewpoint.

Putting that fatal flaw aside, even if one assumes that the law serves some government interest, it is nonetheless invalid because it is not narrowly tailored. A statute restricting speech is not narrowly tailored if the government's purported interests could have been served by a less restrictive alternative, and the State bears the burden to prove that available alternatives would have been ineffective. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (2000). "Precision must be the touchstone when it comes to regulations of speech." *NIFLA*, 138 S. Ct. at 2376 (cleaned up). "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the Government thought to try." *Conant*, 309 F.3d at 637 (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002)).

First, as explained above, the law is fatally underinclusive. "In light

of this underinclusiveness," the State cannot meet "its burden to prove that its [law] is narrowly tailored." *Reed*, 576 U.S. at 172; *accord Victory Processing*, 937 F.3d at 1228.

Next, if California were concerned about harmful COVID-19 treatments, it could have regulated those treatments (or harms) directly, rather than pretend that "the conveyance of information" is itself a COVID-19 "treatment." § 2270(b)(3). Certainly governments— including California's—have not hesitated to impose various COVID-19-related mandates. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) ("This is the fifth time the Court has summarily rejected the Ninth Circuit's analysis of California's COVID restrictions on religious exercise."). Regulating *treatments* or mandating vaccines would be a more narrowly tailored way to promote any interest in medical care than regulating pure speech.

Or the government could have engaged in its own speech, promoting its views on COVID via official channels. When speech that the government considers harmful is at issue, the "least restrictive alternative" is unlikely to involve censorship. "The remedy for speech that is false is speech that is true. This is the ordinary course in a free

41

society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straight-out lie, the simple truth." *Alvarez*, 576 U.S. at 727. "[M]ore speech, not enforced silence" is the best response to perceived falsehoods or misguided ideas. *Whitney v. California*, 274 U.S. 357, 377 (1927); *see also Video Software Dealers Ass'n*, 556 F.3d at 965 (9th Cir. 2009) (California failed to show that an education campaign could not equally serve its asserted interest). Given the existence of these less restrictive alternatives to California's content-based restriction on speech, the law is not narrowly tailored.

Indeed, Governor Newsom's signing statement, in which he felt the need to invoke his own narrowing construction, reenforces the lack of tailoring of the law as written. The Governor insists the Act does not "apply only to those egregious instances in which a licensee is acting with malicious intent or clearly deviating from the required standard of care." Governor Gavin Newsom, Signing Statement (Sept. 30, 2022).[9] Yet the statute's definition of "misinformation" says "false information that is contradicted by contemporary scientific consensus contrary to

---

[9] https://www.gov.ca.gov/wp-content/uploads/2022/09/AB2098-signing-message.pdf.

the standard of care." There is no requirement that the information *clearly* deviate from a standard of care, nor any standard for the required clarity of the deviation. And malicious intent is only required under the definition of "Disinformation," a separate category the Act defines as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead." The Act is written in the disjunctive, regulating the "disseminat[ion]" of "misinformation *or* disinformation," (emphasis added) such that physicians are equally at risk no matter the nobility or malice of their intent.

And in any case, the Governor's attempt at narrow tailoring has no substantive effect: the Governor is not the enforcement authority who will decide where and to whom to apply the Act, and even if he were, this Circuit has held that an announced enforcement policy cannot save an unconstitutional statute through a narrowing construction. *United States v. Wunsch*, 84 F.3d 1110, 1118 (9th Cir. 1996) ("California has failed to show that this new policy represents an authoritative and binding construction of [the statute] rather than a mere enforcement strategy, which would not be binding on the court.").

This also means that the McDonald Appellants can take no solace in

the district court's overly narrow reading of the text (by, for instance, saying it covers only false statements of fact and not opinion). Absent injunctive relief, a narrowing construction provided by a federal court is merely advisory, and in no way binds the Board or any other state official in any future enforcement action. In the context of a First Amendment challenge, this Court should read the law for what it says, and not credit empty promises of prosecutorial discretion.

## III.  AB 2098 is void for vagueness because it fails to provide physicians adequate notice of what will or will not violate the law.

AB 2098 suffers from another constitutional defect: it is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause. A law is unconstitutionally vague if it does not give "a person of ordinary intelligence fair notice of what is prohibited" or if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Put another way, a law is void for vagueness if it "lack[s] any ascertainable standard for inclusion and exclusion." *Kashem v. Barr*, 941 F.3d 358, 374 (9th Cir. 2019) (internal quotation marks and citation omitted). As the Eastern District of California recently ruled,

AB 2098 fails this test. *Høeg*, 2023 U.S. Dist. LEXIS 13131, at *31.

Though civil laws are sometimes permitted a greater "degree of vagueness," if "the law interferes with the right of free speech or of association"—as here—"a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). Vague laws "raise[] special First Amendment concerns" because they empower the government to silence viewpoints with which it disagrees. *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). So, "where First Amendment freedoms are at stake, a 'great[] degree of specificity and clarity of laws is required.'" *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2020) (cleaned up). When "[d]efinitions of proscribed conduct . . . rest wholly or principally on the subjective viewpoint of a" government official, such laws "run the risk of unconstitutional murkiness." *Id.* at 666.

Here, ambiguity pervades the statute. Take the statutory definition of "misinformation": "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." § 2270(b)(4). Read literally, the definition is senseless, as it says that the covered information is contradicted by a consensus that is itself

contrary to the standard of care. That alone suffices to make the statute void for vagueness, for it is incomprehensible.

Even if one guesses and adds words that the legislature did not ("false information that is contradicted by contemporary scientific consensus *and that is* contrary to the standard of care"), hopeless ambiguities remain. Is information false *because* it is "contradicted by contemporary scientific consensus" and (or?) "contrary to the standard of care"? Or is falsity a separate requirement? How does a court decide "falsity" in the context of scientific questions that are, and will always remain, matters of hypothesis and study? When is falsity determined: at the time of the statement, or given how the evidence has developed? What is a "scientific consensus," and how is a doctor to determine it? When is "contemporary": when the statement was made, or at another point? Whose "standard of care" matters? Does the information have to be *both* contradicted by consensus *and* contrary to the standard of care?

Indeed, the Medical Board recognized during the drafting process that the reference to a "contemporary scientific consensus" was "unclear and may lead to legal challenges." It successfully suggested adding "contrary to the standard of care" to the definition of "misinformation."

Letter, Md. Bd. of Cal., *supra*, at 2. But rather than fixing the problem, this just added to it. Besides making the sentence incomprehensible (the scientific consensus must be contrary to the standard of care?), it just added to the confusion. Must the information be false, and contrary to the scientific consensus, and contrary to the standard of care? Is it false because it is contrary to the scientific consensus or standard of care? Is it false because it is contrary to both the scientific consensus and the standard of care? The amendment only made things worse.

All these ambiguities are heightened by the statute's failure to impose an intent requirement. *See Vill. of Hoffman Ests.*, 455 U.S. at 499 ("a scienter requirement may mitigate a law's vagueness"). The definition of "misinformation" (unlike the definition of "disinformation") does not require any intent at all on the physician or surgeon's part, and it does not require that the "false information" be *knowingly* false. Indeed, the original version of the bill included intent as a factor for bringing a disciplinary action, but the Medical Board specifically and successfully lobbied against any intent requirement in the final version. Bill as Introduced § 2 (Feb. 14, 2022); Letter, Md. Bd. of Cal., *supra*, at 2 (intent "is not relevant"). These deficiencies exacerbate the law's

47

vagueness problems.

The district court did its level best to untangle this grammatical garble, inserting conjunctions and qualifiers to create a clearer law that some legislature could have passed, but which the California legislature did not. The court suggested that the law covered only "*demonstrably false information*" (emphasis added), and said that "to the extent a scientific consensus is unclear, AB 2098 would not impose liability because there is nothing to contradict." (ER-015). Neither of these extra limitations appears in the text—they amount to a clarifying and narrowing construction meant to save the legislature from itself. Nor is the requirement that the state prove a scientific consensus comforting, because any scientific consensus is contingent, and much new knowledge begins as heresy—Galileo was put on trial for contradicting a well-established scientific consensus the best experts had agreed about for centuries.

By contrast, the district court in *Høeg* pointed out that the Board's "'contemporary scientific consensus' lacks an established meaning within the medical community," pointing out that "defendants do not propose one." 2023 U.S. Dist. LEXIS 13131, at *20-21. Even if "there is

a clear scientific consensus on certain issues," the fact remains that "AB 2098 does not apply the term 'scientific consensus' to such basic facts, but rather to COVID-19—a disease that scientists have only been studying for a few years, and about which scientific conclusions have been hotly contested." *Id.* at *24. It rejected the district court's saving construction, which proposed 'scientific consensus' and 'standard of care' as separate elements, since "if the Legislature meant to create two separate requirements, surely it would have indicated as such--for example, by separating the two clauses with the word 'and,' or at least with a comma." *Id.* at *27. Nor did the inclusion of "false" resolve the issue, since "drawing a line between what is true and what is settled by scientific consensus is difficult, if not impossible." *Id.* at 28-29. As that court explains, there is simply no reasonable way for doctors to understand what speech is or is not prohibited under AB 2098.

To give a concrete example, take a physician who in April 2020 disregarded the consensus guidance not to wear masks and advised his patients that they needed to wear N95 masks to have the best protection from COVID-19. Was that advice false? When? Was it contradicted by a contemporary scientific consensus? Which consensus?

When? Was it contrary to a standard of care? Was it all three? If it *was* all three, but is *now* none, does it matter? The statute answers none of these questions, all of which are crucial to understanding the law.

And the law raises still more impossible questions. It defines "disseminate" as "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice." § 2270(b)(3). But is it limited to a direct conveyance of information? What if the physician gives remarks at a public seminar that a patient attends or sees on the Internet? And what does "conveyance of information . . . in the form of treatment or advice" mean? As discussed, "conveyance of information" is not a treatment for COVID-19. The connection between "conveyance of information" and "treatment or advice" is unknowable. Indeed, the Medical Board specifically demanded that the legislature remove any suggestion that patient harm is required to impose discipline, *see* Letter, Md. Bd. of Cal., *supra*, at 1, further detaching the statute from any concrete application.

Finally, consider the Act's umbrella prohibition, which forbids "disseminat[ing] misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and

risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines." § 2270(a). But "misinformation" and "disinformation" are both defined as limited to "false information," *id.* § 2270(b)(2), (4), so the statutory prohibition apparently includes a new category of "misleading information." The statute leaves this category undefined, and it is not susceptible to an apparent interpretation in this context. To return to the example, would a physician's advice to wear an N95 have been misleading? Who can know?

In sum, AB 2098's vagueness exacerbates the First Amendment defects with its blanket prohibition on pure speech. This Court therefore should reverse the district court's decision otherwise, and find that the McDonald Appellants are likely to succeed on the merits of their vagueness claim.

## IV.   The McDonald Appellants satisfy the remaining preliminary injunction factors.

After concluding that the McDonald Appellants' arguments fell short on the merits, the district court understandably found that this foreclosed the remaining preliminary injunction factors. Because the

McDonald Appellants here ask this Court to reverse the decision on the merits, they also ask that this Court reverse the contingent ruling on the other preliminary injunction factors. Because the McDonald Appellants have "a colorable First Amendment claim," they have "demonstrated that [they] likely will suffer irreparable harm if the [law] takes effect." *Am. Beverage Ass'n*, 916 F.3d at 758.

These harms are particularly severe here. A physician or surgeon "will derive no direct benefit from giving" information that they believe to be accurate and in accord with their patient's needs, "other than the satisfaction of doing their jobs well." *Conant*, 309 F.3d at 639 (Kozinski, J., concurring). "At the same time, the burden of the" law "falls directly and personally on the doctors: By speaking candidly to their patients . . . , they risk losing their license to write prescriptions, which would prevent them from functioning as doctors. In other words, they may destroy their careers and lose their livelihoods." *Id.* at 639–40. "This disparity between benefits and burdens matters because it makes doctors peculiarly vulnerable to intimidation; with little to gain and much to lose, only the most foolish or committed of doctors will defy the [State's] policy and continue to give patients candid" information. *Id.* at

640.

"Next, the fact that [the McDonald Appellants] have raised serious First Amendment questions compels a finding that the balance of hardships tips sharply in [their] favor." *Am. Beverage Ass'n*, 916 F.3d at 758 (cleaned up). Finally, courts have "consistently recognized the significant public interest in upholding First Amendment principles." *Id.* "Indeed, it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (cleaned up). And "the harm to patients from being denied the right to receive candid medical advice" is "great[]." *Conant*, 309 F.3d at 643 (Kozinski, J., concurring).

## V. This Court has jurisdiction over the consolidated appeals.

In its consolidation order, this Court directed the parties to address the basis for the Court's jurisdiction over the Couris Appellants' appeal. *See* Dkt. 5 at 2. The McDonald Appellants position is that the Couris appeal is procedurally proper and this Court has jurisdiction, because the Southern District of California's *sua sponte* stay was "effectively a final decision and thus the district court order is final for purposes of appellate review." *Herrera v. City of Palmdale*, 918 F.3d 1037, 1043 (9th Cir. 2019).

Since the Couris Appellants will suffer irreparable injury to their First Amendment rights without a preliminary injunction, this appeal is the Couris Appellants' only opportunity to avoid that irreparable harm. The stay order therefore has not only "the practical effect of refusing an injunction," it also may have the "serious, perhaps irreparable, consequence" of abridging the Couris Appellants' First Amendment rights." *Carson v. Am. Brands*, 450 U.S. 79, 83-84 (1981) (quoting *Baltimore Contractors, Inc. v. Bodinger*, 348 U.S. 176, 181 (1955)).

However, whatever the Court holds as to this question, it should not implicate the McDonald Appellants' appeal from the Central District of California's denial of their Motion for a Preliminary Injunction, an interlocutory appeal expressly provided for under 28 U.S.C. § 1292(a)(1) ("the courts of appeals shall have jurisdiction of appeals from . . . Interlocutory orders of the district courts of the United States . . . refusing . . . injunctions."). Where two cases are consolidated, and there are jurisdictional concerns about one appeal but not the other, the proper course is to decide the merits of at least those claims raised in the case over which the court's jurisdiction is certain. *Deutsch v. Turner*

*Corp.*, 324 F.3d 692, 718 (9th Cir. 2003) (reaching the merits despite the fact that "[a]mong the many cases that have been consolidated, there are some individual cases as to which federal jurisdiction may be uncertain," since in some of the consolidated cases "jurisdiction is certain."). Courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Chandler v. Judicial Council of Tenth Circuit*, 398 U.S. 74, 94 (1970) (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821)). This Court has jurisdiction over the McDonald Appellants' appeal, and therefore should decide the merits of their speech and vagueness claims.

## CONCLUSION

The Court should reverse the decision below and find that the McDonald Appellants have made the required showing for preliminary injunctive relief. "[S]uppression of speech by the government can make exposure of falsity more difficult, not less so," and society's "right and civic duty to engage in open, dynamic, rational discourse" "are not well served when the government seeks to orchestrate public discussion through content-based mandates." *Alvarez*, 567 U.S. at 728. California's attempt to control the speech of doctors will not serve the public

interest—rather, it will undermine the public trust. Patients need to believe that the advice they get from their doctors is the doctor's best judgment, not the government-mandated opinion they are required to parrot.

Dated: February 2, 2023          Respectfully submitted,


Daniel R. Suhr
dsuhr@libertyjusticecenter.org
Reilly Stephens
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Phone: 312-637-2280

Mariah Gondeiro, Esq.
mgondeiro@faith-freedom.com
Julianne E. Fleischer, Esq.
jfleischer@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 600-2733
Facsimile: (951) 600-4996


*Attorneys for McDonald Appellants*

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(g)

I certify that this brief complies with the word limit of Cir. R. 32-1, because this brief contains 10,967 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

/s/ Daniel R. Suhr
February 2, 2023

**STATEMENT OF RELATED CASES**

Other than *Couris v. Lawson*, No. 23-55069, which has been

consolidated with this case, the McDonald Appellants are not aware of

any other related proceeding pending before the Ninth Circuit. The

McDonald Appellants are aware of two additional cases challenging AB

2098 pending in the Eastern District of California, *Høeg v. Lawson*, No.

2:22-cv-1980, and *Hoang v. Bonta*, No. 2:22-at-01221.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2023, I electronically filed the forgoing Opening Brief of the McDonald Appellants with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/Daniel R. Suhr
Daniel R. Suhr

No. 22-56220

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

Mark McDonald and Jeff Barke,

*Plaintiffs-Appellants*,

v.

Kristina D. Lawson, in her official capacity as President of
the Medical Board of California et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Central District of California
No. 8:22-cv-01805
Hon. Fred W. Slaughter

---

## APPELLANTS' STATUTORY ADDENDUM

---

Daniel R. Suhr
dsuhr@libertyjusticecenter.org
Reilly Stephens
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Phone: 312-637-2280

Robert H. Tyler, Esq.
btyler@faith-freedom.com
Mariah Gondeiro, Esq.
mgondeiro@faith-freedom.com
Julianne E. Fleischer, Esq.
jfleischer@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 600-2733
Facsimile: (951) 600-4996

*Attorneys for Appellants*

A-001

# INDEX

Cal. Bus. & Prof. Code § 2234 ........................................................... A-003

Cal. Bus. & Prof. Code § 2270 ........................................................... A-005

# Cal Bus & Prof Code § 2234

Deering's California Codes are current through the 2022 Regular Session.

*Deering's California Codes Annotated > BUSINESS & PROFESSIONS CODE (§§ 1 — 30047) > Division 2 Healing Arts (Chs. 1 — 16) > Chapter 5 Medicine (Arts. 1 — 25) > Article 12 Enforcement (§§ 2220 — 2329)*

## § 2234. Unprofessional conduct

The board shall take action against any licensee who is charged with unprofessional conduct. In addition to other provisions of this article, unprofessional conduct includes, but is not limited to, the following:

**(a)** Violating or attempting to violate, directly or indirectly, assisting in or abetting the violation of, or conspiring to violate any provision of this chapter.

**(b)** Gross negligence.

**(c)** Repeated negligent acts. To be repeated, there must be two or more negligent acts or omissions. An initial negligent act or omission followed by a separate and distinct departure from the applicable standard of care shall constitute repeated negligent acts.

**(1)** An initial negligent diagnosis followed by an act or omission medically appropriate for that negligent diagnosis of the patient shall constitute a single negligent act.

**(2)** When the standard of care requires a change in the diagnosis, act, or omission that constitutes the negligent act described in paragraph (1), including, but not limited to, a reevaluation of the diagnosis or a change in treatment, and the licensee's conduct departs from the applicable standard of care, each departure constitutes a separate and distinct breach of the standard of care.

**(d)** Incompetence.

**(e)** The commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician and surgeon.

**(f)** Any action or conduct that would have warranted the denial of a certificate.

**(g)** The failure by a certificate holder, in the absence of good cause, to attend and participate in an interview by the board. This subdivision shall only apply to a certificate holder who is the subject of an investigation by the board.

## History

Added Stats 1980 ch 1313 § 2. Amended Stats 1983 ch 398 § 2; Stats 1996 ch 902 § 3 (SB 2098); Stats 2002 ch 1085 § 21 (SB 1950); Stats 2011 ch 115 § 1 (AB 1127), effective January 1, 2012; Stats 2013 ch 399 § 2 (SB 670), effective January 1, 2014; Stats 2019 ch 456 § 58 (SB 786), effective January 1, 2020; Stats 2019 ch 849 § 4.5 (SB 425), effective January 1, 2020 (ch 849 prevails).

Cal Bus & Prof Code § 2234

Deering's California Codes Annotated
Copyright © 2023 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

**End of Document**

A-004

# Cal Bus & Prof Code § 2270

Deering's California Codes are current through the 2022 Regular Session.

*Deering's California Codes Annotated  >  BUSINESS & PROFESSIONS CODE (§§ 1 — 30047)  >  Division 2 Healing Arts (Chs. 1 — 16)  >  Chapter 5 Medicine (Arts. 1 — 25)  >  Article 12 Enforcement (§§ 2220 — 2329)*

## § 2270. Dissemination of COVID-19 misinformation or disinformation as unprofessional conduct

**(a)** It shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.

**(b)** For purposes of this section, the following definitions shall apply:

**(1)** "Board" means the Medical Board of California or the Osteopathic Medical Board of California, as applicable.

**(2)** "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.

**(3)** "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.

**(4)** "Misinformation" means false information that is contradicted by contemporary scientific consensus contrary to the standard of care.

**(5)** "Physician and surgeon" means a person licensed by the Medical Board of California or the Osteopathic Medical Board of California under Chapter 5 (commencing with Section 2000).

**(c)** Section 2314 shall not apply to this section.

## History

Added Stats 2022 ch 938 § 2 (AB 2098), effective January 1, 2023.

Deering's California Codes Annotated
Copyright © 2023 All rights reserved.

**End of Document**