Nos. 22-56220, 23-55069

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

MARK MCDONALD and JEFF BARKE,
*Plaintiffs-Appellants*,
v.
KRISTINA D. LAWSON, *et al.*,
*Defendants-Appellees*.

————————

MICHAEL COURIS and MICHAEL FITZGIBBONS,
*Plaintiffs-Appellants*,
v.
KRISTINA D. LAWSON, *et al.*,
*Defendants-Appellees*.

————————

On Appeals from the U.S. District Court for the Central District of
California, No. 8:22-cv-01805-FWS-ADS; and the U.S. District Court
for the Southern District of California, No. 3:22-cv-01922-RSH-JLB

————————

# BRIEF OF *AMICI CURIAE* ACLU OF NORTHERN CALIFORNIA AND
# ACLU OF SOUTHERN CALIFORNIA IN SUPPORT OF PLAINTIFFS-
# APPELLANTS

————————

Hannah Kieschnick (SBN 319011)
Shilpi Agarwal (SBN 270749)
Angélica Salceda (SBN 296152)
Chessie Thacher (SBN 296767)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
hkieschnick@aclunc.org
cthacher@aclunc.org
sagarwal@aclunc.org
asalceda@aclunc.org

Peter Eliasberg (SBN 189110)
Melissa Goodman (SBN 289464)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West 8th St.
Los Angeles, CA 90017
(213) 977-9500
peliasberg@aclusocal.org
mgoodman@aclusocal.org

*Counsel for Amici Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A),

*Amici Curiae* state that they do not have a parent corporation and no publicly held

corporation owns 10% or more of their stock.

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF INTEREST ......................................................... 1

INTRODUCTION ...................................................................... 2

ARGUMENT ........................................................................... 5

I.   Under this Court's Well-Established and Recently
     Reaffirmed Framework for Evaluating Healthcare
     Regulations, AB 2098 Regulates Protected Speech,
     and the First Amendment Applies ......................................... 5

II.  The Trial Court Misapplied this Court's Precedent
     to Conclude that AB 2098 Does Not Implicate
     the First Amendment ......................................................... 9

III. Even if AB 2098 Regulates Some Conduct, First
     Amendment Scrutiny Applies Because AB 2098 Is
     Overbroad and Chills Protected Speech ................................ 14

IV.  AB 2098 Is Unconstitutional Because the State Can
     Achieve its Goal of Protecting Patients Using Less
     Restrictive Alternatives, like Laws that Already
     Regulate Physician Conduct ............................................... 16

CONCLUSION ......................................................................... 22

FORM 8 CERTIFICATE OF COMPLIANCE .......................................... 23

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                         **<u>Page(s)</u>**

*Brandenburg v. Ohio*,
   395 U.S. 444 (1969) ......................................................................... 1

*Cobbs v. Grant*,
   8 Cal. 3d 229 (1972) ............................................................... 17, 18

*Conant v. Walters*,
   309 F.3d 629 (9th Cir. 2022) ...........................................*Passim*

*Davis v. Physician Assistant Bd.*,
   66 Cal. App. 5th 227 (2021) ................................................. 17, 18

*Forsyth Cnty., Ga. v. Nationalist Movement*,
   505 U.S. 123 (1992) ...................................................................... 14

*Fuller v. Bd. of Med. Exam'rs*,
   14 Cal. App. 2d 734 (1936) ......................................................... 19

*Madigan v. Telmktg. Assocs., Inc.*,
   538 U.S. 600 (2003) ................................................................ 14, 19

*Klein v. San Diego Cnty.*,
   463 F.3d 1029 (9th Cir. 2006) .................................................... 14

*Mahanoy Area Sch. Dist. v. B.L.*,
   141 S. Ct. 2038 (2021) ................................................................... 1

*NAACP v. Button*,
   371 U.S. 415 (1963) ...................................................................... 13

*Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of*,
   228 F.3d 1043 (9th Cir. 2000) ...................................................... 7

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018) ...........................................................*Passim*

**Cases (Cont'd)**      **Page(s)**

*Nelson v. Gaunt*,
   125 Cal. App. 3d 623 (1981)............................................................... 19

*Pickup v. Brown*,
   740 F.3d 1208 (9th Cir. 2014).................................................*Passim*

*Thomas v. Collins*,
   323 U.S. 516 (1945) ............................................................................ 8

*Thompson v. W. States Med. Ctr.*,
   535 U.S. 357 (2002) .......................................................................... 21

*Thornhill v. Alabama*,
   310 U.S. 88 (1940) ............................................................................ 14

*Tingley v. Ferguson*,
   47 F.4th 1055 (9th Cir. 2022) ...................................................*Passim*

*United States v. Alvarez*,
   567 U.S. 709 (2012) .......................................................................... 19

*United States v. Hansen*,
   25 F.4th 1103 (9th Cir. 2022) ............................................... 1, 14, 15

*United States v. Playboy Ent. Group, Inc.*,
   529 U.S. 803 (2000) .......................................................................... 17

*Yellen v. Bd. of Med. Quality Assurance*,
   174 Cal. App. 3d 1040 (1985)........................................................... 20

**Statutes**

Cal. Bus. & Prof. Code § 2234 ...................................................*Passim*

Cal. Bus. & Prof. Code § 2234.1 ........................................................ 18

Cal. Bus. & Prof. Code § 2270 ...................................................... 3, 8, 9

iv

**Page(s)**

<u>**Other Authorities**</u>

Johnny Diaz, *A San Diego doctor receives a prison sentence for selling a '100 percent' cure for COVID-19*, N.Y. Times (May 30, 2022)................................20

Andres Picon, *Napa doctor convicted of selling fake COVID vaccination cards, remedies*, S.F. Chronicle (Apr. 6, 2022) ..............................................................20

v

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union of Northern California ("ACLU NorCal") and the American Civil Liberties Union of Southern California ("ACLU SoCal") (collectively, "ACLU *Amici*") are affiliates of the national American Civil Liberties Union ("ACLU"), a non-profit, non-partisan civil liberties organization with more than 1.8 million members. The ACLU and its affiliates are dedicated to defending the principles of liberty and equality embodied in the United States Constitution and our nation's civil rights laws. Since its founding in 1920, the ACLU has vigorously defended free speech rights, frequently serving as either direct counsel or *amicus curiae* in key cases before the United States Supreme Court, this Court, and other federal courts. *See, e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021); *United States v. Hansen*, 25 F.4th 1103 (9th Cir. 2022), *cert. granted* -- S. Ct. --, 2022 WL 17544995 (Mem) (Dec. 9, 2022).

As organizations long committed to protecting free speech *and* individual autonomy to make personal medical decisions, ACLU *Amici* have a strong interest

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting this brief. No person, other than *amici*, their members, or their counsel, contributed money intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

in the resolution of this controversy. The ACLU and its affiliates served as direct counsel or *amici curiae* in the three cases from this Court that are central to the resolution of this matter. *See Conant v. Walters*, 309 F.3d 629 (9th Cir. 2022) (ACLU and ACLU NorCal as direct counsel); *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) (ACLU NorCal as *amicus*); *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) (ACLU and ACLU Washington as *amici*). Additionally, ACLU *Amici* served as *amici curiae* in the court below in *McDonald v. Lawson* as well as two similar challenges to AB 2098, *Hoang v. Bonta*, No. 2:22-cv-02147-WBS-AC (E.D. Cal.), and *Høeg v. Newsom*, No. 2:22-cv-01980-WBS-AC (E.D. Cal.). The court below in *Couris v. Lawson* stayed proceedings before ruling on ACLU *Amici*'s application to serve as *amici curiae*.

## **INTRODUCTION**

"An integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients." *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002). Physicians engage in a significant amount of speech before taking more tangible steps to address patients' concerns, like prescribing medicine, performing a procedure, or administering some other form of treatment. They discuss their patient's symptoms, risk factors, and goals; explain treatment options; share their opinion on the advantages and disadvantages to different courses of action; and

ultimately recommend next steps. Healthcare decisions are "deeply personal" and candor between physician and patient is "crucial." *Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2374 (2018) (citation omitted).

Assembly Bill ("AB") 2098[2] threatens that candor. While California is understandably focused on the role of licensed medical professionals during the COVID-19 pandemic, AB 2098 goes too far. According to the State, the law is needed because an "extreme minority" of physicians have used their positions of trust—and popularity on social and legacy media—to propagate what the State deems "false or misleading information" about COVID-19.[3] But rather than employ the existing tools at its disposal, the State has taken a blunt instrument to the entire profession. AB 2098 declares it "unprofessional conduct" for a physician to "disseminate" government-defined "misinformation" or "disinformation" related to COVID-19 to their patient "in the form of treatment or advice." Cal. Bus. & Prof. Code § 2270(a), (b)(3).[4]

---

[2] 2022 Cal. Stat., ch. 938 (AB 2098) (codified at Cal. Bus. & Prof. Code § 2270).

[3] *See* MER-70–71 (Defs.' Req. for Judicial Notice, Ex. B, Assembly Comm. on Bus. & Prof. Report (Apr. 19, 2022) [hereinafter "Apr. 19, 2022 Assembly Rep."]). "MER" refers to the *McDonald* Plaintiffs-Appellants' Excerpts of Record.

[4] ACLU *Amici* focus on the First Amendment analysis but share the *McDonald* and *Couris* Plaintiffs-Appellants' concerns that AB 2098 is impermissibly vague.

AB 2098 is a content-based regulation of speech subject to First Amendment scrutiny because it directly regulates physicians' medical advice and recommendations—speech this Court has protected for the past twenty years. *See Conant*, 309 F.3d at 636–37. Indeed, this Court recently reaffirmed both *Conant* and the speech-conduct "continuum" it has long used to evaluate regulations in the healthcare context and to distinguish between impermissible restrictions on physician speech and permissible regulations of professional conduct. *See Tingley v. Ferguson*, 47 F.4th 1055, 1072–73 (9th Cir. 2022). Despite this precedent, the *McDonald* court below held that AB 2098 is out of reach of the First Amendment as a mere regulation of professional conduct because, according to that court, it affects only how physicians practice medicine. In so holding, the court misplaced AB 2098 along the speech-conduct continuum and misapplied this Court's precedent.

As a speech regulation, AB 2098 must pass strict scrutiny. It does not. AB 2098 is not necessary to keep patients safe because a less restrictive alternative exists: the California Business and Professions Code already regulates unprofessional conduct by physicians to the full extent allowed by the First Amendment. Under section 2234 of that code, physicians can be—and historically have been—disciplined for committing medical fraud, prescribing medically inappropriate treatment, and failing to provide patients with material information to

4

make informed choices, like the availability of conventional treatment options. Inexplicably, the California Medical Board has not taken advantage of its authority under section 2234 to investigate and punish unprofessional conduct related to COVID-19. Requiring California to prove such misconduct before imposing a sanction neither ties officials' hands nor harms patients, particularly when the State cannot show that existing law has fallen so short as to justify sweeping censorship.

Because AB 2098 violates the First Amendment, ACLU *Amici* respectfully urge this Court to reverse the *McDonald* trial court's ruling, vacate the *Couris* trial court's stay, and grant the motions for preliminary injunction. If the Court is not inclined to enjoin the law in full, ACLU *Amici* urge this Court to narrowly construe AB 2098 so that it reaches only conduct by holding that the phrase "or advice" violates the First Amendment and enjoining the State from enforcing that portion of the law.

## **<u>ARGUMENT</u>**

### I. **Under this Court's Well-Established and Recently Reaffirmed Framework for Evaluating Healthcare Regulations, AB 2098 Regulates Protected Speech, and the First Amendment Applies.**

While the government must play a role in licensing physicians and regulating the practice of medicine, the First Amendment strictly limits restrictions on doctor-patient communications. *See NIFLA*, 138 S. Ct. at 2373–75. This Court recently reaffirmed using a "continuum approach" to evaluate whether the

government is interfering with the speech of healthcare providers or instead merely regulating the conduct of the profession. *See Tingley*, 47 F.4th at 1072, 1075. If the former, the First Amendment and strict scrutiny apply. *Id.* at 1072–73. If the latter, the First Amendment does not apply, and the regulation need only be reasonable. *Id.* at 1077–78. This approach safeguards both the free speech rights of physicians to exchange information and opinions, and the government's ability to regulate medical treatment for patient safety.

Whether AB 2098 triggers First Amendment scrutiny turns on where along the speech-conduct continuum the law falls. At one end of the continuum, restrictions on pure speech, such as physicians' "public dialogue," are subject to the most exacting of First Amendment scrutiny. *Id.* at 1072–73. This enhanced protection extends even to a physician's public advocacy for a "position that the medical establishment considers outside the mainstream." *Id.* at 1073 (citing *Pickup v. Brown*, 740 F.3d 1208, 1227 (9th Cir. 2014), *overruled on other grounds by NIFLA*, 138 S. Ct. 2361 (2018)).

At the other end of the continuum, consistent with the government's general police powers, regulations on "professional conduct"—such as performing a particular type of procedure—do not receive First Amendment scrutiny. *Id.* at 1073 (citing *Pickup*, 740 F.3d at 1229). Nor does First Amendment scrutiny apply to regulations on the "practice of medicine" that incidentally involve speech,

including licensing requirements, laws that mandate obtaining informed consent, and prohibitions on malpractice. *Id.* at 1073–74 (quoting *NIFLA*, 138 S. Ct. at 2373).

In *Tingley*, for example, this Court reaffirmed that regulations on treatments provided through words—such as talk therapy designed to alter a patient's sexual orientation or gender identity—still constitute regulations on professional conduct: "States do not lose the power to regulate the safety of medical treatments performed under the authority of a state license merely because those treatments are implemented through speech rather than through scalpel." *Id.* at 1064; *see also, e.g.*, *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1054 (9th Cir. 2000) (rejecting argument that psychoanalysis, as "talking cure," was pure speech because "key component of psychoanalysis" is "*treatment* of emotional suffering and depression") (emphasis added) (internal citation, quotation marks omitted).

At the middle of the speech-conduct continuum, certain speech receives "less protection under the First Amendment," including "commercial speech or compelled disclosures" about the terms of services. *Tingley*, 47 F.4th at 1074 (citing *NIFLA*, 138 S. Ct. at 2372). Some courts, including this one, previously recognized a distinct category of "professional speech"—that is, speech "within the confines of a professional relationship"—that also fell in the middle of the

continuum and so categorically received "diminished" constitutional protection. *See Pickup*, 740 F.3d at 1228. The Supreme Court, however, expressly rejected such a rule in *NIFLA*. *See* 138 S. Ct. at 2371–72, 2374–75. Thus, consistent with *NIFLA* and this Court's precedent, communications between physicians and patients are considered pure speech within the meaning of the First Amendment because physicians "must be able to speak frankly and openly." *Conant*, 309 F.3d at 636–37. Such communications encompass physicians' medical advice and recommendations, including about treatments the government is otherwise permitted to regulate. *See id.* at 632 (federal policy allowing government to revoke DEA prescription authority based solely on physician's *recommendation* that medical marijuana could help patient violated First Amendment); *see also Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring) ("[T]he state may prohibit the pursuit of medicine as an occupation without its license but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought.").

As written, AB 2098 undoubtedly reaches speech protected by the First Amendment under the lines drawn by this Court. It expressly limits the ability of physicians to speak about certain topics to their patients and thereby restricts their ability to communicate their protected advice and opinions. The law defines the prohibited dissemination as a licensed professional's "conveyance of information

from the licensee to a patient under the licensee's care in the form of treatment *or advice*." Cal. Bus. & Prof. Code § 2270(b)(3) (emphasis added). This Court's decision in *Conant* plainly forecloses the State from censoring physicians' discussion, medical advice, and recommendations related to COVID-19 unless the content-based regulation can meet strict scrutiny.[5]

## II.    The Trial Court Misapplied this Court's Precedent to Conclude that AB 2098 Does Not Implicate the First Amendment.

As the foregoing shows, AB 2098 regulates speech under a straightforward application of this Court's speech-conduct continuum. The law explicitly restricts physicians' "advice," and such advice is speech. Despite this evident infirmity, the trial court agreed with the State that AB 2098 reaches only conduct. In so concluding, the trial court misapplied this Court's speech-conduct continuum by first conflating medical advice with medical treatment and then reading into the analysis an additional limitation on doctor-patient communications. These errors

---

[5] Early versions of AB 2098 focused on an "extreme minority" of healthcare practitioners' contribution to "the public discourse" on COVID-19, rather than on doctor-patient communications. *See* Apr. 19, 2022 Assembly Rep., MER-71, 73 (describing as an "illustrative example of the type of behavior" legislation sought to regulate a well-known physician speaking at a public rally and otherwise engaging "in multiple campaigns to stoke public distrust in COVID-19 vaccines"). Disciplining physicians for sharing their opinions in the public square obviously violates the First Amendment, and the Legislature was right to narrow the reach of AB 2098. But as *Amici* explain herein, the Legislature did not narrow the law enough, and AB 2098 continues to penalize protected speech.

notwithstanding, the Court's framework for evaluating healthcare regulations is doctrinally sound and should not be disturbed.

First, the trial court erred by construing the definition of what constitutes medical treatment, and thus conduct, far too broadly. Specifically, it wrongly equated the "medical treatment" a physician "administer[s] . . . to a COVID-19 patient" with the medical "advice" they give such a patient. MER-19. The court then concluded that, because the First Amendment does not protect speech-based medical treatments, physicians engage in professional conduct rather than speech when they advise patients regarding COVID-19. MER-18–19 (quoting *Pickup*, 740 F.3d at 1055). This interpretation parallels the State's: AB 2098 regulates the "practice of medicine" because it applies to a super-category of physician-provided "patient care." State Opp. to Mot. for Prelim. Inj. ("State Opp. to MPI") at 17, ECF No. 50, *McDonald v. Lawson*, No. 8:22-cv-01805-FWS-ADS (C.D. Cal. Oct. 27, 2022). According to the State, this category of care encompasses not just medical treatment but "the *advice and* treatment physicians provide—and the information conveyed in such advice and treatment." *Id.* (emphasis added).

These sweeping interpretations eviscerate the carefully wrought distinction between speech and conduct, threatening to swallow whole the free speech rights of physicians. This Court has not recognized the all-encompassing "patient care" category urged by the State, and it has further declined to construe all clinical

communications or interactions between a physician and their patient as falling into a catch-all category of conduct subject to regulation.

Instead, to strike the balance between protecting physicians' free speech rights and patient safety, the Court has expressly distinguished treatment from the discussions, advice, recommendations, and other information-sharing a physician may engage in leading *up to* the treatment itself. So in *Conant*, the First Amendment applied to a physician's "discussions of the medical use of marijuana," including the "pros and cons" of such use, and the "recommendation" that, even if the physician could not prescribe it, "medical marijuana would likely help a specific patient." 309 F.3d at 634, 637. In *Pickup*, too, the First Amendment protected providers' "discussions about treatment, recommendations to obtain treatment, and expressions of opinions" about treatment even if the First Amendment did not protect the treatment itself. 740 F.3d at 1229. The same in *Tingley*. *See* 47 F.4th at 1073, 1077–78. Clearly, then, while many medical treatments require some speech, this Court does not treat all physician speech as a form of medical treatment subject to regulation.[6]

---

[6] In addition to effectively reading out of AB 2098 the phrase "or advice," the trial court also read into the law an artificial distinction between medical advice and opinions, and any "information underlying the . . . advice." MER-19. According to the court, AB 2098 does not restrict a physician from sharing their "particular medical opinion[s]" or recommendations, just categories of information underlying those opinions and recommendations. *Id.* But even if advice somehow

Second, the trial court took an unduly narrow interpretation of speech by reading into this Court's precedent a qualification that doctor-patient communications must be consistent with the "standard of care" to be considered speech. *See* MER-20 (quoting *Pickup*, 740 F.3d at 1228). The State similarly claimed below that the medical advice in *Conant* was protected as speech only because it was consistent with the standard of care. *See* State Opp. to MPI at 13. This rule fails because it would resurrect something like the "professional speech" doctrine and would subject all doctor-patient communications to lesser First Amendment protection. In fact, the passage from *Pickup* on which the *McDonald* court below relied to make this argument comes directly from this Court's discussion of professional speech at "the midpoint of the continuum"—which is no longer good law following *NIFLA*. *Compare* MER-20 (quoting *Pickup*, 740 F.3d at 1228) and *Pickup*, 740 F.3d at 1228 (discussing professional speech at the "midpoint of the continuum," including "negligent medical advice"), *with Tingley*, 47 F.4th at 1074 ("There is no question that *NIFLA* abrogated the professional speech doctrine, and its treatment of all professional speech *per se* as being subject to intermediate scrutiny.").

---

could be disaggregated from information-sharing in practice, the distinction finds no textual support in AB 2098 and no legal significance under this Court's framework, which recognizes the broad free speech rights of physicians to communicate with patients.

Moreover, the proposed limitation conflicts with the very case law on which it is based. Look again to the conversion-therapy bans at issue in *Pickup* and *Tingley*. It was critical to this Court's First Amendment analyses there that physicians could still talk about, express support for, and even recommend a treatment that both the "medical community" and the States of California and Washington had deemed contrary to the "applicable standard of care and governing consensus at the time." *See Tingley*, 47 F.4th at 1081.

To be sure, the *NIFLA* Court recognized that the First Amendment does not stand in the way of "[l]ongstanding torts for professional malpractice" that harms patients. 138 S. Ct. at 2373 (citing *NAACP v. Button*, 371 U.S. 415, 438 (1963)). The Supreme Court was quick to caution, however, that the government "may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." *Id.* (quoting *NAACP*, 371 U.S. at 439). Healthcare providers who endanger or harm their patients can be held accountable, but "[b]road prophylactic rules in the area of free expression are suspect." *See NAACP*, 371 U.S. at 438 (listing cases). So, where a rule of professional misconduct regulates what amounts to speech, that rule must comply with the First Amendment—and many do. Here, however, the trial court skipped that First Amendment analysis. Instead, it construed AB 2098 as falling outside the area of free expression when, by the law's own terms, AB 2098 applies to advice and thus speech.

**III.    Even if AB 2098 Regulates Some Conduct, First Amendment Scrutiny Applies Because AB 2098 Is Overbroad and Chills Protected Speech.**

Prophylactic, content-based rules like AB 2098 are suspect in part because their "very existence" threatens to chill speech. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) (listing cases). And because the threat of chilled speech is untenable, courts have struck down overbroad laws that may have some constitutional applications, but which also reach a substantial amount of protected speech. *Id.* at 129–30, 133–34; *see also Illinois, ex rel. Madigan v. Telmktg. Assocs., Inc.* ("*Madigan*"), 538 U.S. 600, 619–20 (2003) (distinguishing between constitutional regulations "aimed at fraud" and unconstitutional regulations "aimed at something else in the hope that it would sweep fraud in during the process") (citation omitted). So even if the Court determines that AB 2098 touches on some professional conduct that is properly regulated by the State, AB 2098 should still be subject to First Amendment scrutiny because the law applies to and threatens to chill a significant amount of protected speech.

"A law is overbroad if it 'does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech[.]'" *Klein v. San Diego Cnty.*, 463 F.3d 1029, 1038 (9th Cir. 2006) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940)). Courts apply the overbreadth

doctrine when there is a "realistic danger" that the law will "significantly compromise" the free speech rights of others or where it is "susceptible of regular application to protected expression." *United States v. Hansen*, 25 F.4th 1103, 1109–10 (9th Cir. 2022), *cert. granted* -- S. Ct. --, 2022 WL 17544995 (Mem) (Dec. 9, 2022) (internal citations, quotation marks omitted).

These risks are present here. Given the ambiguities in the reach of AB 2098 highlighted by the *McDonald* and *Couris* Plaintiffs-Appellants, physicians will be loath to speak their minds and share their opinions and recommendations with patients about a rapidly evolving disease with many unknowns. These physicians must somehow hew to the shifting goalposts of a medical consensus and standard of care that are in the State's purview to set. And, at any point, California could determine that a physician has violated AB 2098 for sharing an unconventional opinion deemed contrary to its capricious standards, resulting in the loss of that physician's medical license. The State's briefing below did not assuage such concerns and left ambiguous the scope of the law. With good reason, the district court in the related *Høeg* and *Hoang* cases emphasized "the chilling effect caused by the statute's unclear phrasing and structure" when enjoining AB 2098. *See Høeg v. Newsom*, No. 2:22:-cv-01980-WBS-AC, 2023 WL 414258, at *11 (E.D. Cal. Jan. 25, 2023).

**IV.    AB 2098 Is Unconstitutional Because the State Can Achieve its Goal of Protecting Patients Using Less Restrictive Alternatives, like Laws that Already Regulate Physician Conduct.**

Properly construed as a restriction on protected speech, AB 2098 fails strict scrutiny because it is not narrowly tailored to the State's asserted interests. The legislative record reflects the State's driving concerns in passing AB 2098. First and foremost, the Legislature focused on addressing physicians' public dialogue regarding COVID-19—ironically beyond AB 2098's final scope because the State cannot regulate such speech. *See supra* 12 n.5 And second, the Legislature focused on curtailing physicians who "promot[e] [] treatments and therapies that have no proven effectiveness against the virus" and prescribe what it labeled "ineffective and potentially unsafe" treatments, like ivermectin, hydroxychloroquine, and injecting disinfectants. *See, e.g.*, Apr. 19, 2022 Assembly Rep., MER-70, 72–73; MER-89–90, 93 ((Defs.' Req. for Judicial Notice, Ex. D, Sen. Comm. on Bus., Prof., & Econ. Dev. Report (June 27, 2022)).

AB 2098 is not necessary to address these concerns, however. California has at its disposal existing narrowly tailored laws that govern unprofessional conduct to the full extent tolerated by the First Amendment. Under California Business and Professions Code section 2234, the Medical Board of California ("MBC") "shall take action against any licensee who is charged with unprofessional conduct," which includes, among other things, gross negligence, repeated negligent acts,

16

incompetence, and acts involving "dishonesty." Cal. Bus. & Prof. Code §§ 2234, (b)–(e). California courts have long interpreted the types of conduct the Legislature was concerned about—such as failing to provide patients with sufficient information to make informed health choices, committing medical fraud, and providing patients with medically inappropriate treatment—as falling under section 2234. And strikingly, when considering AB 2098, the Legislature acknowledged that the MBC was "*already fully capable* of bringing an accusation against a physician for this type of misconduct." Apr. 19, 2022 Assembly Rep., MER-72 (emphasis added); *see also* State Opp. to MPI at 5 (citing same). But throughout the legislative process and litigation, the State has failed to meet its burden and explain or offer evidence demonstrating why the existing laws governing unprofessional conduct have fallen short. This failure dooms AB 2098. *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 816 (2000) ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals.").

**Starting with informed consent.** A physician who fails to obtain informed consent or to provide their patient with "adequate information to enable an intelligent choice" about their health can be disciplined under section 2234. *See Cobbs v. Grant*, 8 Cal. 3d 229, 245 (1972); *see also Davis v. Physician Assistant*

*Bd.*, 66 Cal. App. 5th 227, 276–79 (2021) (affirming finding of unprofessional conduct under section 2234(c) when physician assistant failed to disclose information material to patients' healthcare decisions). When recommending or administering treatment, physicians must provide "whatever information is material to the [patient's] decision" to undergo such treatment, which must include both the "available choices" for treatment options and "the dangers inherently and potentially involved in each." *Cobbs*, 8 Cal. 3d at 243, 245.

In addition to general informed-consent requirements, physicians are specifically required to obtain informed consent and to describe "conventional treatment" before recommending or providing unconventional or "alternative or complementary medicine." Cal. Bus. & Prof. Code § 2234.1(a)(1). This provision alone can accomplish most, if not all, of what the State set out to do with AB 2098. And importantly, disciplining physicians for failure to provide adequate material information does not violate the First Amendment because informed-consent requirements are treated as regulations on professional conduct that only incidentally impact speech. *See NIFLA*, 138 S. Ct. at 2373. Thus, even though, under *Conant*, the First Amendment protects physicians' advice about unconventional COVID-19 treatments, the State can still discipline those physicians if they fail to provide patients with the material information necessary to make an informed decision about choosing to undergo such treatments.

18

***Moving to medical fraud.*** A physician who peddles harmful treatments below the standard of care to their patients commits fraud and thus engages in unprofessional conduct based on a dishonest act. *See* Cal. Bus. & Prof. Code § 2234(e); *Nelson v. Gaunt*, 125 Cal. App. 3d 623, 635–36 (1981) (patient stated cause of action for fraud against physician who falsely told patient she would experience "absolutely no side effects" from unsafe treatment that physician had previously been arrested for providing, ultimately leading to patient needing double mastectomy); *see also, e.g.*, *Fuller v. Bd. of Med. Exam'rs*, 14 Cal. App. 2d 734, 739–40, 743 (1936), *abrogated on other grounds by Hughes v. Bd. of Architectural Exam'rs*, 17 Cal. 4th 763 (1998) (affirming revocation of medical license of physician who falsely advertised to patients that he could cure their hernias without surgery).

Disciplining physicians for medical fraud does not violate the First Amendment because "the First Amendment does not shield fraud." *Madigan*, 538 U.S. at 612; *see also United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality op.) ("Where false claims are made to effect a fraud or secure moneys or other valuable considerations . . . , it is well established that the Government may restrict speech without affronting the First Amendment."). Instead of prophylactically censoring vast swaths of protected speech, California could—and should—have relied on the existing prohibitions against medical fraud to respond to any harm

19

that flows from physicians who mislead patients about COVID-19. Indeed, the federal government has done so, successfully prosecuting licensed healthcare providers in California who defrauded patients by marketing and selling, for example, so-called "COVID-19 treatment packs" and "homeoprophylaxis immunization pellets" that were promised to provide "lifelong immunity" to COVID-19 as well as fake COVID-19 vaccination record cards.[7]

**_Continuing with gross negligence and incompetence._** Even if they do not intentionally lead their patients astray, a physician who engages in a course of treatment that is medically inappropriate or otherwise not indicated can be found to be grossly negligent and incompetent, and thus liable for unprofessional conduct. Cal. Bus. & Prof. Code §§ 2234(b), (d). For example, in _Yellen v. Board of Medical Quality Assurance_, 174 Cal. App. 3d 1040 (1985), the California Court of Appeal affirmed the revocation of the medical license of a physician who had a "practice of injecting and prescribing medications which were medically inappropriate and dangerous," even though the physician saw "nothing wrong with the injections and type of prescription given" to a minor patient who ultimately

---

[7] _See_ Johnny Diaz, _A San Diego doctor receives a prison sentence for selling a '100 percent' cure for COVID-19_, N.Y. Times (May 30, 2022), https://tinyurl.com/52pkj5hn; Andres Picon, _Napa doctor convicted of selling fake COVID vaccination cards, remedies_, S.F. Chronicle (Apr. 6, 2022), https://tinyurl.com/ck8rvj46.

died. *Id.* at 1048, 1059. The physician also failed to instruct his minor patient's guardian about appropriate care while ordering these "contraindicated" or "useless" medications. *Id.* at 1058. As with medical fraud, disciplining physicians for prescribing harmful or inappropriate treatments does not violate the First Amendment. *See Conant*, 309 F.3d at 635 (act of prescribing controlled substance constitutes conduct rather than speech within meaning of First Amendment). Thus, California already can discipline physicians for prescribing or administering medically inappropriate or dangerous medications to treat COVID-19.

"If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the Government thought to try." *Conant*, 309 F.3d at 637 (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002)). As in *Conant*, the legislative record in this case reflects that the regulatory body charged with enforcing section 2234 has not taken advantage of what should have been the State's first step. For instance, the Legislature criticized the MBC's "underwhelming enforcement activities" and failure "to take aggressive action against physicians who commit unprofessional conduct." *See* Apr. 19, 2022 Assembly Rep., MER-72. And the Executive Director of the MBC admitted below that, "[t]o date, no physician or surgeon has been disciplined by the Board related to the dissemination of COVID-19 misinformation or dissemination." Decl. of W. Pasifka ISO Opp. to Mot. Prelim. Inj. ¶ 13, ECF 50-

21

2, *McDonald v. Lawson*, No. 8:22-cv-01805-FWS-ADS (C.D. Cal. Oct. 27, 2022). Until California explains the ways in which existing law has fallen short, it cannot justify AB 2098 as a new, overbroad law that sweeps in a significant amount of protected speech.

## **CONCLUSION**

For these reasons, ACLU *Amici* respectfully urge this Court to reverse the *McDonald* district court's order, vacate the *Couris* district court's stay, and grant Plaintiffs-Appellants' motions for preliminary injunction. In the alternative, if the Court is not inclined to enjoin the law in full, ACLU *Amici* respectfully urge this Court to hold that the phrase "or advice" violates the First Amendment and enjoin the State from enforcing that portion of the law.

Dated: February 9, 2023

By: /s/ Hannah Kieschnick
    Hannah Kieschnick
    Shilpi Agarwal
    Angélica Salceda
    Chessie Thacher
    ACLU FOUNDATION OF
    NORTHERN CALIFORNIA
    39 Drumm Street
    San Francisco, CA 94111

Peter Eliasberg
Melissa Goodman
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West 8th St.
Los Angeles, CA 90017

*Counsel for Amici Curiae*

22

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** <u>22-56220, 23-55069</u>

I am the attorney or self-represented party.

**This brief contains 5,031 words,** i excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
     29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
     only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>/s/ Hannah Kieschnick</u>        **Date** <u>February 9, 2023</u>