22-56220, 23-55069

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

**MARK MCDONALD; JEFF BARKE,**

Plaintiffs-Appellants,

v.

**KRISTINA D. LAWSON, in her official capacity as President of the Medical Board of California; et al.,**

Defendants-Appellees.

---

**MICHAEL COURIS; MICHAEL FITZGIBBONS,**

Plaintiffs-Appellants,

v.

**KRISTINA D. LAWSON, in her official capacity as President of the Medical Board of California; et al.,**

Defendants-Appellees.

---

On Appeal from the United States District Court for the
Central District of California, No. 8:22-cv-01805-FWS-ADS;
and On Appeal from the United States District Court for the
Southern District of California, No. 3:22-cv-01922-RSH-JLB

## DEFENDANTS-APPELLEES' CONSOLIDATED ANSWERING BRIEF ON THE MERITS

ROB BONTA
Attorney General of California
GLORIA L. CASTRO
THOMAS S. PATTERSON
Senior Assistant Attorneys General
EDWARD KIM
ANYA M. BINSACCA
Supervising Deputy Attorneys General
CHRISTINA SEIN GOOT
Deputy Attorney General

KRISTIN A. LISKA
Deputy Attorney General
State Bar No. 315994
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone: (415) 510-3916
 Fax: (415) 703-5480
 Email:  Kristin.Liska@doj.ca.gov

*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................... 1

Statement of Jurisdiction ..................................................... 2

Statement of Issues .............................................................. 3

Statutory Addendum ............................................................ 4

Statement of the Case .......................................................... 4

    A.    The Long History of Regulating the Practice of
         Medicine in Anglo-American Law ................................. 4

    B.    Regulation of the Practice of Medicine in
         California ...................................................................... 7

    C.    AB 2098 ...................................................................... 12

    D.    *McDonald v. Lawson* .................................................. 16

    E.    *Couris v. Lawson* ....................................................... 18

Standard of Review ............................................................. 21

Summary of Argument ........................................................ 20

Argument ............................................................................ 23

    I.    AB 2098 Does Not Violate the First Amendment ................ 23

    A.    AB 2098 Is a Permissible Regulation of
         Professional Conduct ................................................... 24

         1.    AB 2098 Regulates Professional Conduct ......... 24

         2.    AB 2098 Meets Rationality Review................... 34

    B.    AB 2098 Is Constitutional as Part of the Long-
         Standing Tradition of Regulating the Practice of
         Medicine ..................................................................... 35

    C.    AB 2098 Meets Strict Scrutiny, if Applicable ............. 39

         1.    AB 2098 Serves a Compelling State Interest ..... 40

         2.    AB 2098 Is Narrowly Tailored to Serve
            Those Interests .................................................. 42

**TABLE OF CONTENTS**
**(continued)**

**Page**

II.    AB 2098 Is Not Impermissibly Vague.................................... 48

    A.    AB 2098 Is Clear as to What It Regulates.................... 48

    B.    If Any Aspects of AB 2098 Were Vague, the Remedy Would Be Severance ..................................... 56

III.    The Remaining Factors Weigh Against Injunctive Relief...... 58

Conclusion ..................................................................................... 61

Statement of Related Cases........................................................... 62

Certificate of Compliance ............................................................. 64

Statutory Addendum ..................................................................... 65

# TABLE OF AUTHORITIES

**Page**

### CASES

*Air Wis. Airlines Corp. v. Hoeper*
  571 U.S. 237 (2014)................................................................. 51

*Am. Beverage Ass'n v. City of San Francisco*
  916 F.3d 749 (9th Cir. 2019) ........................................... 20, 59

*Arce v. Douglas*
  793 F.3d 968 (9th Cir. 2015) ................................................. 48

*Arnett v. Dal Cielo*
  14 Cal. 4th 4 (1996) ..............................................................7

*Avivi v. Centro Medico Urgente Med. Ctr.*
  159 Cal. App. 4th 463 (2008) ................................................ 51

*Bickham v. Grant*
  861 So. 2d 299 (Miss. 2003)................................................. 10

*Booth v. United States*
  155 F. Supp. 235 (Ct. Cl. 1957).............................................6

*Bowman v. Woods*
  1 Greene 441 (Iowa 1848) ......................................................6

*Brown v. Colm*
  11 Cal. 3d, 639 (1974) .......................................................... 10

*Cal. Redevelopment Ass'n v. Matosantos*
  53 Cal. 4th 231 (2011) .................................................... 56, 57

*Carroll v. Richardson*
  110 S.E.2d 193 (Va. 1959) .....................................................8

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Carson v. Am. Brands, Inc.*
450 U.S. 79 (1981) ....................................................................3

*Collins v. Texas*
223 U.S. 288 (1912) ................................................................ 36

*Conant v. Walters*
309 F.3d 629 (9th Cir. 2002) ....................................... 30, 31, 32

*Cross v. Guthrey*
2 Root 90 (Conn. 1794) .............................................................5

*Davis v. Walker*
745 F.3d 1303 (9th Cir. 2014) ...................................................3

*Dent v. West Virginia*
129 U.S. 114 (1889) ........................................................... 37, 42

*Doe v. Harris*
772 F.3d 563 (9th Cir. 2014) .................................................. 50

*Donaldson v. Maffucci*
156 A.2d 835 (Penn. 1959) ........................................................6

*Douglas v. Bussabarger*
438 P.2d 829 (Wash. 1968) ..................................................... 10

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014) ................................................ 58

*Dunman v. Raney*
176 S.W. 339 (Ark. 1915) .........................................................8

*Frisby v. Schultz*
487 U.S. 474 (1988) ............................................................... 42

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Fuller v. Bd. of Med. Exam'rs*
   14 Cal. App. 2d 734 (1936) ........................................................7

*Gammoh v. City of La Habra*
   395 F.3d 1114 (9th Cir. 2005) ................................................. 54

*Garcia v. Google. Inc.*
   786 F.3d 733 (9th Cir. 2015) ................................................... 20

*Garrison v. Louisiana*
   379 U.S. 64 (1964).................................................................. 51

*Goldfarb v. Va. State Bar*
   421 U.S. 773 (1975)................................................................ 41

*Hawker v. New York*
   170 U.S. 189 (1898)................................................................ 36

*Herrera v. City of Palmdale*
   918 F.3d 1037 (9th Cir. 2019) ...................................................3

*Hewitt v. Charier*
   33 Mass. (16 Pick.) 353 (1835) .................................................6

*Hill v. Colorado*
   530 U.S. 703 (2000)........................................................... 55, 56

*Holder v. Humanitarian Law Project*
   561 U.S. 1 (2010)................................................................... 27

*Howard v. Grover*
   28 Me. 97 (1848) ......................................................................6

*Kearl v. Bd. of Med. Quality Assurance*
   189 Cal. App. 3d 1040 (1986) ............................................. 9, 10

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Keck v. Collins*
    357 P.3d 1080 (Wash. 2015) .................................................. 10

*Kenneally v. Med. Bd.*
    27 Cal. App. 4th 489 (1994) .................................................. 36

*Klein v. City of San Clemente*
    584 F.3d 1196 (9th Cir. 2009) ........................................... 3, 20

*Kolender v. Lawson*
    461 U.S. 352 (1983) .............................................................. 48

*Lambert v. Yellowley*
    272 U.S. 581 (1926) .............................................................. 36

*Legal Services Corp. v. Velazquez*
    531 U.S. 533 (2001) ......................................................... 30, 32

*Levett v. Etkind*
    265 A.2d 70 (Conn. 1969) ....................................................... 6

*Levil Metals Corp. v. Parr-Richmond Terminal Co.*
    817 F.2d 1448 (9th Cir. 1987) ............................................... 56

*Lewis v. Superior Ct.*
    3 Cal. 5th 561 (2017) ............................................................ 40

*Maryland v. King*
    567 U.S. 1301 (2013) ............................................................ 59

*Mazurek v. Armstrong*
    520 U.S. 968 (1997) .............................................................. 20

*Melendres v. Arpaio*
    695 F.3d 990 (9th Cir. 2012) ................................................ 58

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Nash v. Royer*
127 S.E. 356 (N.C. 1925) ........................................................................ 10

*Nat'l Institute of Family & Life Advocates v. Becerra* (*NIFLA*)
138 S. Ct. 2361 (2018)........................................................... 24, 27, 35, 36

*People v. Phippin*
37 N.W. 888 (1888) .....................................................................................5

*Pickup v. Brown*
740 F.3d 1208 (9th Cir. 2014) ........................................................ *passim*

*Pimentel v. Dreyfus*
670 F.3d 1096 (9th Cir. 2011) ................................................................ 20

*Privitera v. Cal. Bd. of Med. Quality Assurance*
926 F.2d 890 (9th Cir. 1991) .....................................................................3

*Randall v. State Bd. Of Medical Exam'rs*
110 Cal. App. 61 (1930) .............................................................................7

*Recht v. Morrisey*
32 F.4th 398 (4th Cir. 2022) .................................................................... 40

*Reed v. Town of Gilbert*
576 U.S. 155 (2015)................................................................................... 39

*Roman Catholic Diocese of Brooklyn v. Cuomo*
141 S. Ct. 63 (2020)................................................................................... 41

*S. Bay United Pentecostal Church v. Newsom*
140 S. Ct. 1613 (2020).............................................................................. 12

*Sinz v. Owens*
33 Cal. 2d 749 (1949) ............................................................................... 10

## TABLE OF AUTHORITIES
### (continued)

**Page**

*State v. Heath*
   101 N.W. 429 (1904) ................................................................5

*Stormans, Inc. v. Selecky*
   586 F.3d 1109 (9th Cir. 2009) ................................................ 56

*Tingley v. Ferguson*
   47 F.4th 1055 (9th Cir. 2022) ........................................ *passim*

*Titus v. Dep't of Corrections*
   496 P.3d 412 (Alaska 2021) .................................................. 10

*Trowbridge v. United States*
   703 F. Supp. 2d 1129 (D. Idaho 2010) .................................. 51

*Truman v. Thomas*
   27 Cal. 3d 285 (1980) ...................................................... 37, 41

*Tunkle v. Regents of the Univ. of Cal.*
   60 Cal. 2d 92 (1963) ............................................................. 11

*United States v. Harris*
   705 F.3d 929 (9th Cir. 2013) .................................................. 54

*Valle del Sol, Inc. v. Whiting*
   732 F.3d 1006 (9th Cir. 2013) ............................................... 48

*Vivid Entm't, LLC v. Fielding*
   774 F.3d 566 (9th Cir. 2014) ................................................. 56

*Waln v. Dysard Sch. Dist.*
   54 F.4th 1152 (9th Cir. 2022) ................................................ 39

*Watson v. Maryland*
   218 U.S. 173 (1910) ............................................................... 42

**TABLE OF AUTHORITIES**
(continued)

Page

*Williams-Yulee v. Fla. Bar*
    575 U.S. 433 (2015)...........................................................................46, 47

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008)............................................................................20, 59

*Wollschlaeger v. Governor of Fla.*
    848 F.3d 1293 (11th Cir. 2017) .............................................................32

**STATUTES**

United States Code, Title 28
    § 1292 ..............................................................................................2

1876 Cal. Stat., ch. 518
    § 1 .....................................................................................................7
    § 10 ...................................................................................................7

2022 Cal. Stat., ch. 938 (Assembly Bill 2098) ....................................*passim*
    § 1(a) ...............................................................................................13
    § 1(b) ...............................................................................................13
    § 1(d) ..........................................................................................14, 41
    § 1(e) ..........................................................................................13, 41
    § 1(f) ...............................................................................................14
    § 2(a) ..........................................................................................15, 49
    § 2(b)(2) ...........................................................................................15
    § 2(b)(3) ..........................................................................15, 27, 45, 49
    § 2(b)(4) ......................................................................................15, 49

Ala. Code § 34-24-360...........................................................................26

Nev. Rev. Stat. § 630.304 ......................................................................26

Or. Rev. Stat. § 677.190..........................................................................26

# TABLE OF AUTHORITIES
## (continued)

**Page**

California Business and Professions Code

§ 741(a)(1) ................................................................. 26
§ 741(a)(2) ................................................................. 25
§ 2001.1 .......................................................................8
§ 2004 .........................................................................8
§ 2220 ....................................................................... 11
§ 2220(a) ................................................................... 11
§ 2234 .................................................................... 8, 9
§ 2234(b) .............................................................. 9, 60
§ 2234(c) .............................................................. 9, 60
§ 2234(d) .............................................................. 9, 60
§ 2234(e) .....................................................................9
§ 2234.1 ................................................................... 26
§ 2249(a) .....................................................................9
§ 2257 .........................................................................9
§ 2259 .........................................................................9
§ 2259.5 ......................................................................9
§ 2266 .........................................................................9
§ 2270(a) ................................................................... 15
§ 2270(b)(2) .............................................................. 15
§ 2270(b)(3) .............................................................. 15
§ 2270(b)(4) .............................................................. 15
§ 3600 .........................................................................9
§ 3600-1 ......................................................................9
§ 3600-2 ......................................................................9
§ 3600-5 ......................................................................9

**CONSTITUTIONAL PROVISIONS**

United States Constitution

First Amendment ............................................. *passim*
Fourteenth Amendment .................................. *passim*

## TABLE OF AUTHORITIES
### (continued)

**Page**

**COURT RULES**

Federal Rules of Appellate Procedure
    Rule 4(a)(1).............................................................................. 33

Federal Rules of Civil Procedure
    Rule 11(b) .............................................................................. 32
    Rule 11(c) .............................................................................. 32

**OTHER AUTHORITIES**

C. Joseph Stetler, *The History of Reported Medical Malpractice Professional Liability Cases*, 30 Temple L.Q. 366 (1957) .......................5

CACI 501 ....................................................................................... 51

*Consensus*, Cambridge Dictionary, *available at* https://dictionary.cambridge.org/us/dictionary/english/consensus ................................................................................ 52

*Consensus*, Merriam Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/consensus ..................... 52

David Johnson & Humayun J. Chaudhry, *The History of the Federation of State Medical Boards: Part One*, 98 J. Med. Reg. 20 (2012) ............................................................................5

Elizabeth Cohen, *Covid-19 Vaccine Ads Expected in Next Few Weeks as Part of $250 Million Biden Administration Campaign*," CNN.com (March 15, 2021), https://www.cnn.com/2021/03/15/health/covid-19-vaccine-ads-hhs/index.html .................................................................. 47

Harrison Blythe, Note, *Physician-Patient Speech: An Analysis of the State of Patients' First Amendment Rights to Receive Accurate Medical Advice*, 65 Case W. Res. L. Rev. 795, 803 (2015) ................................................................................. 28

# TABLE OF AUTHORITIES
## (continued)

**Page**

Louis G. Caldwell, *Early Legislation Regulating the Practice of Medicine*, 18 Ill. L.R. 225 (1923-24)..........................................................4

Paula Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201, 225-28 (1994)............................ 37

Rob Kuznia et al., *They Take an Oath To Do No Harm, but These Doctors Are Spreading Misinformation About the Covid Vaccines*, CNN.com (Oct. 20, 2021) ........................................... 14

Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*," 2007 U. Ill. L. Rev. 939, 950-951 (2007).................................................. 25, 29

Washington Dep't of Transportation, *Tacoma Narrows Bridge History*, https://www.wsdot.wa.gov/tnbhistory/...................................... 34

**INTRODUCTION**

States have long regulated the practice of medicine within their borders, to protect the residents who place their trust on matters of life and death in medical professionals.  A critical and universal feature of that regulation is the requirement that physicians adhere to the standard of care when treating their patients.  And as part of that requirement, a doctor who has undertaken the responsibility to treat a particular patient may not advise the patient to rely on fraudulent or untested therapies or give other instructions about treatment that fall below the standard of care.  Although AB 2098, the statute challenged in this case, is being litigated in the context of the COVID-19 pandemic, it is part of this long-standing tradition of regulation: it simply requires that the advice and treatment doctors provide to their patients not contain false information and fall below the standard of care.

Plaintiffs contend that AB 2098 impermissibly restricts their speech under the First Amendment and is unduly vague under the Fourteenth Amendment.  Their primary contention is that AB 2098 interferes with a doctor's ability to voice his or her candid beliefs to patients.  But States may permissibly regulate the professional conduct of doctors and the speech used to effectuate that conduct, such as advice used to treat and care for patients.  Such regulations serve to protect the public from substandard medical

1

treatment.  And doctors' traditional ability to challenge the established consensus does not equate to a constitutional right to provide, as part of a patient's treatment and care, advice that is below the standard of care.  These principles at the core of regulating the medical practice allow for a wide scope of frank advice while protecting patients.  They are uncontroversial and followed by doctors every day.

AB 2098 adheres to these same principles and protections.  It simply holds doctors to the standard of care when treating and advising patients concerning COVID-19.  Plaintiffs' arguments that AB 2098 is subject to strict scrutiny are inconsistent with the long tradition of state regulation of the practice of medicine and this Court's precedents recognizing the State's ability to regulate speech incident to treating patients.  They would leave patients vulnerable to harm in areas well beyond the COVID-19 context of this case.  This Court should deny injunctive relief.

## STATEMENT OF JURISDICTION

Defendants agree with the Statement of Jurisdiction set forth by the plaintiffs in the *McDonald* and *Couris* matters in this consolidated appeal.

Defendants also agree that this Court has jurisdiction to hear the appeal of the *Couris* matter under 28 U.S.C. § 1292.  While a stay typically does not constitute a final judgment that is appealable, this Court has recognized

2

circumstances when a party can appeal from a stay. *Herrera v. City of Palmdale*, 918 F.3d 1037, 1042-43 (9th Cir. 2019). One of those circumstances is when the trial court's stay order functions as a denial of injunctive relief. *See Privitera v. Cal. Bd. of Med. Quality Assurance*, 926 F.2d 890, 893-94 (9th Cir. 1991) (citing *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981)). By leaving AB 2098 in effect as to the plaintiffs in that matter, the stay order in *Couris* effectively denies the plaintiffs' motion for a preliminary injunction. While defendants do not agree that AB 2098 violates any constitutional rights, this Court has recognized that a violation of constitutional rights constitutes irreparable harm. *E.g.*, *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009). To the extent that plaintiffs are correct that AB 2098 violates their constitutional rights, they would be experiencing irreparable harm because of the stay order. And "[a]lthough the district court's stay order could theoretically be modified," the district court did not indicate any intent to do so. *Davis v. Walker*, 745 F.3d 1303, 1309 (9th Cir. 2014). Given these circumstances, the stay order operates as a functional denial of injunctive relief and is appealable.

## STATEMENT OF ISSUES

1.    Whether a State, consistent with the First Amendment, may clarify that unprofessional conduct for doctors includes providing treatment

3

and advice that is contrary to the medical standard of care and contains false information.

2.    Whether the professional regulation of doctors in California's AB 2098 is unconstitutionally vague.

## STATUTORY ADDENDUM

The relevant statutory text is included in an addendum at the end of the brief.

## STATEMENT OF THE CASE

### A.   The Long History of Regulating the Practice of Medicine in Anglo-American Law

Governmental examination, licensing, and oversight of those practicing medicine goes back hundreds of years. In 1511, the English Parliament passed a statute prohibiting the practice of medicine and surgery without examination and approval by the local bishop. Louis G. Caldwell, *Early Legislation Regulating the Practice of Medicine*, 18 Ill. L.R. 225, 229 (1923-24). In 1518, King Henry VIII created the College of Physicians and gave it the power to license and examine candidates practicing in London and to punish practitioners who "did not well exercise their faculty." *Id.* at 230.

The American colonies likewise passed laws limiting who could practice medicine and surgery. *Caldwell*, *supra*, at 233-235. By 1910,

4

nearly every state had established a regulatory body to govern the practice of medicine by examining and licensing practitioners and by overseeing practitioners' professional conduct. David Johnson & Humayun J. Chaudhry, *The History of the Federation of State Medical Boards: Part One*, 98 J. Med. Reg. 20, 22 (2012). Such regulatory oversight served to protect the public from incompetent or fraudulent practitioners and the harm they can cause. *Id.*[1]

As part of this tradition of regulation, Anglo-American law has long held doctors liable for substandard care in widely litigated medical malpractice cases. C. Joseph Stetler, *The History of Reported Medical Malpractice Professional Liability Cases*, 30 Temple L.Q. 366, 367 (1957) (noting English legal decisions dating to 1400s). From the earliest published decisions in American courts, the legal standard employed to determine whether physician care was actionably negligent was whether the physician had exercised due care and skill. *E.g.*, *Cross v. Guthrey*, 2 Root 90, 91 (Conn. 1794) (allowing suit against doctor who had acted in an "unskillful,

---

[1] *See also, e.g.*, *State v. Heath*, 101 N.W. 429, 431 (1904) (statute regulating practice of medicine served to "protect the people from the consequences of ignorance or incapacity, as well as deception and fraud" from medical practitioners); *People v. Phippin*, 37 N.W. 888, 895 (1888) (statute regulating practice of medicine served to protect public from "charlatans" and "quackery").

5

ignorant and cruel manner, contrary to all the well-known rules and principles of practice" in operating on a patient). Thus, by the mid-1800s, there was "no doubt" that physicians and surgeons undertaking to practice these professions were responsible "for that degree of skill and capacity which ordinarily belong to those who practi[c]e them." *Hewitt v. Charier*, 33 Mass. (16 Pick.) 353, 354 (1835); *see also, e.g.*, *Howard v. Grover*, 28 Me. 97, 101 (1848); *Bowman v. Woods*, 1 Greene 441, 443 (Iowa 1848). Over time, this would become known as the "standard of care"—a standard designed to protect patients by ensuring that a patient's individual physician does not fall below the standard of competence and diligence of the profession at large.[2]

---

[2] *See, e.g.*, *Levett v. Etkind*, 265 A.2d 70, 73 (Conn. 1969) ("standard of care" is the "degree of skill and care which physicians in the same general neighborhood and in the same general line of practice ordinarily have and exercise in like cases"); *Donaldson v. Maffucci*, 156 A.2d 835, 838 (Penn. 1959) ("standard of care" is "well-settled" to be "the skill and knowledge usually possessed by physicians in the same or a similar locality"); *Booth v. United States*, 155 F. Supp. 235, 238 (Ct. Cl. 1957) ("standard of care" is "'reasonable and ordinary care, skill, and diligence as physicians and surgeons in good standing . . . ordinarily have and exercise in like cases'" (citation omitted)).

### B.    Regulation of the Practice of Medicine in California

California, too, has been part of this long-standing tradition of regulating the practice of medicine to protect the public. *See Arnett v. Dal Cielo*, 14 Cal. 4th 4, 7 (1996).  Since at least 1876, California has regulated the practice of medicine by imposing licensing and training requirements on medical practitioners. *See* 1876 Cal. Stats., ch. 518, p. 792, § 1 (included at McDonaldER-63).[3]  The 1876 Act also permitted licenses to be refused or revoked for unprofessional conduct. *Id.*, § 10 (included at McDonaldER-64).  Thus, "[s]ince the earliest days of regulation," the State has sought to "protect the public against incompetent, impaired, or negligent physicians, and, to that end," regulators have "been vested with the power to revoke medical licenses on grounds of unprofessional conduct." *Arnett*, 14 Cal. 4th at 7.  And also since the earliest days, unprofessional conduct in California has encompassed, in some circumstances, a treating practitioner's speech[4]—

---

[3] The 1876 Act was included as Exhibit A to Defendants' Request for Judicial Notice below.  This brief cites to the exhibits to Defendants' Request for Judicial Notice as included in the *McDonald* Excerpts of Record.  Exhibits A-F to Defendants' Requests for Judicial Notice filed in the trial court in both *McDonald* and *Couris* are identical.

[4] *E.g.*, *Fuller v. Bd. of Med. Exam'rs*, 14 Cal. App. 2d 734, 740-41 (1936) (upholding sanctions on physician who made false claims about ability to treat hernias), *abrogated on other grounds by Webster v. Bd. of Dental Examiners*, 17 Cal. 2d 534 (1941); *Randall v. State Bd. Of Medical*

7

just as cases in other states have recognized that a practitioner's speech can constitute malpractice.[5]

In California today, the practice of medicine is regulated primarily by the Medical Board of California (Board), which regulates physicians and surgeons by issuing or denying licenses, imposing discipline for unprofessional conduct, and enforcing the statutes governing the practice of medicine. Cal. Bus. & Prof. Code § 2004; *see also* CourisER-9; SER-4.[6] In carrying out its duties, the Board's highest priority is protection of the public. Cal. Bus. & Prof. Code § 2001.1.

The governing statutes require the Board to "take action against any licensee who is charged with unprofessional conduct." Cal. Bus. & Prof.

---

*Exam'rs*, 110 Cal. App. 61, 62-63 (1930) (examining but rejecting claim that physician committed misconduct by advertising he could cure any sexual disease).

[5] *E.g.*, *Carroll v. Richardson*, 110 S.E.2d 193, 197 (Va. 1959) (examining whether facts supported a claim of negligence based on failure to follow the ordinary practice in area advising patients to remain seated after blood draw); *Dunman v. Raney*, 176 S.W. 339, 342 (Ark. 1915) (affirming jury instruction against argument that it assumed defendant doctor was under a duty to give instructions since it left it to the jury to decide if the doctor had a duty to give instructions or negligently failed to do so).

[6] The Board regulates the practice of allopathic physicians and surgeons. Osteopathic practitioners are regulated separately by the Osteopathic Board of Medicine. *See* Cal. Bus. & Prof. Code §§ 3600-1, 3600-5. Both boards follow the same statutory code sections as to misconduct and disciplinary procedures. *Id.* §§ 3600, 3600-2.

Code § 2234.  The statute does not give a comprehensive list of everything that constitutes unprofessional conduct.  *See id.*  However, certain kinds of misconduct are expressly noted, including incompetence, *id.* § 2234(d), "[t]he commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician and surgeon," *id.* § 2234(e); failure to maintain adequate and accurate records, *id*. § 2266; failure to provide a required standardized summary of information before silicone implant surgery, breast cancer treatments, or collagen injections, *id*. §§ 2257, 2259, 2259.5; and failure to provide a standardized summary describing in layperson's terms symptoms and methods of diagnoses for gynecological cancer, *id*. § 2249(a).

Section 2234 also provides that "gross negligence," "repeated negligent acts," and "incompetence" constitute unprofessional conduct.  Cal. Bus. & Prof. Code § 2234(b), (c), (d).  "Gross negligence" is defined as "the want of even scant care" or "an extreme departure from the standard of care," *Kearl v. Bd. of Med. Quality Assurance*, 189 Cal. App. 3d 1040, 1052 (1986) (citation omitted), while "negligence" is a "simple departure" from the current standard of care, SER-10, 38.

Much as in other States, the "standard of care" is "that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by

9

members of their profession under similar circumstances." *Sinz v. Owens*, 33 Cal. 2d 749, 753 (1949) (citation omitted).[7] Typically, the standard of care is established through expert testimony. *Sinz*, 33 Cal. 2d at 753. Incompetence, in turn, is defined as "an absence of qualification, ability or fitness to perform a prescribed duty or function." *Kearl v. Bd. of Med. Quality Assurance*, 189 Cal. App. 3d 1040, 1054 (1986) (citation omitted). Thus, the general standard of care is not set by the State but rather is determined by the standard prevailing in the relevant medical community at the time the medical treatment is rendered. *See Brown v. Colm*, 11 Cal. 3d, 639, 644-47 (1974).

The "standard of care" concept encompasses the understanding that the standard of care evolves. A physician must "keep abreast of the times, and a departure from approved methods in general use . . . will render him liable, however good his intentions may have been." *Nash v. Royer*, 127 S.E. 356, 360 (N.C. 1925) (citation omitted); *see also Douglas v. Bussabarger*, 438 P.2d 829, 837 (Wash. 1968) (en banc) ("[T]oday's rural practitioner . . . is expected to keep himself apprised of recent developments as they are

---

[7] *Accord, e.g.*, *Titus v. Dep't of Corrections*, 496 P.3d 412, 416 (Alaska 2021) (similar definition of "standard of care"); *Keck v. Collins*, 357 P.3d 1080, 1086 (Wash. 2015) (en banc) (same); *Bickham v. Grant*, 861 So. 2d 299, 303 (Miss. 2003) (same).

10

regularly published in medical journals."); *Tunkle v. Regents of the Univ. of Cal.*, 60 Cal. 2d 92, 104 (1963) (holding a patient's waiver of liability in exchange for admission to a charitable research hospital to be void as a matter of public policy despite hospital's claim that the standard of care in a research facility will evolve quickly). The medical community must be trusted "to treat our ailments and update their recommendations on the governing standard of care" as knowledge evolves. *Tingley v. Ferguson*, 47 F.4th 1055, 1081 (9th Cir. 2022); *see also* SER-9, 10, 36, 37.

Part of the Board's duties include administering a multi-step process for allegations of professional misconduct. Cal. Bus. & Prof. Code § 2220. The Board is required to respond to all complaints of professional misconduct, whether "from the public, other licensees, from health care facilities or from the board [itself]," including anonymous complaints. *Id.* § 2220(a). Upon receiving a complaint, the Board's staff conducts a review to determine whether the Board has jurisdiction over the alleged misconduct and whether there is sufficient evidence of a violation to proceed. CourisER-9; SER-4.

If jurisdiction and sufficient evidence exist, the case is referred for further investigation. CourisER-9; SER-4. Few complaints get to this point: data from fiscal year 2019-2020, the most recent available, shows that of

11

10,868 complaints, only 1,956 turned into an investigation. CourisER-10; SER-5. During the investigation process, a medical consultant will examine the record and determine whether there is a potential violation of the standard of care. CourisER-9, 10; SER-4, 5. If the consultant determines there is a potential violation, the case is referred for further review by an outside medical expert to further independently determine if a violation of the standard of care or misconduct occurred. CourisER-10; SER-5. Should either the consultant or the independent expert determine there is not sufficient evidence to show a violation, the investigation will be closed. CourisER-10; SER-5. The Board is required to maintain confidentiality throughout this process. CourisER-10; SER-5.

### C.   AB 2098

AB 2098 was enacted as a continuation of this long-standing history of regulating the medical practice. COVID-19 emerged in the United States in March 2020 as "a novel severe acute respiratory illness" with "no known cure, no effective treatment, and no vaccine" at the beginning of the pandemic. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring). As the Legislature found, at the time of AB 2098's enactment "[t]he global spread of . . . COVID-19 ha[d] claimed the lives of over 6,000,000 people worldwide, including nearly

12

90,000 Californians." 2022 Cal. Stat., ch. 938 ("AB 2098"), § 1(a).

Vaccines have now played a critical role in helping to stem the spread of the

disease and reduce its severity: the Legislature cited data from the Federal

Centers for Disease Control and Prevention showing that "unvaccinated

individuals are at a risk of dying from COVID-19 that is 11 times greater

than those who are fully vaccinated." AB 2098, § 1(b); *see also*

McDonaldER-72. Yet, as the legislative history recounted, as of July 21,

2022, a quarter of those over age five were not vaccinated. McDonaldER-

103. Research at that time estimated that "2 million to 12 million people in

the US were unvaccinated against COVID-19 because of misinformation or

disinformation." McDonaldER-91; *see also* AB 2098, § 1(d). Such

misinformation included myths, for instance, that the vaccines contain

microchips, would make a person magnetic, or would change someone's

DNA. McDonaldER-91.

The Legislature found it particularly concerning that some of this

medically inaccurate information came from physicians. The legislative

findings for AB 2098 note that "[m]ajor news outlets have reported that

some of the most dangerous propagators of inaccurate information regarding

the COVID-19 vaccines are licensed health care professionals." AB 2098,

13

§ 1(e); *see also* McDonaldER-73, 91, 92.[8]  This behavior, the Legislature noted, would run contrary to a doctor's "duty to provide their patients with accurate, science-based information."  AB 2098, § 1(f).  In addition, "[p]hysicians and healthcare professionals play a critical role in keeping communities healthy," and "[a] physician's recommendation and information sharing will educate and inform decisions made by their patients."  McDonaldER-92.  For this reason, whether a doctor provides accurate information to her patient "will ultimately impact [that] patient's health."  McDonaldER-92.

As explained in the legislative history, existing statutes already provide sanctions for repeated instances of negligence or a single instance of gross negligence.  *E.g.*, McDonaldER-93.  Some instances of spreading misinformation about COVID-19 would arguably already have fallen within these existing provisions.  McDonaldER-74.  The Legislature enacted AB 2098, however, to "confirm that in California, physicians who disseminate

---

[8] *See, e.g.*, Rob Kuznia et al., *They Take an Oath To Do No Harm, but These Doctors Are Spreading Misinformation About the Covid Vaccines*, CNN.com (Oct. 20, 2021), https://www.cnn.com/2021/10/19/us/doctors-covid-vaccine-misinformation-invs/index.html (last accessed Mar. 2, 2023) (discussing specific doctors who claimed that the COVID-19 vaccines make people magnetic, that a woman who sleeps with a vaccinated man will become infertile, or that the vaccine will make women infertile).

14

COVID-19 misinformation or disinformation" to their patients could be subject to formal discipline.  McDonaldER-74.

AB 2098 provides that "[i]t shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines."  AB 2098, § 2(a) (codified at Cal. Bus. & Prof. Code § 2270(a)).  It defines "disseminate" as the "conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice."  AB 2098, § 2(b)(3) (codified at Cal. Bus. & Prof. Code § 2270(b)(3)).  "Misinformation" is defined as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."  *Id.*, § 2(b)(4) (codified at Cal. Bus. & Prof. Code § 2270(b)(4)).  And "disinformation" is defined as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead."  *Id.*, § 2(b)(2) (codified at Cal. Bus. & Prof. Code § 2270(b)(2)).  The statute took effect January 1, 2023.

### D. *McDonald v. Lawson*

Plaintiffs Jeff Barke and Mark McDonald are doctors licensed by the Board. McDonaldER-47, 54. Both plaintiffs allege that they have been "outspoken" about the "flaws [they] see in the public health response to the COVID-19 pandemic." McDonaldER-49, 56. On October 4, 2022, plaintiffs filed suit against California Attorney General Rob Bonta and the members of the Board in their official capacities. McDonaldER-35. They contend that AB 2098 violates their First Amendment rights because it chills medical professionals' protected speech and is void for vagueness under the Fourteenth Amendment. McDonaldER-35. Shortly after filing suit, plaintiffs filed a motion for a preliminary injunction. McDonaldER-35. The trial court concluded that the plaintiffs had failed to demonstrate standing to pursue their claims. McDonaldER-44. As a result, the court denied the requested injunction and dismissed the action with leave to amend. McDonaldER-44.

Plaintiffs subsequently filed an amended complaint and a second motion for a preliminary injunction. McDonaldER-3. On December 28, 2022, after briefing and argument, the court issued an order denying the motion for a preliminary injunction. McDonaldER-3. With respect to standing, the court concluded that the amended complaint and new motion

16

had resolved the court's earlier concerns by establishing that plaintiffs had "a 'concrete plan to violate' AB 2098 within the meaning of the applicable doctrine." McDonaldER-11 (citation omitted).

On the merits, however, the court held that plaintiffs had not shown a likelihood of success on either of their constitutional claims. McDonaldER-29. First, the court concluded the statute was clear. McDonaldER-17. The court explained that the statute's definition of misinformation was "comprised of three elements." McDonaldER-15. Specifically, the state must demonstrate that the treatment or advice: (1) contained "demonstrably false information, (2) contradicted by the contemporary scientific consensus" and was "(3) contrary to the standard of care." McDonaldER-15. Through such language, the court continued, AB 2098 defined its terms "by reference to familiar standards of medical regulations and the opinions of the medical community." McDonaldER-16. This conclusion was buttressed by the fact that AB 2098 required "as a necessary, but not sufficient condition predicate to liability" that the advice or treatment given be contrary to the standard of care, a standard "long familiar to California's medical malpractice limitation." McDonaldER-13.

The court next held that plaintiffs were unlikely to demonstrate that AB 2098 violated the First Amendment. McDonaldER-26, 29. It held that AB

17

2098 regulated conduct, rather than speech, under this Court's precedents. McDonaldER-23. Since AB 2098 was rationally related to the State's "legitimate, if not compelling, interest in assuring safe medical care for its citizens and regulating the practice of medicine within its borders," the court held the statute did not violate the First Amendment. McDonaldER-23. Alternatively, the court held the statute was constitutional since it was part of the longstanding tradition of regulating medical care and treatment. McDonaldER-28.

### E.  *Couris v. Lawson*

Plaintiffs Michael Couris and Michael Fitzgibbons are physicians licensed by the Board. CourisER-87. Dr. Fitzgibbons, an infectious disease specialist, alleges that he has treated over 1,000 patients with COVID-19, including by prescribing the controversial medications hydroxychloroquine and ivermectin. CourisER-95, 96. Dr. Couris is an ophthalmologist. CourisER-98.

On December 6, 2022, plaintiffs sued Attorney General Rob Bonta, Board President Kristina Lawson, and the Board's Executive Director William Prasifka, in their official capacities. CourisER-87. Plaintiffs allege that AB 2098 violates their free speech rights under the First Amendment and is unconstitutionally vague under the Fourteenth Amendment.

18

CourisER-100, 101, 102.  They also raised a claim that AB 2098 violates

their free speech rights under the California Constitution.  CourisER-103.  A

few days later, they filed a motion for a preliminary injunction.[9]

The motion for a preliminary injunction was briefed and set for oral

argument on February 2, 2023.  On January 23, 2023, the district court

issued an order staying resolution of that motion pending this Court's

resolution of the *McDonald* appeal.  CourisER-3, 4.  Plaintiffs filed a notice

of appeal.  CourisER-105, 106.

## STANDARD OF REVIEW

This Court reviews the denial of a preliminary injunction for abuse of

discretion.  *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2011) (per

curiam).  To do so, it first determines de novo whether the trial court

"identified the correct legal rule to apply to the relief requested."  *Id*.

(citation omitted).  It then determines if the "district court's application of

the correct legal standard was (1) illogical, (2) implausible, or (3) without

support in the inferences that may be drawn from the facts in the record."

---

[9] Plaintiffs' motion for a preliminary injunction was predicated solely
on the likelihood of succeeding on their federal constitutional claims, not
their state-law claim.

*Id.* (citation omitted). The Court reviews conclusions of law de novo and findings of fact for clear error. *Id.*

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20. If a movant fails to establish a likelihood of success, the court generally need not consider the other factors. *Garcia v. Google. Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). With respect to cases arising under the First Amendment, this Court has stated that showing a "colorable First Amendment claim" suffices to meet the remaining elements for injunctive relief. *E.g.*, *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc).

Plaintiffs, as the movants here, bear the burden to prove each element. *Klein*, 584 F.3d at 1201. They must do so by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (citation and emphasis omitted)).

## SUMMARY OF ARGUMENT

The lower court correctly denied the motion for a preliminary injunction because plaintiffs have failed to meet the elements for injunctive relief.

1. Plaintiffs have failed to demonstrate that they are likely to succeed on their First Amendment challenge. As an initial matter, AB 2098 is subject to rational basis review, not to strict scrutiny, for two independent reasons. First, AB 2098 is a regulation of professional conduct—namely, treating and caring for patients. And when doctors care for their patients, they frequently must use speech (e.g., medical practice in the form of diagnosis, advice, or recommendations to their patients) to do so effectively. When doctors use advice or recommendations to effectuate the care and treatment of their patients, such speech is incidental to the conduct of engaging in the practice of medicine. That alone is what AB 2098 regulates.

Second, AB 2098 is subject to rational basis regardless of whether it is a regulation of speech or conduct because it is part of the time-hallowed tradition of regulating medical care and the practice of medicine. There is a long-standing tradition of regulating the speech of medical practitioners when treating patients, as this Court has recognized.

Under rational basis review, AB 2098 is constitutional. Even if, however, strict scrutiny applies, plaintiffs still have not demonstrated a likelihood of succeeding on their First Amendment claim. AB 2098 furthers the State's compelling interest to ensure patients receive adequate health care from their treating physicians, particularly with respect to COVID-19 and potentially life-saving COVID-19 vaccines. And because AB 2098 addresses only advice and treatment that a physician provides to those under the physician's care—and subjects to discipline only such care that falls below the standard of care—AB 2098 is narrowly tailored.

2. Plaintiffs have failed to demonstrate a likelihood of success on their Fourteenth Amendment claims. AB 2098 is not an unduly vague statute. The definition of "misinformation" on its face establishes three required elements, all of which must be met for the statute to apply: that the relevant advice or treatment 1) is contrary to the standard of care, and 2) contains false information, 3) that is contradicted by the contemporary scientific consensus. None of these elements are impermissibly vague, particularly in light of the ubiquity of the requirement that doctors conform to the standard of care. A practitioner knows that as long as they are acting in accordance with the profession's standard of care—as they must regardless of AB 2098—they are not subject to discipline under AB 2098.

22

3.    Because AB 2098 does not infringe on plaintiffs' constitutional rights, the plaintiffs receive no special assumption that the remaining factors are in their favor. AB 2098 makes a narrow change to the existing regulatory scheme by specifying that a single instance of a doctor relaying false information to a patient that is contrary to the standard of care can suffice for unprofessional conduct, rather than the existing laws that require either gross misconduct or repeated acts of negligence. This slight expansion of the existing regulatory scheme serves important purposes by protecting patients' health and safety, and the public interest weighs against enjoining it.

## ARGUMENT

### I.    AB 2098 DOES NOT VIOLATE THE FIRST AMENDMENT

Plaintiffs contend that AB 2098 is subject to (and fails) strict scrutiny under the First Amendment because it is content- and viewpoint-based. Plaintiffs are incorrect. They err first in their argument that strict scrutiny applies. As plaintiffs recognize, states may permissibly regulate professional conduct and speech incident thereto. AB 2098 does precisely that and therefore is subject only to rational basis review—a standard it easily meets. An independent reason why AB 2098 is not subject to strict scrutiny—even if it is deemed to regulate speech rather than conduct—is

23

that it is part of the long-standing tradition of regulating the practice of

medicine and care provided by medical practitioners. Finally, even if strict

scrutiny did apply, AB 2098 would meet that standard as well. Plaintiffs

therefore fail to demonstrate a likelihood of success on their First

Amendment claim.

### A. AB 2098 Is a Permissible Regulation of Professional Conduct

#### 1. AB 2098 Regulates Professional Conduct

AB 2098 regulates physician conduct by circumscribing the advice or

treatment doctors may give their patients. Although speech by professionals

is protected by the First Amendment, states may still "regulate professional

conduct, even though that conduct incidentally involves speech." *Nat'l*

*Institute of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361,

2372 (2018). Regulations of doctors' professional conduct that incidentally

regulate speech are widespread and well-established. As *NIFLA* recognized,

"[l]ong-standing torts for professional malpractice, for example, 'fall within

the traditional purview of state regulation of professional conduct.'" *Id.* at

2737 (citation omitted). And such malpractice unquestionably includes torts

predicated on a doctor's speech: "[d]octors commit malpractice for failing to

inform patients in a timely way of an accurate diagnosis, for failing to give

patients proper instructions, for failing to ask patients necessary questions, or for failing to refer a patient to an appropriate specialist."  Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*," 2007 U. Ill. L. Rev. 939, 950-951 (2007) (compiling cases).  Indeed, "doctors are routinely held liable for giving negligent advice to their patients, without serious suggestion that the First Amendment protects their right to give advice that is not consistent with the accepted standard of care." *Pickup v. Brown*, 740 F.3d 1208, 1228 (9th Cir. 2014), *abrogated on other grounds by NIFLA*, 128 S. Ct. 2361.  A doctor "may not counsel a patient to rely on quack medicine.  The First Amendment would not prohibit the doctor's loss of license for doing so." *Id.* (citation omitted).

Such restrictions on professional conduct that merely incidentally burden speech may also include laws requiring the conveyance of certain information as part of rendering care, as the Supreme Court has noted. *NIFLA*, 138 S. Ct. at 2737.  Such requirements, the Court explained, "regulate[] speech only 'as part of the practice of medicine, subject to reasonable licensing and regulation by the State.'" *Id.* (citation omitted).

California is thus no outlier in regulating medical practitioners' provision of treatment and care to patients in ways that also impact their speech.  *See, e.g.*, Cal. Bus. & Prof. Code § 741(a)(1), (2) (requiring

disclosures when prescribing opioids under certain conditions); *id*. § 2234.1 (requiring disclosures for complementary or alternative medicine); *supra* at pp. 8-9. Such regulations appear in the laws of other states as well. *See, e.g.*, Ala. Code § 34-24-360 (doctor may be sanctioned for untruthful statements concerning doctor's qualifications or proposed treatment's effect); Nev. Rev. Stat. § 630.304 (doctor may be sanctioned for discouraging second opinion); Or. Rev. Stat. § 677.190 (doctor may be sanctioned for representing that incurable disease can be cured or for making false or misleading statements about the efficacy of a drug or treatment).

This Court, too, has recognized that States may regulate the conduct of medical professionals—and the practice of medicine—even when doing so implicates medical professionals' speech. In *Pickup* and *Tingley*, this Court upheld the validity of state statutes prohibiting conversion therapy—that is, efforts to change a person's sexual orientation—performed on minors. *See Tingley*, 47 F.4th at 1071-72. Both statutes regulated professional conduct, this Court concluded, because they regulated the kind of care a practitioner could provide their patients. *Id.* at 1077. The fact that such care was "performed through speech alone" made no difference. *Pickup*, 740 F.3d at 1230. Rather, this Court recognized that "the fact that speech may be used

to carry out" regulated conduct "does not turn the regulation of conduct into a regulation of speech." *Id.* at 1229.[10]

Like the bans at issue in *Pickup* and *Tingley*, AB 2098 fits into this long-running tradition of regulating the practice of medicine and governing professional conduct. In AB 2098, "disseminate" is defined as "the conveyance of information from [a practitioner] to a patient under the [practitioner's] care in the form of treatment or advice." AB 2098, § 2(b)(3). This definition makes clear that AB 2098 governs *only* how doctors care for and treat their patients. Providers remain free to engage in any speech, discussion, or debate about COVID-19 or any other topic outside the context of treating patients. By regulating the care that physicians provide to patients, AB 2098 is a regulation of professional conduct, i.e., the practice of medicine. That it also impacts the speech used to effectuate treatment (such as advice) does not turn it into a regulation of "speech as speech," *NIFLA*, 138 S. Ct. at 2373, just like the statutes upheld in *Tingley* and *Pickup*.

---

[10] Amicus Institute for Justice argues that the relevant case to apply for determining whether this case involves speech or conduct is instead *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). Br. of Amicus Institute for Justice at 8. However, *Holder* involved a general analysis of whether a particular statute regulated expressive conduct or speech. 561 U.S. at 27. Here, the question is whether AB 2098 regulates speech incident to professional conduct. Since that is the legal question specifically addressed by *Pickup* and *Tingley*, those cases govern here.

Plaintiffs argue that because AB 2098 mentions "advice" as well as "treatments," it cannot be categorized as a regulation of conduct but instead must be considered a regulation of speech. *McDonald* OBM 20; *Couris* OBM 28. However, AB 2098's mention of "advice" is understood in context to apply to advice given to a patient as part of medical care, not to advice disconnected from care. Moreover, plaintiffs' and amici's argument relies on a supposed barrier between advice/speech and treatment/conduct that simply fails to acknowledge how doctors treat their patients. Plaintiffs and amici propose, essentially, that "treatment" is limited to physical interventions like surgery or prescribing a medicine. *E.g.*, *McDonald* OBM at 21 (prescribing ivermectin or hydroxychloroquine); *Couris* OBM at 31 (receiving a vaccination).

But a doctor's treatment of a patient *also* consists of advice and recommendations. "Most, if not all, medical and mental health treatments *require speech*." *Pickup*, 740 F.3d at 1229 (emphasis added). "[W]hen a doctor tells a patient to take two pills a day for a week, she is speaking to the patient, but more generally she is *treating* the patient." Harrison Blythe, Note, *Physician-Patient Speech: An Analysis of the State of Patients' First Amendment Rights to Receive Accurate Medical Advice*, 65 Case W. Res. L. Rev. 795, 803 (2015). So, too, is the endocrinologist who advises a diabetic

28

about which foods to eat, the neurologist who advises a migraine sufferer about potential migraine triggers to avoid, and the general practitioner who advises a patient with back pain to perform particular stretches. Even within the context of prescribing a medication—which plaintiffs and their amici view as "treatment" distinct from "advice" or "speech", *e.g.*, Br. of Amici ACLU at 21—advice and speech can *still* be necessary to effectively provide that treatment: advising a patient to stop taking a prescribed medication when they develop a new medical condition or allergy, to increase the dosage or frequency of a prescribed medication, to take a prescribed medication at night because it can make them drowsy, to take a prescribed medication with food because it can make them nauseous, not to drive while on a prescribed medication, and so on.

In these situations, as in innumerable others, the care and treatment a physician provides is effectuated through the medium of speech, frequently advice and recommendations. Thus, in many situations, regulating the conduct of doctors in treating and caring for patients "is theoretically and practically inseparable" from regulating the speech they use when doing so. Post, *supra*, at 751. This does not mean that *all* speech by doctors when caring for patients is part of treatment or that speech is automatically able to be regulated because it comes from a doctor while caring for a patient. But

*some* speech *is* an incidental and integral part of patient treatment and care. When treatment and care are carried out through advice and speech, regulating the *act* of treating and caring for patients—which is the *conduct* that physicians engage in—necessarily means regulating the speech that is part and parcel of that act. That is precisely what AB 2098 does: it regulates treatment and advice—which is speech necessary to effectuate the care and treatment of patients and thus incidental to conduct.

In arguing to the contrary, plaintiffs rely on this Court's decision in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002). But their argument rests upon an overreading of that case. In *Conant*, this Court addressed a federal government policy of investigating physicians for violation of federal criminal drug laws "solely on the basis of a recommendation of marijuana within a bona fide doctor-patient relationship." *Id.* at 636. This Court upheld an injunction that precluded the federal government from so doing unless it "in good faith believes that it has substantial evidence of criminal conduct." 309 F.3d at 636; *see also id.* at 637 (policy sanctioned doctors for any "discussions of the medical use of marijuana"). The Court analogized the enjoined policy to the funding restriction held unconstitutional in *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), which had prohibited legal aid attorneys receiving federal funds "from challenging existing

30

welfare laws." *Conant*, 309 F.3d at 638. In both cases, this Court explained, the government's challenged policy "'alter[ed] the traditional role'" of professionals "by 'prohibit[ing] speech necessary to the proper functioning'" of the profession. *Id.* (citation omitted).

*Conant* does not hold that states cannot permissibly impose *any* regulation on speech (such as advice) that is part of a physician's treatment to a patient. Nowhere does *Conant* say, for instance, that a State could not sanction a doctor who recommended marijuana negligently or to a patient taking a drug that interacts dangerously with marijuana. Rather, the policy at issue in *Conant* criminalized *any and all* recommendations of marijuana use between doctors and patients—including those made when the doctor "compl[ied] with accepted medical procedures" and was acting "in conformity" with medical standards. *Conant*, 309 F.3d at 647 (Kozinski, J., concurring).

There is a difference between the state disciplining *any* recommendations or discussions of a particular treatment irrespective of the context or circumstances and the state simply requiring that such recommendations or discussions abide by recognized standards of care. In the first instance, the state has kept medical professionals from utilizing acceptable professional judgment to determine the best course of treatment

31

for a patient or to obtain informed consent thereto—even when acting in conformity with standard medical practice and norms. *Cf. Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1317 (11th Cir. 2017) (striking down statute that prohibited doctors from asking certain questions even when *consistent* with the standard of care and when there was no evidence the prohibited questions were "medically inappropriate, ethically problematic, or potentially ineffective"). In the latter, the state leaves doctors free to exercise their professional medical judgment—what is taken off the table are only options that are below the standard of care. It is the same as the distinction between the requirement struck down in *Velazquez* that prohibited *any* argument challenging an existing welfare law by a government-funded attorney versus ordinary regulations that indisputably apply to such challenges if they are *frivolous*. *See* Fed. R. Civ. P. 11(b), (c).

AB 2098 does the latter. It is thus akin to the statute challenged in *Pickup*. Both generally "allow discussions about treatment, recommendations to obtain treatment, and expressions of opinion about" treatment options. *Pickup*, 740 F.3d at 1229 (emphasis removed); *cf. Conant*, 309 F.3d at 647 (Kozinski, J., concurring) (distinguishing enjoined policy from the state sanctioning a doctor who "recommend[ed] marijuana without examining the patient, without conducting tests, without considering

32

the patient's medical history or without otherwise following standard medical procedures"). AB 2098 solely proscribes such treatments and advice predicated on false information and below the standard of care. By circumscribing the care and treatment of patients to ensure conformity with the standard of care, rather than prohibiting any recommendations of a certain treatment regardless of its appropriateness or propriety in context, AB 2098 regulates professional conduct.

Plaintiffs' reasoning to the contrary would imply that *any* regulation of professional advice—no matter how unfounded, fraudulent, substandard, or incompetent that advice is under the profession's standards—is a content-based regulation of speech that must withstand strict scrutiny. Their argument applies equally to regulations of the advice that doctors give as to the advice that other professionals give. Thus, under plaintiffs' theory, the State would have to justify under strict scrutiny a rule disciplining a lawyer who tells a client he might have 90 days to appeal instead of 30 days, *see* Fed. R. App. P. 4(a)(1), or a law penalizing an engineer who advises a client to consider using a bridge design akin to that of the Tacoma Narrows

Bridge.[11] The First Amendment cannot mean that a State must meet strict scrutiny any time it seeks to enforce professional norms on the speech used to carry out professional conduct. Rather, where the State regulates the speech used to carry out professional conduct—here, the advice doctors give to treat and care for patients—it is regulating professional conduct, not speech. That is precisely what AB 2098 does.

## 2. AB 2098 Meets Rationality Review

Under *Tingley* and *Pickup*, the applicable standard for reviewing the constitutionality of AB 2098's regulation of conduct is rational basis. *Tingley*, 47 F.4th at 1077-78.[12] That standard requires only that AB 2098 "bear[] a rational relationship to a legitimate state interest." *Pickup*, 740 F.3d at 1231. AB 2098 readily meets this standard. As discussed in more

---

[11] The Tacoma Narrows Bridge is famous for flaws in its design as a suspension bridge that led to a collapse known as "the most dramatic failure in bridge engineering history." Washington Dep't of Transportation, *Tacoma Narrows Bridge History*, https://www.wsdot.wa.gov/tnbhistory/ (last accessed Mar. 2, 2023).

[12] Plaintiffs in *McDonald* contend that the proper standard is intermediate review. *McDonald* OBM 29 n.4. However, the statute in *Tingley* was also content-based insofar as its applicability turned on the content of the therapeutic speech, yet this Court in *Tingley* was clear that rational basis was the proper standard. *See Tingley*, 740 F.3d at 1077. That decision governs here as to the proper standard of review. In any event, if intermediate review applied, the statute would be permissible in light of the importance of the legislative ends and the tailoring of the remedy discussed in our section on strict scrutiny below, *see infra* at pp. 39-47.

34

detail below, *see infra* at pp. 39-42, AB 2098 furthers the government's legitimate interests in public health and patient safety. AB 2098 was motivated by the Legislature's concerns that physicians were spreading misinformation and disinformation to patients that could dissuade patients from receiving critical or necessary care to prevent COVID-19 (such as vaccinations) or to treat COVID-19. *E.g.*, McDonaldER-83, 91, 92. Moreover, recommendations that fall below the standard of care can harm patients individually and public health generally. Protecting public health and patient safety certainly is a legitimate state interest; indeed, it is a compelling one. *See infra* at pp. 39-42. Prohibiting doctors from providing inaccurate information in a way that renders their care below the requisite standard of care furthers those legitimate interests. AB 2098 is therefore constitutional as a reasonable regulation of professional conduct.

### B. AB 2098 Is Constitutional as Part of the Long-Standing Tradition of Regulating the Practice of Medicine

Even if AB 2098 were not a regulation of professional conduct, plaintiffs still have not shown—and cannot show—a likelihood of success on the merits. "The Supreme Court has recognized that laws regulating categories of speech belonging to a 'long . . . tradition' of restriction are subject to lesser scrutiny." *Tingley*, 47 F.4th at 1079 (quoting *NIFLA*, 138 S.

35

Ct. at 2372).  And there is indeed a long tradition of "regulation governing the practice of those who provide health care within state borders."  *Id.* at 1080.[13]  Since the birth of modern medicine, states have imposed restrictions on who can practice medicine and on the care medical practitioners may provide.  *See id.* at 1080-81 (discussing, *inter alia*, *Collins v. Texas*, 223 U.S. 288 (1912), and *Lambert v. Yellowley*, 272 U.S. 581 (1926)); *supra* at pp. 4-6.  This has included restrictions on the provision of care that involves the speech of practitioners:  "centuries-old medical malpractice laws," for instance, "restrict treatment *and the speech* of health care providers."  *Tingley*, 47 F.4th at 1082 (emphasis added); *supra* at pp. 4-6.

This history of regulation arises out of important concerns.  "The health professions differ from other licensed professions" because medical treatment "can result in physical and psychological harm to their patients."  *Tingley*, 47 F.4th at 1083.  "The physician is one whose relations to life and health are of the most intimate character."  *Hawker v. New York*, 170 U.S. 189, 193 (1898); *see also Kenneally v. Med. Bd.*, 27 Cal. App. 4th 489, 500

---

[13] Defendants are not seeking to recreate the *general* category of "professional speech" disproved of in *NIFLA*, contrary to arguments of amici and plaintiff otherwise.  Rather, defendants argue that there is a narrower category of speech for which a longstanding tradition of regulation exists, specifically speech used in the practice of medicine and treatment of patients, as the decision in *Tingley* recognized.

(1994) ("The work of physicians has life and death consequences for their patients."). The doctor-patient relationship requires that patients be able to trust their doctors to provide advice that does not fall below the standard of competent care. After all, while "[e]very one may have occasion to consult" a doctor, "comparatively few can judge of the qualifications of learning and skill which he possesses." *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). "The knowledge of patient and physician are not in parity," and a patient "has an abject dependence upon and trust in his physician for the information upon which he relies during the decisional process." *Truman v. Thomas*, 27 Cal. 3d 285, 291 (1980) (citation omitted). Indeed, research suggests that patients are reluctant to challenge or question their doctors given this disparity. *See* Paula Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201, 225-28 (1994) (discussing studies).

Since patients are not in a position to judge for themselves whether their doctors are providing competent care, "[r]eliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he possess the requisite qualifications." *Dent*, 129 U.S. at 122-23. Thus, "[w]hen a health care provider acts or speaks about treatment with the authority of a state license, that license is an 'imprimatur

37

of a certain level of competence.'" *Tingley*, 47 F.4th at 1083 (citation omitted). Patients need to know that their doctors can be trusted, and ensuring that medical professionals are required to meet a basic threshold standard of care helps facilitate that trust. Because caring for and treating patients can often be effectuated only through recommendations and advice, effective protection for patients must encompass the ability to regulate the speech used in rendering care and treatment.

AB 2098 falls within the category of laws recognized as permissible under *Tingley*. The advice and treatment physicians provide—and the information conveyed in such advice and treatment—is medical care for patients. *See, e.g.*, *Tingley*, 47 F.4th at 1082-83; *see also supra* at pp. 24-30. It is that context of patient care, and that alone, which AB 2098 regulates. It does not tell doctors what specifically they must say or even require them to say anything at all. It likewise does not govern physicians as to statements about COVID-19 that are made to a patient but are not actually part of patient care. Rather, to the extent a provider chooses to discuss COVID-19 as part of delivering treatment, AB 2098 simply prohibits them from doing so in a manner that violates the standard of care. This has long been a requirement for doctors in order to protect their patients. Any contention that California cannot require that much of its medical practitioners would

38

"endanger centuries-old medical malpractice laws that restrict treatment and the speech of healthcare providers." *Tingley*, 47 F.4th at 1082.

### C. AB 2098 Meets Strict Scrutiny, if Applicable

Plaintiffs contend primarily that AB 2098 is subject to strict scrutiny because it is content- and viewpoint-based, since determining whether a physician's advice or treatment violates AB 2098 requires looking at the content of the speech—an argument that would seemingly apply to any professional disciplinary law for any profession that involves determining whether advice complies with the requisite professional standards. Regardless, even if this Court were to conclude that AB 2098 is subject to strict scrutiny, plaintiffs still cannot show a likelihood of success. To survive strict scrutiny, a statute must be narrowly tailored to serve a compelling government interest. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). AB 2098 meets this standard.[14]

---

[14] The *Couris* plaintiffs appear to contend that if AB 2098 is viewpoint based, it is unconstitutional *per se*, regardless of whether it meets the requirements of strict scrutiny. *Couris* OBM at 35. This Court has held, however, that "[v]iewpoint-based restrictions on speech are subject to strict scrutiny," not *per se* invalid. *Waln v. Dysard Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022).

### 1. AB 2098 Serves a Compelling State Interest

AB 2098 serves interests that are not only legitimate, but compelling.
First, AB 2098 furthers the State's compelling interest in "protecting patients
from negligent or incompetent physicians." *Lewis v. Superior Ct.*, 3 Cal. 5th
561, 577 (2017). States "unquestionably ha[ve] a 'compelling interest in
assuring safe health care for the public.'" *Recht v. Morrisey*, 32 F.4th 398,
413 (4th Cir. 2022) (citation omitted). As the legislative history explains,
"[p]hysicians and healthcare professionals play a critical role in keeping
communities healthy. A physician's recommendation and information
sharing will educate and inform decisions made by their patients."
McDonaldER-92; *see also* SER-10, 38. Because medical decisions that
patients make under doctor advice are by definition matters involving their
health—and frequently a matter of life and death—the State has a
compelling interest in ensuring the care provided is not substandard. This is
certainly true with respect to COVID-19, where interventions like
vaccinations have helped to protect health and save lives. *See supra* at p. 13.
Like malpractice law and other prohibitions on treatment below the standard
of care, AB 2098 guards and protects patients' health and safety.

Second, AB 2098 furthers the compelling interest of ensuring patient
access to accurate, complete, and truthful information about health care.

40

Misinformation from a doctor during medical treatment presents a real danger of harm to a patient. SER-10, 38; *see, e.g.*, *Truman*, 27 Cal. 3d at 293-94 (patient declined pap smear test due to advice below the standard of care and subsequently died of cervical cancer). In addition to furthering this interest generally, AB 2098 does so in a way that also helps limit the spread and severity of the deadly COVID-19 pandemic. The Supreme Court has recognized that "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam). Vaccines have played a crucial role in helping stem the spread of COVID-19 and limiting the severity of the disease. *See supra* at p. 13. However, as the Legislature found, "misinformation and disinformation about COVID-19 vaccines"—including misinformation from medical practitioners—have "placed lives at serious risk" by precluding patients from receiving such vaccines due to factually incorrect information. AB 2098, § 1(d), (e); *see also* McDonaldER-72, 91.

Third, AB 2098 furthers the State's "compelling interest in the practice of professions within their boundaries." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975). The Supreme Court has noted that among the professions, "[t]here is perhaps no profession more properly open to [state] regulation than that which embraces the practitioners of medicine," "[d]ealing as its

41

followers do with the lives and health of the people." *Watson v. Maryland*,

218 U.S. 173, 176 (1910); *see also Tingley*, 47 F.4th at 1083 ("'[F]ew

professions require more careful' scrutiny than 'that of medicine.'" (citation

omitted)). AB 2098, acting in harmony with other similar and long-standing

regulations, furthers this compelling interest. It is critical that patients be

able to trust the medical judgment, advice, and recommendations of their

state-licensed medical providers. *See generally supra* at pp. 36-38

(discussing, *inter alia*, *Dent*, 129 U.S. at 122). Without such trust, patients

may well avoid acting on medically appropriate advice and suffer serious, if

not life-threatening, health consequences. This is no less true in the

COVID-19 arena than in other areas of health care.

### 2. AB 2098 Is Narrowly Tailored to Serve Those Interests

Finally, AB 2098 meets the requirements for narrow tailoring. "A

statute is narrowly tailored if it targets and eliminates no more than the exact

source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485

(1988). The Legislature's primary concern in enacting AB 2098 was to stop

doctors from conveying to patients medically inaccurate information about

COVID-19 that is below the standard of care, as evidenced by the examples

in the legislative history of medical practitioners spreading such medically

inaccurate information (e,g., vaccines contain microchips or make people magnetic). *See, e.g.*, McDonaldER-72, 73, 91, 92. The legislative history explained that doctors play a key role in guiding patient decisions about health care, making it particularly concerning when they violate the standard of care by failing to provide medically accurate information or by providing substandard advice or treatment. *See, e.g.*, McDonaldER-72, 73, 91, 92.

The Legislature acted to limit this harm in the narrowest possible way. It simply appended to the general rule a requirement that doctors only provide advice or treatment concerning COVID-19 in conformity with the standard of care. The Legislature narrowed the application of AB 2098 further by adding that disciplinary action even for substandard care could take place only if the substandard care included information that was not true and not in conformity with the contemporary scientific consensus. AB 2098 leaves practitioners free to express themselves in innumerable other fora outside of patient care. And within the context of patient care, it does not limit advice that meets the standard of care. It thus specifically targets the precise category of conduct or speech where the State's interest is

43

highest and that poses the greatest risk of harm:  substandard advice and treatment to patients within a doctor's care.[15]

Considering AB 2098's place within the larger system of medical regulation reinforces its narrow tailoring.  As the legislative history notes, doctors are already subject to discipline for repeated negligent acts, gross negligence, or incompetence.  McDonaldER-93; *see also supra* at p. 9. Thus, a physician who repeatedly provides treatment or guidance concerning COVID-19 that falls below the requisite standard of care—or a physician who does so only once in a manner constituting gross negligence or incompetence—already faces the possibility of discipline or liability.  All that AB 2098 does is clarify that, with respect to advice and treatment concerning COVID-19, a single instance of conveying false information in a substandard manner in a care setting can suffice for discipline.  That clarification is narrowly tailored to further the State's compelling interests in public health and patient safety.

---

[15] That AB 2098 is narrowly tailored is further illustrated by looking to the legislative history of the enactment.  As originally introduced, AB 2098 did not include a definition of "dissemination."  McDonaldER-78.  The statute was amended to include a definition of "disseminate" that clarified the statute was targeted at "communications made to a patient under [the provider's] care in the form of treatment or advice" and not to "statements made to the general public about COVID-19 through social media or at a public protest."  McDonaldER-78.

Plaintiffs contend that AB 2098 is not narrowly tailored because it "regulat[es] everything a doctor may discuss with a patient about COVID-19." *Couris* OBM at 36. That is a willful misreading of the statute. AB 2098 does not apply to any and all speech about COVID-19; AB 2098 only reaches the "conveyance of information . . . in the form of treatment or advice." AB 2098, § 2(b)(3). It would not apply, for instance, to a doctor talking about their own experience with COVID-19 or explaining why— without advising a patient—they chose not to receive a vaccine. And it has no effect at all on statements that do not involve medical treatment and advice—such as speculation about the virus's origin or assertions about its political aspects.

Plaintiffs further argue that AB 2098 is underinclusive because it only regulates advice and treatment to a patient, rather than doctors' statements to the general public. In other words, plaintiffs appear to be arguing that because the Legislature focused on a *narrower* category of speech than the examples it specifically referenced, the statute is not sufficiently tailored. This argument flips the narrow tailoring inquiry on its head. A legislative body acts properly when it declines to extend a statute into constitutionally suspect realms—as would be the case if California tried to regulate public or political speech rather than limiting its concern (as it did) to the type of

45

patient treatment that States have regulated for centuries.  The Legislature targeted the narrow swath of speech posing the greatest risk to patient health and safety and confined its reach to circumstances well within the historical tradition of regulating direct patient case.

Additionally, plaintiffs contend that AB 2098 is underinclusive because it only address misinformation about COVID-19 rather than all health information and because it does not cover all possible types of medical professionals. *McDonald* OBM at 37.  But the Legislature was specifically concerned about misinformation related to COVID-19, as evidenced by its citation to examples of doctors spreading such misinformation, and could permissibly act in a way targeted to that type of misinformation without addressing all possible health misinformation at once.  And physicians and surgeons play a unique role in the health care system and occupy a position of trust vis-à-vis their patients given their expertise, which other healthcare professionals like a nurse do not identically share.  These unique considerations justify a decision to focus on physicians and surgeons specifically in AB 2098.  In any event, "[a] State need not address all aspects of a problem in one fell swoop," and the Supreme Court has "upheld laws— even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of" the government's interests.

46

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). AB 2098 does not fail narrow tailoring simply because the Legislature chose to target one specific issue it was concerned about without restricting speech as broadly as it possibly could have.

Finally, plaintiffs contend the statute is not narrowly tailored because alternatives could have been used, such as public information campaigns. This argument is also unconvincing. Federal and state entities were already engaging in extraordinary public information campaigns about COVID-19, but misinformation from physicians was nonetheless resulting in serious health consequences to patients.[16] More importantly, plaintiffs' argument would threaten to render unconstitutional *any* application of the standard-of-care requirement—whether in professional discipline or medical malpractice law—to dangerous and substandard medical advice to a patient. A similar argument could be made that the State should devise a way to somehow detect and step in to provide information directly to any patient who has been advised by a doctor to take a drug that would be dangerous to those in

---

[16] For instance, the federal government has spent at least $250 million on a vaccination promotional campaign. Elizabeth Cohen, *Covid-19 Vaccine Ads Expected in Next Few Weeks as Part of $250 Million Biden Administration Campaign*," CNN.com (March 15, 2021), https://www.cnn.com/2021/03/15/health/covid-19-vaccine-ads-hhs/index.html (last accessed Mar. 2, 2023).

the patient's condition or from whom the doctor has withheld information about a pertinent side effect of treatment. No court has ever held that such dubious arguments mean that the First Amendment prohibits States from holding medical providers to the standard of care.

## II. AB 2098 Is Not Impermissibly Vague

### A. AB 2098 Is Clear as to What It Regulates

Plaintiffs argue that AB 2098 is unconstitutionally vague under the Fourteenth Amendment. That, too, is incorrect. A statute is impermissibly vague when it "fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citation omitted). But "[d]ue process does not require 'impossible standards of clarity.'" *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 361 (1983)). The statute must simply "give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1019 (9th Cir. 2013) (citation omitted). And where a statute "regulates licensed . . . health providers, who constitute 'a select group of persons having specialized knowledge,' the standard for clarity is lower." *Pickup*, 740 F.4th at 1234 (citation omitted).

48

AB 2098 meets this standard. The statutory definitions of the relevant terms provide adequate context and guidance for a practitioner of ordinary intelligence to know what is prohibited. AB 2098 classifies as unprofessional conduct a physician "disseminat[ing] misinformation or disinformation related to COVID-19." AB 2098, § 2(a). "Dissemination" is defined as "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice." AB 2098, § 2(b)(3). This makes clear that the type of behavior implicated by AB 2098 is when a physician: 1) conveys information, 2) in the form of treatment or advice, 3) to a patient under the practitioner's care. A practitioner of ordinary intelligence can distinguish between the situations covered by this provision (e.g., providing advice to one's patient about whether to receive the COVID-19 vaccines) from those that are not (e.g., publishing a scientific article in a journal about the effectiveness of the COVID-19 vaccines).

AB 2098 further defines "misinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." AB 2098, § 2(b)(4). This language establishes three separate, independent requirements for advice or treatment to fall within the scope of AB 2098, as the lower court recognized: that it is 1) contrary to the standard of care and contains information that is 2) false and 3) contradicted by the

scientific consensus. The contention that this is not the proper understanding of the statute stems from a willful misreading. The lack of a conjunction between "contradicted by the scientific consensus" and "contrary to the standard of care" does not alter the natural reading that these are two distinct and independent requirements that must both be met for treatment or advice to constitute misinformation—just as a statute that regulated "activities on school grounds during school hours" would be ordinarily understood to impose two requirements for "activities" to fall within its scope. That natural reading also accords with the statute's overall intent. The original definition of "misinformation" was amended during the legislative process with the express purpose of tying a violation of AB 2098 to the well-known "standard of care" in the medical field. McDonaldER-97. This legislative history supports the conclusion that the definition of AB 2098 contains *three* independent requirements, each of which must be proven to demonstrate a physician has disseminated "misinformation."[17]

These three elements are, in turn, sufficiently clear for practitioners to understand. First, it would strain credulity to argue that it is unclear to a

---

[17] Plaintiffs' contention that this Court should assume a broader reading of the statute would also violate the general judicial practice of adopting a narrower construction of a statute to avoid constitutionality concerns. *See, e.g.*, *Doe v. Harris*, 772 F.3d 563, 578 (9th Cir. 2014).

medical practitioner what it means to convey information, give advice, or treat a patient in a manner "contrary to the standard of care." The term "standard of care" is not only familiar to medical practitioners but is used pervasively in the legal and medical regulatory systems. *E.g.*, CACI 501 (jury instruction stating that a medical practitioner who fails to use "the standard of care" is negligent); *Avivi v. Centro Medico Urgente Med. Ctr.*, 159 Cal. App. 4th 463, 469-70 (2008) (describing "standard of care" in medical malpractice suit); *Trowbridge v. United States*, 703 F. Supp. 2d 1129, 1137-40 (D. Idaho 2010) (discussing factual findings as to "standard of care" in medical malpractice suit); SER-9, 37. Indeed, California's medical licensing system holds licensees to the standard of care with respect to *all* care they provide. *See supra* at pp. 9-10. So do other States. *See supra* at p. 10 & n. 9 (citing cases from other states).

Nor is it unduly vague to specify that within that category, the law will apply only to advice or treatment with information that is indeed "false." Although plaintiffs may contend that it can be hard to show whether something is objectively or empirically true or not, courts routinely are faced with such questions—including where speech is directly concerned. *See, e.g.*, *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014) (airline employees' immunity for reporting to TSA did not apply when statement

made to TSA was "materially false"); *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) (discussing truth as a defense to criminal libel charge). In the present context, for instance, a doctor who says that a study published in the Journal of American Medicine showed a particular result knows that if she can point to that finding in that article, what she says is not false information and will not be actionable under the statute.

Plaintiffs focus much of their argument on the meaning of the phrase "contradicted by the contemporary scientific consensus." But this single aspect of the definition of "misconduct" is similarly not vague enough to render the entire statute vague. The ordinary meaning of "consensus" is something there is a general agreement on or acceptance of.[18] Thus, a "scientific consensus" exists when a fact is generally accepted by the scientific community as true—such as a fact about the human body published in a textbook or typically taught in a classroom. In this context, "contemporary" refers to the time at which a doctor's advice is rendered,

---

[18] *See, e.g.*, *Consensus*, Cambridge Dictionary, *available at* https://dictionary.cambridge.org/us/dictionary/english/consensus (last accessed Mar. 2, 2023) (defining "consensus" as "a generally accepted opinion or decision among a group of people"); *Consensus*, Merriam Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/consensus (last accessed Mar. 2, 2023) (defining "consensus" as "general agreement" or "the judgment arrived at by most of those concerned").

similar to how the relevant standard of care is that which is controlling when a doctor treats a patient. Under the ordinary meaning, then, "contradicted by the contemporary scientific consensus" refers to information that the scientific community generally repudiates at the time treatment is rendered.

As plaintiffs note, there may be countless subjects on which the scientific and medical communities are engaged in ongoing debate. But those points would not be subject to the statute by its own terms; where no scientific consensus exists, a physician's statement could not be contrary to such consensus. There are, however, other issues on which the scientific community does have a consensus. Even plaintiffs would be hard-pressed to deny that a contemporary scientific consensus exists that orange juice contains sugar (so diabetics should not drink unlimited amounts of orange juice), that measles is caused by a virus (so antibiotics cannot cure it), etc. This is equally true in the COVID-19 context, even if there may be far fewer facts on which there is a consensus. Plaintiffs would be hard-pressed to deny there is a contemporary scientific consensus that COVID-19 is caused by a virus and that the COVID-19 vaccines do not contain microchips or turn patients magnetic. They provide no reason why a State should be prohibited from protecting patients from providers who would supply, as

53

part of a patient's treatment, information that is disavowed by the scientific community.

Moreover, to the extent that there are concerns that this one element of the definition, standing alone, may not be sufficiently clear, such concerns are alleviated by the statute's incorporation of the very familiar requirement that the doctor's conduct be consistent with the standard of care. *See Gammoh v. City of La Habra*, 395 F.3d 1114, 1120 (9th Cir. 2005) ("otherwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity"). As explained above, so long as physicians' conduct conforms to the standard of care, they will not violate AB 2098. Plaintiffs argue that this is not sufficient because "[e]very determination about 'misinformation' still turns on the existence or not of a nebulous 'consensus'" and the disputed element "defines the prohibited conduct itself." *Couris* OBM at 45. But the purpose of vagueness is "to provide guidance to citizens concerning how they can avoid violating [the statute] and to provide authorities with principles governing enforcement." *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013) (citation omitted). Less clarity as to one element of "misinformation" can be counterbalanced by the clarity of the others in guiding doctors and enforcement authorities as to what conduct violates the statute. That is

54

particularly so here, where doctors are ordinarily required to act in accordance with the standard of care—and thus in conformity with AB 2098—meaning that any conduct that may be contrary to the standard of care yet not violate AB 2098 is conduct a doctor should avoid engaging in regardless of AB 2098. A physician can clearly know how to avoid violating AB 2098—and enforcement authorities know what conduct does not violate AB 2098—even if there is some ambiguity as to whether a scientific consensus exists on any particular fact or whether a particular piece of information is contrary to the contemporary scientific consensus: avoid providing patients with demonstrably false information or acting contrary to the standard of care.

Ultimately, "while '[t]here is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question,' because we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (citation omitted) (alterations in original). The "Supreme Court has held that 'speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.'" *Pickup*, 740 F.3d at 1234 (quoting *Hill*, 530 U.S. at 733).

All that the Fourteenth Amendment requires is that it be "clear what the [statute] as a whole prohibits." *Hill*, 530 U.S. at 733 (citation omitted). AB 2098 meets that standard.

### B. If Any Aspects of AB 2098 Were Vague, the Remedy Would Be Severance

If the inclusion of "scientific consensus" in the definition of "misinformation" in AB 2098 were unduly vague, that would not mean that plaintiffs are entitled to an injunction against the statute as a whole. Injunctive relief "must be tailored to remedy the specific harm alleged." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (citation omitted).[19] Thus, under these circumstances, the remedy would be to issue an injunction solely as to that specific text in the statute, while leaving the remainder of the definition and AB 2098 intact.

In performing severability analysis, the Court applies California law. *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014). Under California law, courts look to three criteria to determine whether a provision

---

[19] While defendants did not raise the issue of severability below, the Court may consider it for the first time on appeal because it is a purely legal issue that is of significance in determining the proper scope of injunctive relief. *See, e.g.*, *Levil Metals Corp. v. Parr-Richmond Terminal Co.*, 817 F.2d 1448, 1450 n.2 (9th Cir. 1987).

is severable. *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011). A severable provision "must be grammatically, functionally, and volitionally separable." *Id.* (citation omitted). A provision is grammatically separable if "the invalid parts 'can be removed as a whole without affecting the wording' or coherence of what remains." *Id.* (citation omitted). It is functionally separable if "'the remainder of the statute is complete in itself.'" *Id.* (citation omitted). And it is volitionally separable if "the remainder 'would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute.'" *Id.* (citation omitted). The presence of a severability clause in a statute establishes a presumption in favor of severance. *Id.* at 270.

All three criteria are met here. As to the first two, removing the phrase "contradicted by the scientific consensus" would leave "misinformation" defined as "false information that is contrary to the standard of care." This is a grammatically coherent definition. It is similarly functional since it can be enforced with the allegedly problematic language erased, meeting the second criteria for severability. Regarding the third criteria, the presence of a severability clause is a strong indication that the Legislature would have preferred the shortened definition of "misinformation" to no statute whatsoever. This is strongly buttressed by the legislative history showing

57

the Legislature's concern about the impact of patently false information spread by medical professionals to their patients. *E.g.*, McDonaldER-73, 91. In light of its findings, the Legislature would no doubt have preferred a slightly different definition of "misinformation" to no prohibitions against disseminating misinformation about COVID-19 to patients. Thus, should this Court enjoin any aspects of AB 2098, it should sever and enjoin the phrase "contradicted by the contemporary scientific consensus" and uphold the remainder of the statute.

## III. THE REMAINING FACTORS WEIGH AGAINST INJUNCTIVE RELIEF

The plaintiffs in these cases likewise fail to meet the other requirements for injunctive relief. First, none of the plaintiffs have demonstrated any irreparable harm. If plaintiffs had demonstrated that AB 2098 likely violated their constitutional rights, that would constitute irreparable harm. *E.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("deprivation of constitutional rights 'unquestionably constitutes irreparable injury'" (citation omitted)). However, as explained above, AB 2098 is constitutional. *See supra* at pp. 24-56.

Second, the balance of equities and public interest do not favor injunctive relief. Where, as here, the government is the opposing party, the last two factors of the preliminary injunction analysis—the balance of

58

equities and public interest—merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). To analyze these factors, the Court "balance[s] the competing claims of injury" and "consider[s] the effect of granting or withholding the requested relief," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). As with irreparable harm, had the plaintiffs shown a likely constitutional violation—particularly of their First Amendment rights—this factor would have been met. *E.g.*, *Am. Beverage Ass'n*, 916 F.3d at 758. But since, as explained above, they have not, the remaining factors weigh against injunctive relief.

Even as a general matter, a State "suffers a form of irreparable injury" when it is "enjoined . . . from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2013) (internal quotation marks omitted). But here, there is a specific and especially serious type of harm, given the interest (for the State and its people) in avoiding the life-and-death consequences of substandard medical care, especially for a deadly and contagious disease. In addition, an injunction here would undermine the State's long tradition of regulating physician conduct and care. *See Tingley*, 47 F.4th at 1079-81. Patients trust their doctors, and that trust could be irreparably harmed if doctors convey false information to their

59

patients that departs from the standard of care. And, once that trust is eroded (including in the vaccination arena), the public is at risk.

In contrast, any actual burden on the plaintiffs is incidental and exceedingly minimal. State law already defines incompetence, a single instance of gross negligence, or repeated negligent acts as unprofessional conduct—regulations not challenged by plaintiffs in this case. Cal. Bus. & Prof. Code § 2234(b), (c), (d). All AB 2098 does is clarify that a single instance of negligence with respect to the treatment and care provided to a patient can constitute unprofessional conduct, if the relevant care involves misinformation or disinformation to a patient about COVID-19. This *de minimis* change in the regulation of plaintiffs' medical practices must be considered against the lives AB 2098 will save. Any incremental impact on speech—particularly speech that comes in the form of advice or treatment below the standard of care—is far outweighed by the State's compelling interest in ensuring that doctors provide adequate care for the protection and safety of their patients and the public.

## CONCLUSION

The decision in *McDonald* should be affirmed, and the Court should deny any injunctive relief in *Couris*.


Dated:  March 2, 2023          Respectfully submitted,


ROB BONTA
Attorney General of California
GLORIA L. CASTRO
THOMAS S. PATTERSON
Senior Assistant Attorneys General
EDWARD KIM
ANYA M. BINSACCA
Supervising Deputy Attorneys General
CHRISTINA SEIN GOOT
Deputy Attorney General

*s/ Kristin Liska*

KRISTIN A. LISKA
Deputy Attorney General
*Attorneys for Defendants-Appellees*


61

22-56220, 23-55069

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**MARK MCDONALD; JEFF BARKE,**

                      Plaintiffs-Appellants,

      **v.**

**KRISTINA D. LAWSON, in her official capacity as President of the Medical Board of California; et al.,**

                   Defendants-Appellees.

---

**MICHAEL COURIS; MICHAEL FITZGIBBONS,**

                      Plaintiffs-Appellants,

      **v.**

**KRISTINA D. LAWSON, in her official capacity as President of the Medical Board of California; et al.,**

                   Defendants-Appellees.

---

**STATEMENT OF RELATED CASES**

62

To the best of our knowledge, there are no related cases.


Dated:  March 2, 2023                    Respectfully submitted,


                                         ROB BONTA
                                         Attorney General of California
                                         GLORIA L. CASTRO
                                         THOMAS S. PATTERSON
                                         Senior Assistant Attorneys General
                                         EDWARD KIM
                                         ANYA M. BINSACCA
                                         Supervising Deputy Attorneys General
                                         CHRISTINA SEIN GOOT
                                         Deputy Attorney General

                                         *s/ Kristin Liska*

                                         KRISTIN A. LISKA
                                         Deputy Attorney General
                                         *Attorneys for Defendants-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 22-56220, 23-55069

I am the attorney or self-represented party.

**This brief contains** | 13,166 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Kristin Liska | **Date** | March 2, 2023

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**           **64**           *Rev. 12/01/22*

# ADDENDUM

22-56220, 23-55069

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**MARK MCDONALD; JEFF BARKE,**

Plaintiffs-Appellants,

**v.**

**KRISTINA D. LAWSON, in her official capacity as President of the Medical Board of California; et al.,**

Defendants-Appellees.

---

**MICHAEL COURIS; MICHAEL FITZGIBBONS,**

Plaintiffs-Appellants,

**v.**

**KRISTINA D. LAWSON, in her official capacity as President of the Medical Board of California; et al.,**

Defendants-Appellees.

---

**STATUTORY ADDENDUM TO DEFENDANTS-APPELLEES' CONSOLIDATED ANSWERING BRIEF ON THE MERITS**

<u>Description</u>                                                                                  <u>Page</u>

Cal. Bus. & Prof. Code § 2270 .................................................................... A-1

2022 Cal. Stat., ch. 938 (Assembly Bill 2098) ........................................... A-3

§ 2270. Dissemination of misinformation or disinformation..., CA BUS & PROF § 2270

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Validity Called into Doubt by   Hoeg v. Newsom,   E.D.Cal.,   Jan. 25, 2023

West's Annotated California Codes
    Business and Professions Code (Refs & Annos)
        Division 2. Healing Arts (Refs & Annos)
            Chapter 5. Medicine (Refs & Annos)
                Article 12. Enforcement (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 2270

§ 2270. Dissemination of misinformation or disinformation related to
SARS-CoV-2 coronavirus, or "COVID-19"; unprofessional conduct.

Effective: January 1, 2023
Currentness

(a) It shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.

(b) For purposes of this section, the following definitions shall apply:

(1) "Board" means the Medical Board of California or the Osteopathic Medical Board of California, as applicable.

(2) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.

(3) "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.

(4) "Misinformation" means false information that is contradicted by contemporary scientific consensus contrary to the standard of care.

(5) "Physician and surgeon" means a person licensed by the Medical Board of California or the Osteopathic Medical Board of California under Chapter 5 (commencing with Section 2000).

(c) Section 2314 shall not apply to this section.

**Credits**
(Added by Stats.2022, c. 938 (A.B.2098), § 2, eff. Jan. 1, 2023.)

A-1

Notes of Decisions (11)

West's Ann. Cal. Bus. & Prof. Code § 2270, CA BUS & PROF § 2270
Current with all laws through Ch. 997 of 2022 Reg.Sess.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-2**

2021 California Assembly Bill No. 2098, California 2021-2022 Regular Session

CALIFORNIA BILL TEXT

**TITLE: Physicians and surgeons: unprofessional conduct.**

VERSION: Adopted
September 30, 2022
Low (A), Aguiar-Curry (A) , Pan (S) , Akilah Weber (A) , Wicks (A) , Wiener (S)

Image 1 within document in PDF format.

SUMMARY: An act to add Section 2270 to the Business and Professions Code, relating to healing arts.

**TEXT:**

Assembly Bill No. 2098

CHAPTER 938

An act to add Section 2270 to the Business and Professions Code, relating to healing arts.

[Approved by Governor September 30, 2022. Filed with Secretary of State September 30, 2022.]

LEGISLATIVE COUNSEL'S DIGEST

AB 2098, Low. Physicians and surgeons: unprofessional conduct.

Existing law provides for the licensure and regulation of physicians and surgeons by the Medical Board of California and the Osteopathic Medical Board of California. Existing law requires the applicable board to take action against any licensed physician and surgeon who is charged with unprofessional conduct, as provided.

This bill would designate the dissemination of misinformation or disinformation related to the SARS-CoV-2 coronavirus, or "COVID-19," as unprofessional conduct. The bill would also make findings and declarations in this regard.

The people of the State of California do enact as follows:

SECTION 1. The Legislature finds and declares all of the following:

(a) The global spread of the SARS-CoV-2 coronavirus, or COVID-19, has claimed the lives of over 6,000,000 people worldwide, including nearly 90,000 Californians.

(b) Data from the federal Centers for Disease Control and Prevention (CDC) shows that unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated.

(c) The safety and efficacy of COVID-19 vaccines have been confirmed through evaluation by the federal Food and Drug Administration (FDA) and the vaccines continue to undergo intensive safety monitoring by the CDC.

(d) The spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence and placed lives at serious risk.

(e) Major news outlets have reported that some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals.

(f) The Federation of State Medical Boards has released a statement warning that physicians who engage in the dissemination of COVID-19 vaccine misinformation or disinformation risk losing their medical license, and that physicians have a duty to provide their patients with accurate, science-based information.

(g) In House Resolution No. 74 of the 2021-22 Regular Session, the California State Assembly declared health misinformation to be a public health crisis, and urged the State of California to commit to appropriately combating health misinformation and curbing the spread of falsehoods that threaten the health and safety of Californians.

SEC. 2. Section 2270 is added to the Business and Professions Code, to read:

2270. (a) It shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.

(b) For purposes of this section, the following definitions shall apply:

(1) "Board" means the Medical Board of California or the Osteopathic Medical Board of California, as applicable.

(2) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.

(3) "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.

(4) "Misinformation" means false information that is contradicted by contemporary scientific consensus contrary to the standard of care.

(5) "Physician and surgeon" means a person licensed by the Medical Board of California or the Osteopathic Medical Board of California under Chapter 5 (commencing with Section 2000).

(c) Section 2314 shall not apply to this section.

SEC. 3. The provisions of this act are severable. If any provision of this act or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# CERTIFICATE OF SERVICE

Case Name: ***McDonald, et al. v. Lawson, et al.***, Case No. **22-56220**; and
Case Name: ***Couris, et al. v. Lawson, et al.***, Case No. **23-55069**

I hereby certify that on <u>March 2, 2023</u>, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

## DEFENDANTS-APPELLEES' CONSOLIDATED ANSWERING BRIEF ON THE MERITS

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on <u>March 2, 2023</u>, at San Francisco, California.

|  |  |
|---|---|
| Vanessa Jordan | s/ Vanessa Jordan |
| Declarant | Signature |