**Nos. 22-56220, 23-55069**

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Mark McDonald and Jeff Barke,

*Plaintiffs-Appellants*,

v.

Kristina D. Lawson et al.,

*Defendants-Appellees.*

AND

Michael Couris et al.,

*Plaintiffs-Appellants*,

v.

Kristina D. Lawson et al.,

*Defendants-Appellees.*

## MCDONALD APPELLANTS' REPLY BRIEF

Daniel R. Suhr
dsuhr@libertyjusticecenter.org
Reilly Stephens
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Phone: 312-637-2280
*Attorneys for McDonald Appellants*

Mariah Gondeiro, Esq.
mgondeiro@faith-freedom.com
Julianne E. Fleischer, Esq.
jfleischer@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 600-2733
Facsimile: (951) 600-4996

# TABLE OF CONTENTS

INTRODUCTION ........................................................................1

ARGUMENT ...............................................................................2

   I.  Abridging doctors' First Amendment rights requires the State to meet  the burden of strict scrutiny. ...................................2

   II.  AB 2098 is unconstitutionally vague because it fails to give doctors adequate notice of the conduct proscribed......................................14

   III. The remaining preliminary injunction factors favor reversal.......18

CONCLUSION............................................................................19

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(g)..........21

CERTIFICATE OF SERVICE .................................................................22

TABLE OF AUTHORITIES

**Cases**

*Bd. of Regents v. Southworth*, 529 U.S. 217 (2000) ...................................8

*Conant v. McCaffrey*, No. C 97-00139 WHA, 2000 U.S. Dist. LEXIS 13024 (N.D. Cal. Sep. 7, 2000)...............................................................8

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ............................*passim*

*Nat'l Ass'n for the Advancement of Psychoanalysis v. Calif. Bd. of Psychology*, 228 F.3d 1043 (9th Cir. 2000) .............................................14

*Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ......................................................................................2, 11

*National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043 (9th Cir. 2000) .........14

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) .......................................4

*Regan v. Time, Inc.*, 468 U.S. 641 (1984) ...............................................16

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022)..................................3

*United States v. Moore*, 423 U.S. 122 (1975) ...........................................6

*United States v. Wunsch*, 84 F.3d 1110 (9th Cir. 1996) ..........................10

*Victory Processing, LLC v. Fox*, 937 F.3d 1218 (9th Cir. 2019) ...............3

*Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017) ....3

*Yu Cong Eng v. Trinidad*, 271 U.S. 500 (1926) ......................................16

**Statutes**

Ala. Code § 34-24-360 ...............................................................................6

Nev. Rev. Stat. § 630.304............................................................................6

Or. Rev. Stat. § 677.190 ..............................................................................6

**Other Authorities**

"Covid-19 pandemic is over in the US - Joe Biden," BBC.com (Sept. 20, 2022), https://www.bbc.com/news/world-us-canada-62959089..............9

"Governor Newsom to End the COVID-19 State of Emergency," Press Release (Oct. 17, 2022), https://www.gov.ca.gov/2022/10/17/governor-newsom-to-end-the-covid-19-state-of-emergency/. ...............................9

Alexandra Stevenson, *Senator Tom Cotton Repeats Fringe Theory of Coronavirus Origins*, New York Times, Feb. 17, 2020 .........................1

Christopher Brito, *Dr. Fauci again dismisses Wuhan lab as source of coronavirus*, CBS News, May 5, 2020, https://www.cbsnews.com/news/anthony-fauci-wuhan-lab-coronavirus-source-dismissal/. ......................................................................................1

Geoff Brumfiel, *Scientists Debunk Lab Accident Theory Of Pandemic Emergence*, NPR, Apr. 22, 2020, https://www.npr.org/2020/04/22/841925672/scientists-debunk-lab-accident-theory-of-pandemic-emergence ................................................1

Michael R. Gordon and Warren P. Strobel, *FBI Director Says Covid Pandemic Likely Caused by Chinese Lab Leak*, Wall Street Journal, Feb. 28, 2023, https://www.wsj.com/articles/fbi-director-says-covid-pandemic-likely-caused-by-chinese-lab-leak-13a5e69b ........................1

Michael R. Gordon and Warren P. Strobel, *Lab Leak Most Likely Origin of Covid-19 Pandemic, Energy Department Now Says*, Wall Street Journal, Feb. 26, 2023, https://www.wsj.com/articles/covid-origin-china-lab-leak-807b7b0a ........................................................................1

**Rules**

Cal. Rules of Prof'l Conduct, Rule 1.1 ....................................................13

Cal. Rules of Prof'l Conduct, Rule 1.3 ....................................................13

iii

**INTRODUCTION**

In between the McDonald Appellants' ("McDonald") opening brief

and this reply brief, the U.S. Department of Energy announced that in

its best judgment the COIVD-19 began with a leak of virus samples

from a lab in Wuhan, China.[1] In this, Energy joined the FBI, which had

previously come to the same conclusion.[2] This theory, now endorsed by

two federal agencies with access to classified intelligence on the matter,

had been dismissed by public health authorities,[3] "debunked"[4], and

declared a fringe conspiracy theory.[5] Under AB 2098, a doctor could

---

[1] Michael R. Gordon and Warren P. Strobel, *Lab Leak Most Likely Origin of Covid-19 Pandemic, Energy Department Now Says*, Wall Street Journal, Feb. 26, 2023, https://www.wsj.com/articles/covid-origin-china-lab-leak-807b7b0a.

[2] Michael R. Gordon and Warren P. Strobel, *FBI Director Says Covid Pandemic Likely Caused by Chinese Lab Leak*, Wall Street Journal, Feb. 28, 2023, https://www.wsj.com/articles/fbi-director-says-covid-pandemic-likely-caused-by-chinese-lab-leak-13a5e69b.

[3] Christopher Brito, *Dr. Fauci again dismisses Wuhan lab as source of coronavirus*, CBS News, May 5, 2020, https://www.cbsnews.com/news/anthony-fauci-wuhan-lab-coronavirus-source-dismissal/.

[4] Geoff Brumfiel, *Scientists Debunk Lab Accident Theory Of Pandemic Emergence*, NPR, Apr. 22, 2020, https://www.npr.org/2020/04/22/841925672/scientists-debunk-lab-accident-theory-of-pandemic-emergence

[5] Alexandra Stevenson, *Senator Tom Cotton Repeats Fringe Theory of Coronavirus Origins*, New York Times, Feb. 17, 2020.

1

have lost their medical license for telling a patient what the Department of Energy and the FBI are now telling the public.

This is the fundamental problem with AB 2098: it seeks to punish simply conveying information a doctor believes to be true, on the basis of content and viewpoint, in any instance where the content expresses a viewpoint the Medical Board of California disagrees with. There is no requirement that the conveyed information harm a patient, or even that the patient follow the advice in the first place. AB 2098 is not a malpractice regulation: its intent is the censorship of dissent, and that will be its effect if the decision below is not reversed.

## ARGUMENT

## I.  Abridging doctors' First Amendment rights requires the State to meet the burden of strict scrutiny.

The Board's arguments on the merits begin with the flawed premise that speech by professionals is subject to some special rational basis standard. *See* Board Br. at 21, 34. But the Supreme Court has expressly rejected the professional speech doctrine. *Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) (*NIFLA*). And there are multiple reasons to think more than rational basis applies here.

Indeed, "professional speech may be entitled to the strongest protection our Constitution has to offer." *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002). AB 2098 is content-based (it only applies to speech about one particular topic, COVID-19) and viewpoint-based (it only bars speech about that topic that contradicts the government's definition of the current scientific consensus, even as there are multiple other viewpoints that dissent from the government's definition of what the science shows and whether it's a consensus). For both reasons, it is presumptively unconstitutional and subject to strict scrutiny. *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019).

Defendants attempt to work their way around *NIFLA* by dubbing certain speech they wish to suppress "conduct," Board Br. at 24, but calling speech itself conduct "is a dubious constitutional enterprise" that "is unprincipled and susceptible to manipulation." *See Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1308-09 (11th Cir. 2017) (en banc) (cleaned up).

Of course, *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), held that *NIFLA* had left open some remainder of this Court's professional doctrine as articulated in *Pickup v. Brown*, 740 F.3d 1208, 1221 (9th

3

Cir. 2014). But the conversion therapy bans in *Pickup* and *Tingley* addressed a particular *treatment strategy*—techniques to change a minor's sexual orientation—whereas AB 2098 outlaws providing patients "information" or "advice" that the Board believes they should not be provided. This makes *Tingley* entirely distinguishable. Unlike *Tingley* and *Pickup*, AB 2098 does not simply "regulate[] the kind of care that a physician can provide." Board Br. at 26. The law does not regulate care at all—for example, it does not prevent a doctor from prescribing ivermectin or hydroxychloroquine for COVID. It only regulates doctors' *speech* about ivermectin or hydroxychloroquine (we assume; it's so vague that we can't say for certain whether those two drugs are in or out of the contemporary scientific consensus concerning the standard of care). In *Tingley*, the care was delivered via speech (i.e., talk therapy). This is why the Defendants are right when they say, "The fact that such care 'is performed through speech alone' made no difference" in *Tingley*—in that case, care delivered as speech is still care, even if it is also speech. Board Br. at 26. Here, however, there is no speech component to the actual treatment of COVID-19. Unlike with conversion therapy or nutrition advice, words have no effect on a

4

patient's COVID; one cannot verbally counsel away a virus.

That distinction makes this case much closer to *Conant*, in which the government failed in its defense of a rule that a doctor merely *recommending* marijuana to a patient was a basis to revoke a medical license. According to the Board, "the policy at issue in *Conant* criminalized any and all recommendations of marijuana use between doctors and patients—including those made when the doctor 'compl[ied] with accepted medical procedures' and was acting 'in conformity' with medical standards." Board Br. at 31 (quoting *Conant*, 309 F.3d at 647 (Kozinski, J., concurring)). But what medical standards were the doctors in *Conant* conforming with? As a matter of federal law, marijuana has "no currently accepted medical use in treatment in the United States" and "[t]here is a lack of accepted safety for use of the drug or other substance under medical supervision." 21 U.S.C. § 812(b)(1) (definition of a Schedule I drug). The people of California disagree with Congress on that point and through their representatives have licensed medical uses of marijuana. Fair enough—this debate just illustrates McDonald's point that doctors' speech to patients cannot be limited to any particular government's definition of what it believes to

5

be the standard of care. And indeed, the bits the Board quotes from
*Conant* come from the concurrence, and in context that paragraph is
distinguishing *United States v. Moore*, 423 U.S. 122 (1975), in which a
doctor wrote prescriptions for controlled substances, charging by the
amount of controlled substance, and didn't actually examine the
patients. In other words, the doctor in that case was acting as a drug
dealer, entirely outside the scope of medical practice.

The Board's own citations to what it claims are comparable state
statutes only emphasize what an outlier AB 2098 is. *See* Board Br. at
26. For instance, Nev. Rev. Stat. § 630.304, which the Board
summarizes as "[a] doctor may be sanctioned for discouraging second
opinion," actually prevents a physician from attempting to "retain a
patient or to discourage the use of a second opinion" "by way of
intimidation, coercion or deception." Ala. Code § 34-24-360 prohibits the
"[u]se of any untruthful or deceptive or improbable statements
concerning the licensee's qualifications or the effects or results of his
proposed treatment." Or. Rev. Stat. § 677.190 sanctions "making
statements that the licensee knows, or with the exercise of reasonable
care should know, are false or misleading, regarding skill or the efficacy

6

or value of the medicine, treatment or remedy prescribed . . ." These are *anti-fraud* provisions, targeted at attempts by doctors to deceive patients: lying about qualifications, coercing a patient not to get a second opinion, and knowingly making false statements regarding the efficacy of a particular medicine. None of them threatens to sanction a doctor who sincerely believes that the government's version of the consensus view is mistaken.

The government may establish that a single medical treatment is the official appropriate standard of care, and it may punish doctors who deviate from that standard. And when that care is delivered through speech, it may regulate that care. But it may not punish doctors for discussing with their patients the doctors' view that the official treatment is in fact not the best or only treatment—regardless of whether it can be shown the doctor was wrong, whether their patient even took the advice, and whether the advice ever harmed a single patient. Under AB 2098, the doctor can be *right* and the medical board can be *wrong* about the science, and the doctor can still lose his license for contradicting the "consensus."

The Board also loses sight of *Conant*'s concern for a robust public

policy debate. The district court in *Conant*, which was affirmed by this Court, wanted to protect the patient's right to receive the recommendation and take non-medical action: "the patient upon receiving the recommendation could petition the government to change the law. By chilling doctors' ability to recommend marijuana to a patient, the district court held that the prohibition compromises a patient's meaningful participation in public discourse." *Conant*, 309 F.3d at 634-35 (*summarizing Conant v. McCaffrey*, No. C 97-00139 WHA, 2000 U.S. Dist. LEXIS 13024, at *40 (N.D. Cal. Sep. 7, 2000)). In the same way, on a topic as charged as the government's response to COVID-19, the government's decision to censor minority views limits public debate. This law imposes viewpoint discrimination: it establishes one official viewpoint on a contested topic (whatever the Board defines as the contemporary scientific consensus) and uses the power of the state to punish all who dare share a different viewpoint out loud to their patients. That violates the First Amendment's fundamental command: "The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views." *Bd. of Regents v. Southworth*, 529 U.S. 217, 235 (2000).

The Board asserts that even if its law does burden Plaintiffs' First Amendment rights, it is nevertheless justified by the Government's interests. But the Board's description of its interests would permit it to enact any regulation of physician speech it desired—which would be incompatible with *Conant* and *Wollschlaeger*.

The Board's description of its interests in fighting the COVID pandemic also fails to account for the stage we are in. The President of the United States has declared the pandemic is over,[6] and the Governor of California has ended his emergency declaration.[7] Even if the government may have had a compelling interest in COVID-19 regulation in the past, that interest is certainly different today, and the Board cannot rely on precedents from a previous phase to justify its current policy.

Besides, the Act is in no way tailored narrowly to those interests. Take protection of the public from negligent or incompetent physicians.

---

[6] *Covid-19 pandemic is over in the US - Joe Biden*, BBC.com (Sept. 20, 2022), https://www.bbc.com/news/world-us-canada-62959089.

[7] *Governor Newsom Marks End of California's COVID-19 State of Emergency*, Press Release (Feb. 28, 2023), https://www.gov.ca.gov/2023/02/28/governor-newsom-marks-end-of-californias-covid-19-state-of-emergency/.

Board Br. at 40. AB 2098 does not impose a standard of negligence or incompetence—instead, it relies on a standard of contemporary scientific consensus, with which disagreement could be widespread and reasonable. If the California legislature had wanted to limit AB 2098 to a negligence standard, it could have—but instead, it made the "dissemination" of "information" or "advice" a strict liability offense.

What's more, the Board's interpretation is at war with the statute itself. The statute defines "disseminate" as "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice." That definition is not limited to care, nor is it limited to dealing with a specific treatment. Rather, simply providing "advice" to "a patient under the licensee's care" fits squarely within the language of the Act. At best, the Board's assertions of the limited nature of AB 2098 could be treated as an articulation of its expected enforcement strategy, but this Court cannot take the Board's predictions of its enforcement priorities as a statement of the law—as nothing would bind the board to that modesty. *See United States v. Wunsch*, 84 F.3d 1110, 1118 (9th Cir. 1996) ("California has failed to show that this new policy represents an authoritative and binding

10

construction of [the law] rather than a mere enforcement strategy, which would not be binding on the courts.").

The importance of ensuring patients have access to accurate, complete, and truthful information does not require policing the speech of individual doctors. If the state wants to ensure that the general public has access to what the state believes is accurate information, it can set up a website; it can even run an ad campaign. But it cannot commandeer the speech of others to repeat its message. Those are essentially the facts of *NIFLA*, in which the state required pregnancy centers to post the State's message regarding abortion on their premises. *See* 138 S. Ct. at 2369. California's argument in *NIFLA* was that its state interest in making sure patients had accurate information about abortion allowed it to control the speech of medical professionals. *Id.* at 2375 ("California asserts a single interest to justify the licensed notice: providing low-income women with information about state-sponsored services."). As in *NIFLA*, here the State is seeking to use its power to suppress one viewpoint in favor of its preferred viewpoint. *See NIFLA*, 138 S. Ct. at 2379-80 (Kennedy, J., concurring) ("This law is a paradigmatic example of the serious threat presented when government

seeks to impose its own message in the place of individual speech, thought, and expression."). That "is a matter of serious constitutional concern." *Id*. California's supposed desire to provide information arose in the context of medical treatment; if California could not constitutionally force pro-life pregnancy centers to provide the government's preferred medical information about abortion, how can California force doctors to only provide the government's preferred medical information about COVID-19?

The Board claims that Plaintiffs' arguments would protect any sort of incompetent professional advice, such as a lawyer misinforming a client about the appeal deadline set by the Federal Rules of Appellate Procedure, or an engineer recommending a flawed design for a bridge. Board Br. at 33. But there is no possibility of debate over the appeal deadline set in a rule. If there were a legitimate diversity of opinions among lawyers as to whether, say, the First Amendment protected hate speech, would this Court be comfortable if the State Bar of California declared a "consensus" that it did not protect hate speech and then took away the bar license of any attorney who advised a client that the First Amendment did protect hate speech? Because that is the equivalent of

what the Medical Board has done here.

California's rules of professional conduct only sanction a lawyer for incompetence when they act "intentionally, recklessly, with gross negligence, or repeatedly," Cal. Rules of Prof'l Conduct, Rule 1.1 (Competence), and likewise only sanction a lawyer for lack of diligence where they fail "intentionally, repeatedly, recklessly or with gross negligence," *Id.* at Rule 1.3 (Diligence). California law already punished doctors for similar repeated and gross acts of negligence. What's new about AB 2098 is that it punishes a single conveyance of disfavored information, untethered from either intent or harm. A lawyer misremembering a procedural rule has generally not committed malpractice if it's an innocent mistake that does not prejudice a client's rights; but under AB 2098's standard, a single instance of misinterpreting or misremembering a point of law would cost a lawyer his license, even if the client ultimately *won* their case. And while it probably would be gross negligence for an engineer to endorse a bridge design with a proven tendency to collapse, the AB 2098 standard would punish an engineer who identified a flaw in the officially endorsed bridge design the proper authorities didn't see.

13

And that's before one gets to the point that the law remains content-based and viewpoint-discriminatory. Even if the Board were correct that regulations of medical practice such as this are normally subject to rational basis review, this law *still* should receive strict scrutiny because it imposes content and viewpoint discrimination. *Nat'l Ass'n for the Advancement of Psychoanalysis v. Calif. Bd. of Psychology*, 228 F.3d 1043 (9th Cir. 2000) (after concluding a medical regulation was subject to rational basis review as an exercise of general police power, the Court proceeded to consider whether it qualified for greater scrutiny as content- or viewpoint-based). This law only targets medical advice that speaks about a particular subject and recites a particular viewpoint. Indeed, if the Court agrees with the Appellants that the law covers speech and not conduct, the State does not even attempt to argue the law is not content- or viewpoint-based, only that it would survive heightened scrutiny because of the State's interests (which are inadequate, as explained above).

## II.  AB 2098 is unconstitutionally vague because it fails to give doctors adequate notice of the conduct proscribed.

Regarding vagueness, the Board objects that the scientific consensus

can be objective that "orange juice contains sugar" and "that measles is caused by a virus." Board Br. at 53. But oranges and measles have been known to humanity since antiquity. As the name of the virus itself suggests, COVID-19 just passed its third birthday; Plaintiffs submit that a greater range of uncertainty is warranted when experience is short. The appropriate medical response to COVID is a topic on which "there is a genuine difference of expert opinion on the subject, with significant scientific and anecdotal evidence supporting both points of view." *Conant*, 309 F.3d at 643 (Kozinski, J., concurring). How is any doctor to know what constitutes "the contemporary scientific consensus" when that consensus is constantly changing and evolving, there are a variety of studies and reports, and a genuine difference of expert opinions?

The Board's response is also cold comfort: we can charge you with violating the law, and if we don't prove (to ourselves) that your advice violates the scientific consensus, then we won't take your license away in the end. Board Br. at 54-55. Of course, the government could use such an excuse to defeat any pre-enforcement void-for-vagueness challenge: if we don't prove our case, the jury won't convict, and you can

15

go free. But that is not the legal standard: the question is whether a doctor of ordinary intelligence would know what the Board defines as "the contemporary scientific consensus as to the standard of care." And in this instance, when the so-called scientific consensus is dynamic and constantly evolving, a doctor of ordinary intelligence cannot be expected to know what is "in or out."

As a last-ditch effort, the Board suggests simply severing "contradicted by the scientific consensus" such that "misinformation" would be defined as "false information that is contrary to the standard of care." Board Br. at 57. But that's not severing a troublesome provision; that's rewriting the statute. "[C]ourts addressing questions of severability should be guided by Chief Justice Taft's admonition 'that amendment may not be substituted for construction, and that a court may not exercise legislative functions to save a law from conflict with constitutional limitation.'" *Regan v. Time, Inc.*, 468 U.S. 641, 664 n.2, 104 S. Ct. 3262, 3275 (1984) (Brennan, J., concurring) (quoting *Yu Cong Eng v. Trinidad*, 271 U.S. 500, 518 (1926)) (cleaned up). Simply excising inconvenient words mid-sentence could solve a lot of statuary problems, but that is not how courts operate.

16

And even the Board's proposed alteration does not solve the problem: punishing doctors for "false information contrary to the standard of care" still leaves open the question of what information is false. Was it "false" when official public health authorities told the public not to wear masks, or when they dismissed as a conspiracy theory now officially-endorsed possibility that the virus is a leaked sample from a Chinese lab? Should the public health officials who espoused that conventional wisdom lose their medical licenses? In McDonald's view, they should not, but the State should explain why they agree with him, when their arguments are to the contrary.

Finally, even if the Court were to rewrite this subsection of the law as the State asks, it would not solve the separate problem that the law also promises to punish "misleading" speech. AB 2098 promises to discipline doctors for "disseminat[ing] misinformation or disinformation related to COVID-19, including false or misleading information." § 2270(a). "Misinformation" and "disinformation" are defined in the statute as "false" information, but no definition is provided for "misleading" information. Certainly, at minimum, this terminology is hopelessly vague; no doctor of ordinary intelligence can be expected to

17

know when he crosses a line by providing accurate but "misleading" information.

### III.   The remaining preliminary injunction factors favor reversal.

The Board concedes that, if "plaintiffs ha[ve] demonstrated that AB 2098 likely violated their constitutional rights, that would constitute irreparable harm." Board Br. at 58. Plaintiffs have demonstrated made that demonstration, and they agree with the Board that it constitutes irreparable harm. This also means that the balance of equities and public interest favor Plaintiffs, as the protection of First Amendment rights is always equitable and in the public interest. *Id.* The Board's argument on the balance of harms and public interest mostly relies on harms to patients from bad medical advice, but nothing in AB 2098 requires that a doctor's advice *harm* a patient. Rather, the Act proscribes the *giving of advice* that the Board considers *bad advice.* That's it. When Plaintiffs advise their patients that Vitamin D and Zinc are a better regimen for COVID treatment than the official guidance, there's no particular risk that these common over-the-counter supplements will cause harm. Under AB 2098, that advice is the equivalent of gross negligence.

And because the Plaintiffs have raised at least "serious questions" going to the merits," an injunction should issue because this balance of harms tips sharply in their favor. The right to free speech is of paramount importance, and the effects of the government's policy on the marketplace of ideas for medical innovation affects the plaintiffs' patients, patients across California, and ultimately patients across the nation as doctors decline the risk associated with questioning the State's preferred view on scientific questions.

## CONCLUSION

The government's policy in this case seeks to punish physicians on the basis of the content of doctor-patient communications. "Only doctor-patient conversations that include discussions of [COVID-19] trigger the policy. Moreover, the policy does not merely prohibit the discussion of [COVID-19]; it condemns expression of a particular viewpoint, i.e., that [contrary to the Board's view of the contemporary scientific consensus]. Such condemnation of particular views is especially troubling in the First Amendment context." *Conant*, 309 F.3d at 637. For the reasons stated above, and in McDonald's opening brief, the decision below should be reversed.

Dated: March 23, 2023               Respectfully submitted,


Daniel R. Suhr                          Mariah Gondeiro, Esq.
dsuhr@libertyjusticecenter.org          mgondeiro@faith-freedom.com
Reilly Stephens                         Julianne E. Fleischer, Esq.
rstephens@libertyjusticecenter.org      jfleischer@faith-freedom.com
Liberty Justice Center                  ADVOCATES FOR FAITH & FREEDOM
440 N. Wells Street, Suite 200          25026 Las Brisas Road
Chicago, Illinois 60654                 Murrieta, California 92562
Phone: 312-637-2280                     Telephone: (951) 600-2733
                                        Facsimile: (951) 600-4996


*Attorneys for McDonald Appellants*

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(g)

I certify that this brief complies with the word limit of Cir. R. 32-1, because this brief contains 3,765 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

/s/ Daniel R. Suhr
March 23, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2023, I electronically filed the

forgoing Reply Brief of the McDonald Appellants with the Clerk of the

Court for the United States Court of Appeals for the Ninth Circuit by

using the CM/ECF system. I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the

CM/ECF system.

/s/Daniel R. Suhr
Daniel R. Suhr