NOS. 22-56220, 23-55069

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MARK MCDONALD, *et al.*,
*Plaintiffs-Appellants*,

v.

KRISTINA D. LAWSON, *et al.*,
*Defendants-Appellees*.

MICHAEL COURIS and MICHAEL FITZGIBBONS,
*Plaintiffs-Appellants*,

v.

KRISTINA D. LAWSON, *et al.*,
*Defendants-Appellees*.

**On Appeals from the United States District Court
for the Central District of California, No. 8:22-cv-01805-FWS-ADS; and the
United States District Court for the Southern District of California,
No. 3:22-cv-01922-RSH-JLB**

Opening Brief of Appellants Michael Couris and Michael Fitzgibbons

HAMILTON LINCOLN LAW INSTITUTE
Neville Hedley
1440 W. Taylor Street, #1487
Chicago, IL 60607
(312) 342-6008

HAMILTON LINCOLN LAW INSTITUTE
Theodore H. Frank
Adam E. Schulman
1629 K Street NW, Suite 300
Washington, D.C. 20006
(703) 203-3848
ted.frank@hlli.org
*Attorneys for Appellants Michael Couris
and Michael Fitzgibbons*

**Corporate Disclosure Statement (FRAP 26.1)**

Pursuant to the disclosure requirements of FRAP 26.1, Michael Couris and Michael Fitzgibbons declare that they are individuals and, as such, are not a subsidiary or affiliate of a publicly owned corporation and there is no publicly held corporation that owns ten percent or more of any stock issued by him.

# Table of Contents

Corporate Disclosure Statement (FRAP 26.1) ..................................................... i

Table of Contents .................................................................................................. ii

Table of Authorities ............................................................................................. iv

Statement of Subject Matter and Appellate Jurisdiction ................................... 1

Statement of the Issues ......................................................................................... 2

Standard of Review ............................................................................................... 4

Bills and Statutes .................................................................................................. 5

Statement of the Case ........................................................................................... 8

    A.    The COVID-19 pandemic and its response are controversial in the medical community. ........................................................................... 8

    B.    Doctors Couris's and Fitzgibbons's experience with COVID-19 causes them reasonable skepticism of medical consensus. ..................... 10

    C.    California passes AB 2098 to restrict the speech of doctors. ................. 12

    D.    AB 2098 chills Drs. Couris's and Fitzgibbons's advice to patients; they sue and move for a preliminary injunction. ....................................... 15

    E.    *McDonald v. Lawson*, a parallel case in the Central District of California, denies injunctive relief, and McDonald appeals. .................... 16

    F.    The district court stays proceedings before resolving the motion for preliminary injunction, Couris appeals, and the Ninth Circuit consolidates with *McDonald*. .......................................................... 17

    G.    The Eastern District of California preliminarily enjoins enforcement of AB 2098. ........................................................................ 18

Summary of Argument ....................................................................................... 19

Argument ............................................................................................................. 21

I.    Because the stay order has the "practical effect of refusing an injunction," 28 U.S.C. § 1292(a)(1) provides appellate jurisdiction. ........................... 21

II.    When the First Amendment is at issue, a court must grant a preliminary injunction to plaintiffs likely to succeed on the merits. ........................... 23

III.    Plaintiffs are likely to succeed on the merits; *Høeg* is correct and *McDonald* is incorrect. ....................................................................... 24

    A.     AB 2098 impermissibly regulates content and viewpoint and cannot withstand strict scrutiny.................................................................24

        1.  AB 2098 is a content-based speech regulation.....................................24

        2.  AB 2098 regulates viewpoint.......................................................32

        3.  AB 2098 cannot withstand strict scrutiny............................................35

    B.     AB 2098 is unconstitutionally vague and overbroad. ...............................40

    C.     Plaintiffs will sufferable irreparable harm.................................................46

    D.     The balance of equities and public interest support granting preliminary relief...........................................................................47

Conclusion...............................................................................................49

Statement of Related Cases Under Circuit Rule 28-2.6 ..................................50

Certificate of Compliance Pursuant to 9th Circuit Rule 32-1 for Case Number 23-55069..........................................................................51

Proof of Service ........................................................................................52

# Table of Authorities

<u>Cases</u>

*Am. Beverage Ass'n v. City of San Francisco,*
  916 F.3d 749 (9th Cir. 2019) ............................................................ 2, 23-24, 38, 48

*Animal Legal Def. Fund v. Wasden,*
  878 F.3d 1184 (9th Cir. 2018) ........................................................................ 37-39

*Arato v. Avedon,*
  5 Cal. 4th 1172 (1993) ............................................................................................ 44

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ................................................................................................ 35

*Boos v. Barry,*
  485 U.S. 312 (1988) ................................................................................................ 46

*Brown v. Entm't Merchs. Ass'n,*
  564 U.S. 786 (2011) ................................................................................................ 27

*Cal. Teachers Ass'n v. State Bd. of Educ.,*
  271 F.3d 1141 (9th Cir. 2001) ................................................................................ 45

*Carson v. Am. Brands, Inc.,*
  450 U.S. 79 (1981) ...................................................................................... 1-2, 21-22

*City of Bourne v. Flores,*
  521 U.S. 507 (1997) ........................................................................................... 35-36

*Conant v. Walters,*
  309 F.3d 629 (9th Cir. 2002) ........................................... 2-3, 19, 25, 27-33, 35, 38

*Cramp v. Bd. of Pub. Instruction,*
  368 U.S. 278 (1961) ................................................................................................ 27

*Cuviello v. City of Vallejo,*
  944 F.3d 816 (9th Cir. 2019) ................................................................................. 46

*Daum v. SpineCare Med. Group, Inc.*,
  52 Cal. App. 4th 1285 (1997) ................................................. 44

*Dayton Area Visually Impaired Persons v. Fisher*,
  70 F.3d 1474 (6th Cir. 1995) .............................................. 22-23

*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014) ................................................ 47

*Edge v. City of Everett*,
  929 F.3d 657 (9th Cir. 2019) .............................................. 41-42

*Eisenstadt v. Baird*,
  405 U.S. 438 (1972) ......................................................... 34

*FCC v. Fox TV Stations, Inc.*,
  567 U.S. 239 (2012) ......................................................... 40

*Florio v. Liu*,
  60 Cal. App. 5th 278 (2021) ................................................. 44

*Forbes v. Napolitano*,
  236 F.3d 1009 (9th Cir. 2000) ...................................... 42-43, 45

*Gammoh v. City of La Habra*,
  395 F.3d 1114 (9th Cir. 2005) ............................................... 45

*Gay Lib v. Univ. of Missouri*,
  558 F.2d 848 (8th Cir. 1977) ................................................ 35

*Gentile v. State Bar of Nevada*,
  501 U.S. 1030 (1991) ................................................ 4, 35, 44

*Giebel v. Sylvester*,
  244 F.3d 1182 (9th Cir. 2001) ............................................... 26

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ...................................................... 40-42

*Harris v. Bd. Of Supervisors, L.A. Cty.*,
    366 F.3d 754 (9th Cir. 2004) ............................................................. 4

*Høeg v. Newsom*,
    No. 22-cv-01980, __ F. Supp. 3d __,
    2023 U.S. Dist. LEXIS 13131 (E.D. Cal. Jan. 25, 2023) .............................. *passim*

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)) ........................................................................ 26

*Hopper v. City of Pasco*,
    241 F.3d 1067 (9th Cir. 2001) .......................................................... 42

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019) ............................................................... 32, 46

*IMDb.com v. Becerra*,
    962 F.3d 1111 (9th Cir. 2020) ..................................................... 3, 24, 37

*Kahn v. General Motors Corp.*,
    889 F.2d 1078 (Fed. Cir. 1989) ..................................................... 21-23

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967) ..................................................................... 48

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ...................................................... 22, 47

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ................................................................... 42-43

*Lakewood v. Plain Dealer Pub. Co.*,
    486 U.S. 750 (1988) ..................................................................... 46

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) .................................................................... 22-23

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ............................................................... 3, 32

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ................................................................. 24

*Minnesota Voters Alliance v. Mansky,*
    138 S. Ct. 1876 (2018) ......................................................... 32, 35

*NAACP v. Button,*
    371 U.S. 415 (1963) .............................................................. 27, 35

*Nat'l Gay Task Force v. Bd. of Educ.,*
    729 F.2d 1270 (10th Cir. 1984),
    *aff'd by equally divided court, Bd. of Educ. v. Nat'l Gay Task Force,*
    470 U.S. 903 (1985) ........................................................... 27, 34-35

*Nat'l Inst. Of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361(2018) ....................................2, 19, 25, 29, 31-32, 34-38

*Neb. Press Ass'n v. Stuart,*
    423 U.S. 1327 (1975) ................................................................. 22

*New York Times Co. v. Sullivan,*
    376 U.S. 264 (1964) .................................................................. 20

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ....................................................... 24

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer,*
    961 F.3d 1062 (9th Cir. 2020) ....................................................... 26

*Papachristou v. City of Jacksonville,*
    405 U.S. 145 (1972) .................................................................. 43

*Pickup v. Brown,*
    740 F.3d 1208 (9th Cir. 2014) .............................................. 17, 25, 28-29

*Planned Parenthood v. Casey,*
    505 U.S. 833 (1992) .................................................................. 29

*R.A.V. v. St. Paul,*
    505 U.S. 377 (1992) ................................................................ 27

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ...............................................3, 24, 35, 39

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.,*
    605 F.3d 703 (9th Cir. 2010) .........................................47-48

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ................................................................ 33

*Sammartano v. First Jud. Dist. Ct.,*
    303 F.3d 959 (9th Cir. 2002) ............................................... 24

*Seattle Mideast Awareness Campaign v. King Cty.,*
    781 F.3d 489 (9th Cir. 2015) ............................................... 42

*Shee Atika v. Sealaska Corp.,*
    39 F.3d 247 (9th Cir. 1994) ................................................. 23

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ................................................................ 39

*Stenberg v. Carhart,*
    530 U.S. 914 (2000) ................................................................ 46

*Stock v. Gray,*
    No. 22-cv-04104-DGK (W.D. Mo.) ................................... 27

*Texas v. Johnson,*
    491 U.S. 397 (1989) ................................................................ 39

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ................. 2, 17, 19, 25, 28-29, 32

*United States v. Alvarez,*
    576 U.S. 709 (2012) ................................................3, 19, 31, 48

*United States v. Caronia,*
    703 F.3d 149 (2d Cir. 2012) ................................................................. 39

*United States v. McIntosh,*
    833 F.3d 1163 (9th Cir. 2016) .........................................................21-22

*United States v. Playboy Ent. Grp. Inc.,*
    529 U.S. 803 (2000) ........................................................................... 37

*United States v. Stevens,*
    559 U.S. 460 (2010) ..................................................................... 40, 46

*United States v. Williams,*
    553 U.S. 285 (2008) ........................................................................... 19

*United States v. Wunsch,*
    84 F.3d 1110 (9th Cir. 1996) ........................................................ 40, 44

*Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council,*
    425 U.S. 748 (1976) ........................................................................... 47

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ............................................................ 46

*Victory Processing LLC, v. Fox,*
    937 F.3d 1218 (9th Cir. 2019) ............................................................ 37

*Village of Hoffman Estates v. The Flipside,*
    455 U.S. 489 (1982) ........................................................................... 40

*W. Va. State Bd. Of Educ. v. Barnette,*
    319 U.S. 624 (1943) ........................................................................... 33

*Whitney v. California,*
    274 U.S. 357 (1927) ........................................................................... 48

*Williams-Yulee v. Florida Bar,*
    575 U.S. 433 (2015) ........................................................................... 36

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................... 23

*Wollschlaeger v. Governor*,
    849 F.3d 1293 (11th Cir. 2017) (*en banc*) ................................. 26-27, 30

*Young v. Am. Mini Theaters, Inc.*,
    427 U.S. 50 (1976) ............................................................. 45


Rules and Statutes

28 U.S.C. § 1292 ....................................................................... 23

28 U.S.C. § 1292(a)(1) .............................................................1-2, 8, 21-23

28 U.S.C. § 1331 ........................................................................ 1

Cal. AB 2098 ....................................................................*passim*

Cal. Bus. & Prof. Code § 2234................................................... 6, 37

Cal. Bus. & Prof. Code § 2234(b) ................................................ 6, 36

Cal. Bus. & Prof. Code § 2234(e) ................................................ 7, 36

Cal. Bus. & Prof. Code § 2270.................................................5-6, 15

Cal. Bus. & Prof. Code § 2270(b)(3) ........................................... 31

Fed. R. App. Proc. 4(a)(1)(A) ..................................................... 1

U.S. Const. amend. 1................................................................*passim*

Other Authorities

AJMC Staff,
  *A Timeline of COVID-19 Developments in 2020*,
  AMER. J. OF MANAGED CARE (Jan. 1, 2021) ...................................................8-9, 41

Anoruo, Dr. Nancy A.,
  *'Aerosol' vs. 'airborne' vs. 'droplets' amid COVID-19: What you need to know*,
  ABC News (Oct. 2, 2020) ...................................................................................41-42

Apple, David J., M.D.,
  *Sir Harold Ridley and His Fight for Sight: He Changed the World So That We
  May Better See It* (2006) ............................................................................. 33

Bardosh, Kevin, *et al.*,
  *COVID-19 vaccine boosters for young adults: a risk benefit assessment and ethical
  analysis of mandate policies at universities*,
  J. Med. Ethics (Dec. 5, 2022)............................................................................ 9, 44

Bergengruen, Vera,
  *How 'America's Frontline Doctors' Sold Access to Bogus COVID-19
  Treatments—and Left Patients in the Lurch*,
  Time (Aug. 26, 2021) ............................................................................. 37

Dreger, Nancy,
  *Galileo's Middle Finger: Heretics, Activists, and the Search for Justice in
  Science* (2015)............................................................................................. 33

Federation of State Medical Boards,
  *FSMB: Spreading Covid-19 Vaccine Misinformation May Put Medical License at
  Risk,*
  News Releases (July 29, 2021) ............................................................................. 12

Finley, Allysia,
  *How Biden Officials Bungled a Better Vaccine*,
  Wall St. J. (Jan. 29, 2023) ............................................................................. 9

Flood, Brian,
*Contradictions from Fauci, CDC throughout COVID pandemic outlined in viral Twitter thread,*
Fox News (July 29, 2021) ........................................................................ 41

Khemlani, Anjalee,
*CDC guidance exacerbates confusion over COVID-19 boosters,*
Yahoo News (Sept. 24, 2021) .................................................................. 41

Kuklychev, Yevgeny,
*Did a Johns Hopkins Study "Prove" Lockdowns Don't Work? What We Know So Far,*
Newsweek (Feb. 7, 2022) .......................................................................... 9

Medical Board of California,
Meeting Minutes for Feb. 10-11, 2022 ............................................... 12-13

Medical Board of California Quarterly Board Meeting May 19-20, 2022 video ..... 14, 36

Mill, John Stuart,
*On Liberty* 15 (R. McCallum ed. 1947) .................................................. 20

Newsom, Gov. Gavin,
Signing Message (Sept. 30, 2022) ........................................................... 14

Scott, Dylan,
*California mandated masks. Florida opened its restaurants. Did any of it matter?,*
Vox (June 2, 2021) ..................................................................................... 9

Staff,
*Fauci admits that COVID-19 vaccines do not protect "overly well" against infection,*
Fox News (July 12, 2022) ........................................................................ 41

11A Wright & Miller,
FEDERAL PRACTICE AND PROCEDURE § 2948.1
(3d ed. Apr. 2020 update) ................................................................... 46-47

## Statement of Subject Matter and Appellate Jurisdiction

The district court has jurisdiction under 28 U.S.C. § 1331 because plaintiffs Michael Couris and Michael Fitzgibbons bring constitutional claims against the California government defendants seeking an injunction against enforcement of a new California law, AB 2098. CER-85.[1] We will call plaintiffs "Couris" and the defendants "Lawson" or "the government" or "California" or "the State" or "the Board."

Couris filed a motion for preliminary injunction December 12, 2022. While Couris's motion for preliminary injunction was pending, *McDonald v. Lawson* denied McDonald's motion for preliminary injunction against enforcement of AB 2098, and McDonald appealed under 28 U.S.C. § 1292(a)(1). MER-3; MER-115. This Court docketed the appeal as No. 22-56220, which is now consolidated with this appeal.

On January 23, 2023, the district court ordered "that this case be STAYED pending a ruling by the U.S. Court of Appeals in Case No. 22-56220, or until further Order of this Court," and vacated Couris's motion's hearing date. CER-3. As discussed in Section I below, this has the "practical effect" of refusing an injunction, and creates appellate jurisdiction under 28 U.S.C. § 1292(a)(1). *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981).

Couris appealed on January 23, 2023. CER-105. This appeal is timely under Fed. R. App. Proc. 4(a)(1)(A).

---

[1] "CER" refers to Couris's Excerpts of Record. "MER" refers to McDonald's Excerpts of Record in Appeal No. 22-56220. "Dkt." refers to the district court docket in this case, *Couris v. Lawson*, No. 3:22-cv-01922-RSH-JLB (S.D. Cal.).

## Statement of the Issues

1.     Interlocutory orders that have the "practical effect of refusing an injunction" are appealable under 28 U.S.C. § 1292(a)(1) if they bear "serious, perhaps irreparable, consequence" that can only be "effectually challenged" by immediate appeal. *Carson v. Am. Brands, Inc.*, 450 U.S 79, 84 (1981). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976). Is the district court's *sua sponte* order staying Couris' action indefinitely pending this Court's determination in *McDonald*, and refusing to rule on Couris' motion for a preliminary injunction against enforcement of AB 2098 appealable under 28 U.S.C. § 1292(a)(1)?

2.     A plaintiff is entitled to a preliminary injunction against an infringement of free-speech rights when he or she is likely to succeed on the merits. *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (*en banc*). Are the Couris appellants entitled to a preliminary injunction where:

> a. With a limited exception for speech incidental to professional conduct, licensed professionals possess the same free speech rights as all citizens. *Nat'l Inst. of Fam. & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2374-75 (2018) ("*NIFLA*"). With respect to medical professionals, this Court holds that the line between speech and conduct tracks the distinction between (1) providing information, advice, or recommendations; and (2) providing treatment. *Tingley v. Ferguson*, 47 F.4th 1055, 1072, 1075 (9th Cir. 2022); *Conant v. Walters*, 309 F.3d 629, 634-37 (9th Cir. 2002). Does AB 2098 trespass into First

Amendment territory by forbidding doctors from conveying "misinformation" to patients "in the form of treatment or advice?" ;

b. Viewpoint-based regulations of speech are "forbidden" by the First Amendment. *E.g. Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017). When a law takes one side of a public debate and suppresses speech to the contrary, that law is unconstitutionally viewpoint-based. *E.g. Conant*, 309 F.3d at 637. Does AB 2098's imposition of disciplinary consequences for "disseminating" information "contradicted by the contemporary scientific consensus" discriminate against disfavored views and thus violate the First Amendment? ;

c. Content-based regulations of speech that do not fall into one of several historically-unprotected categories of speech are "presumptively unconstitutional" and must satisfy strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). To satisfy strict scrutiny, California must show, among other things, that the content-based restriction is the least restrictive alternative of achieving its aims. *E.g., IMDB.com Inc., v. Becerra*, 962 F.3d 1111, 1125-26 (9th Cir. 2020). There is no historically-rooted exception to the First Amendment for general misinformation; "[o]ur constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 723 (2012); *accord* 567 U.S. at 751-52 (Alito J., dissenting); 567 U.S. at 731-32 (Breyer, J., concurring). Is AB 2098's prohibition on disseminating misinformation a narrowly-tailored means of ensuring competent medical practice when the State has speech-neutral

means of punishing unprofessional conduct that do not present the same risk of stunting the development of scientific and medical knowledge? ; or

d. Disciplinary rules are unconstitutionally vague when they fail to provide "fair notice" to regulated individuals or when "discriminatory enforcement is a real possibility." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048, 1051 (1991). Rules that employ "classic terms of degree" that have "no settled usage or tradition" risk discriminatory enforcement and forsake fair warning. *Id.* at 1048-49. Did *Høeg v. Newsom* correctly conclude that AB 2098's prohibition on disseminating misinformation, as determined by the "contemporary scientific consensus," was unconstitutionally vague? No. 22-cv-01980, __ F. Supp. 3d __, 2023 U.S. Dist. LEXIS 13131 (E.D. Cal. Jan. 25, 2023).

## Standard of Review

While a district court's decision to deny a preliminary injunction is normally subject to limited review, review is *de novo* when the issues on appeal are purely legal, and the facts are either established or undisputed. *Harris v. Bd. Of Supervisors, L.A. Cty.*, 366 F.3d 754, 760 (9th Cir. 2004).

## Bills and Statutes

**Assembly Bill 2098.**

**Section 1.** The Legislature finds and declares all of the following:

(a)     The global spread of the SARS-CoV-2 coronavirus, or COVID-19, has claimed the lives of over 6,000,000 people worldwide, including nearly 90,000 Californians.

(b)     Data from the federal Centers for Disease Control and Prevention (CDC) shows that unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated.

(c)     The safety and efficacy of COVID-19 vaccines have been confirmed through evaluation by the federal Food and Drug Administration (FDA) and the vaccines continue to undergo intensive safety and monitoring by the CDC.

(d)     The spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence and placed lives at serious risk.

(e)     Major news outlets have reported that some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals.

(f)     The Federation of State Medical Boards has released a statement warning that physicians who engage in the dissemination of COVID-19 vaccine misinformation or disinformation risk losing their medical license, and that physicians have a duty to provide their patients with accurate, science-based information.

(g)     In House Resolution No. 74 of the 2021-22 Regular Session, the California State Assembly declared health misinformation to be a public health crisis, and urged the State of California to commit to the appropriately combating misinformation and curbing the spread of falsehoods that threaten the health and safety of Californians.

**Section 2.** Section 2270 is added to the Business and Professions Code, to read:

**2270.** (a)     It shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.

(b)     For purposes of this section, the following definitions shall apply:

(1)     "Board" means the Medical Board of California or the Osteopathic Medical Board of California, as applicable.

(2)     "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.

(3)     "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.

(4)     "Misinformation" means false information that is contradicted by contemporary scientific consensus contrary to the standard of care.

(5)     "Physician and surgeon" means a person licensed by the Medical Board of California or the Osteopathic Medical Board of California under Chapter 5 (commencing with Section 2000).

(c)     Section 2314 shall not apply to this section.

**Section 3.** The provisions of this act are severable. If any provision of this act or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

~~~

## California Code, Business and Professions Code - BPC § 2234

The board shall take action against any licensee who is charged with unprofessional conduct.  In addition to other provisions of this article, unprofessional conduct includes, but is not limited to, the following:

…

(b) Gross negligence.
(c) Repeated negligent acts.   To be repeated, there must be two or more negligent acts or omissions.   An initial negligent act or omission followed by a separate and distinct departure from the applicable standard of care shall constitute repeated negligent acts.

(1) An initial negligent diagnosis followed by an act or omission medically appropriate for that negligent diagnosis of the patient shall constitute a single negligent act.

(2) When the standard of care requires a change in the diagnosis, act, or omission that constitutes the negligent act described in paragraph (1), including, but not limited to, a reevaluation of the diagnosis or a change in treatment, and the licensee's conduct departs from the applicable standard of care, each departure constitutes a separate and distinct breach of the standard of care.

(d) Incompetence.

…

**Statement of the Case**

Doctors Michael Couris and Michael Fitzgibbons sued California officials to enjoin enforcement of AB 2098, a California statute that would chill their speech. With a motion for preliminary injunction pending, the district court stayed proceedings until the Ninth Circuit decided the *McDonald v. Lawson* appeal, No. 22-56220. This is a § 1292(a)(1) appeal of an order with the practical effect of denying injunctive relief; on Couris's request, this Court has consolidated it with No. 22-56220.

**A.    The COVID-19 pandemic and its response are controversial in the medical community.**

In March 2020 the COVID-19 pandemic hit the United States. In response, federal, state, and local governments, as well as private entities, imposed or recommended various measures to mitigate the effect of the pandemic. These included orders to stay at home, social-distancing, requiring the wearing of masks, school closures, and closing of non-essential businesses. Federal public health authorities such as the National Institutes of Health ("NIH"), the Centers for Disease Control ("CDC"), the Food and Drug Administration ("FDA"), and local public health officials devoted resources to combat the pandemic. *See A Timeline of COVID-19 Developments in 2020*, AMER. J. OF MANAGED CARE (Jan. 1, 2021) ("AJMC 2020 COVID-19 Timeline").

The federal government-initiated Operation Warp Speed, an aggressive and accelerated push to develop vaccines for the virus that caused COVID-19. Several major pharmaceutical and biotech companies participated in this unprecedented effort. In late 2020, Operation Warp Speed bore fruit when Pfizer, Moderna, and Johnson & Johnson announced that trials for their vaccines were successful. The FDA then

approved vaccines on an emergency basis and public health officials and medical clinics began providing vaccines, first to at-risk populations and soon after, to the general public. AJMC 2020 COVID-19 Timeline.

Since its beginning, the pandemic has been marked by controversy. There have been heated scientific and public-policy debates about the relative costs and benefits of lockdowns, social-distancing, wearing of masks, and school closures. *E.g.*, Yevgeny Kuklychev, *Did a Johns Hopkins Study "Prove" Lockdowns Don't Work? What We Know So Far*, Newsweek (Feb. 7, 2022); Dylan Scott, *California mandated masks. Florida opened its restaurants. Did any of it matter?* Vox (June 2, 2021). Other critics have complained that the government has acted too timidly in rolling out and approving vaccines and boosters, and in its prioritization of who received scarce vaccines; for example, the United States was slower to recommend widespread booster use than Israel and some European nations. *E.g.*, *CDC Director overrules panel regarding booster shots*, Israel Nat. News (Sept. 24, 2021); Ezra Klein, *Are We Much Too Timid in the Way We Fight Covid-19?*, N.Y. Times (Apr. 1, 2021). Scientists in peer-reviewed journals debate the risk-benefit calculus of vaccinations for healthy youthful subpopulations. *E.g.*, Kevin Bardosh, *et al.*, *COVID-19 vaccine boosters for young adults: a risk benefit assessment and ethical analysis of mandate policies at universities*, J. Med. Ethics (Dec. 5, 2022). There are disputes about the merits of mRNA vaccines versus traditional vaccines, and concerns that the government acted recklessly in discouraging use of the J&J vaccine in 2021 or creating gaps in the availability of Novavax after February 28. *E.g.*, Allysia Finley, *How Biden Officials Bungled a Better Vaccine*, Wall St. J. (Jan. 29, 2023).

**B.**     **Doctors Couris's and Fitzgibbons's experience with COVID-19 causes them reasonable skepticism of medical consensus.**

Plaintiffs Dr. Michael Couris and Dr. Michael Fitzgibbons are licensed physicians in California. Like most doctors, when the pandemic hit, they did their best to learn about the virus and COVID-19, navigate the sometimes conflicting messages coming from public health officials and the medical community, and, most importantly, provide the best advice and medical care to their patients. CER-95-100.

Dr. Fitzgibbons practices internal medicine and is an infectious disease specialist. Dr. Fitzgibbons has not always agreed with the guidance from public health officials, or with the views of others in the medical and scientific community regarding a variety of issues related to COVID-19. Dr. Fitzgibbons has treated approximately 1000 patients diagnosed with COVID-19 and is familiar with the methods of acquiring, diagnosing, treating and avoiding COVID-19. Early in the pandemic, Dr. Fitzgibbons counseled patients about and prescribed hydroxychloroquine ("HCQ") and azithromycin because both drugs possess anti-inflammatory properties that he believed would be beneficial in the treatment of COVID-19. CER-77-78. Further into the pandemic, Dr. Fitzgibbons prescribed ivermectin to patients both as a treatment and a prophylaxis, and in the instances where he did so, no patient complained about an adverse reaction. CER-78.

When COVID-19 vaccines became available, Dr. Fitzgibbons counseled patients to get vaccinated. But he is opposed to vaccinating children with current vaccines because he believes that the risks associated with the vaccines outweigh the benefits,

and he has communicated this advice to patients and intends to continue to do so. CER-79.

Dr. Couris is an ophthalmologist practicing in San Diego. He has treated patients who suffer from autoimmune diseases, several of whom use HCQ to manage their condition. There is a minor risk of eye damage from the chronic use of HCQ, so frequent eye exams are prudent for such patients. Dr. Couris has on occasion recommended patients discontinue HCQ use. CER-83.

During the pandemic one of Dr. Couris's patients who suffered from an autoimmune disease and was having trouble getting an HCQ prescription filled, asked Dr. Couris to help her get a refill. Dr. Couris did so, but the pharmacy balked at filling the prescription until Dr. Couris spoke to the pharmacy directly. Although this was early in the pandemic, Dr. Couris was concerned that the episode might result in him being reported and investigated by the Board. CER-83.

Dr. Couris has been particularly mindful of COVID-19 issues during the pandemic, particularly regarding transmission. Ophthalmologists are at a higher risk because the proximity of their faces to a patient's face during an exam. Frequently, his patients ask him about COVID-19 and Dr. Couris does his best to provide candid counsel and advice regarding COVID-19. For patients who inquire, Dr. Couris typically advises patients age 60 or over to get vaccinated and get boosters at their discretion. He also encourages those with one or more risk factors such as obesity to get vaccinated. Many of his patients ask about their children or grandchildren and his advice to them is that children should not get the mRNA vaccine. Dr. Couris recommends that patients

who want the vaccine avoid the mRNA vaccines and get the more traditional vaccine produced by Novavax. CER-100.

## C. California passes AB 2098 to restrict the speech of doctors.

In July 2021, the Federation of State Medical Boards ("FSMB") issued a press release condemning physicians who spread misinformation about COVID-19 vaccines and noting that such physicians risked disciplinary action by state medical boards, including suspension or revocation of their medical licenses. Federation of State Medical Boards, *FSMB: Spreading Covid-19 Vaccine Misinformation May Put Medical License at Risk,* News Releases (July 29, 2021).

The California Assembly responded by introducing AB 2098 in February of 2022 to counter the dissemination of "misinformation and disinformation related to" COVID-19 by California licensed physicians and surgeons. CER-59-60. The bill's author said California needed to "show its unwavering support for a scientifically informed populous [sic] to protect ourselves from COVID-19." CER-18. The Medical Board of California ("Board") similarly echoed its concern about misinformation and disinformation at a meeting in February 2022. Defendant Lawson, the Board President, cited the FSMB press release during the meeting, according to the meeting minutes:

> Ms. Lawson stated it is the duty of the board to protect the public from misinformation and disinformation by physicians, noting the increase in the dissemination of healthcare related misinformation and disinformation on social media platforms, in the media, and online, putting patient lives at risk in causing unnecessary strain on the healthcare system.

> Ms. Lawson elaborated [that] in July 2021, the Federation of State Medical Boards released a statement saying physicians spreading misinformation or disinformation risk disciplinary action by their state medical board.

Medical Board of California, Meeting Minutes for Feb. 10-11, 2022 at 6.

The original bill barred physicians from "promot[ing]" misinformation. The Assembly Committee on Business and Professions prepared a bill analysis in April that noted that the Ninth Circuit holds that "doctor-patient communications about medical treatment receive substantial First Amendment protection" and recommended that the Assembly amend AB 2098 to limit the definition of "disseminate" to reach only patient-doctor communications; the Assembly did so. CER-24-25.

The committee report also recommended that "disciplinary action" only occur after considering whether the misinformation "resulted in harm to patient health." CER-26. On April 20, an Assembly amendment followed this recommendation. CER-7. But after AB 2098's initial passage in the Assembly, and upon introduction to the Senate, a further amendment deleted this limitation. The passed bill contains no such tether to harm. An August Senate analysis prepared for the Assembly to vote on concurrence to Senate amendments described three other changes to the bill, but did not mention or explain deleting language specifically recommended by the Assembly committee report. MER-108.

At its May 2022 meeting, several members of the Board expressed reservations about AB 2098 and the ability of the Board to enforce the statute if it passed, and some members indicated that the Board already had authority to investigate and discipline physicians for conduct that misled and/or was harmful to patients. Board member

Dr. Dev GnanaDev noted that medicine "is not a stable thing" and that treatments that might be considered experimental can eventually become the "treatment of choice." Similarly, Board member Richard Thorp noted that many physicians advocating controversial COVID-19 treatment or expressing skepticism about new vaccines were acting in good faith and believed that they were acting in the best interest of patients. Dr. Thorp also noted that science and medicine is always evolving and that frequently medical pioneers engaged in practices that, at the time, might not have been considered firmly within the standard of care, but eventually came to define the standard of care. *See* CER-71 (link to video of meeting available at https://www.youtube.com/watch?v=dz-3h2IEcb4&t=7726s (2:08:48 to 3:03:00) (Dr. Dev GnanaDev's comments at 2:23:00 to 2:24:20; Dr. Thorp's comments at. 2:30:55 to 2:35:00)). The meeting minutes also reflected the Board's concern that the "the definitions of misinformation/disinformation may prove challenging for the Board to prove." *Id.*

In August, the California Assembly and Senate each approved AB 2098. Governor Newsom signed AB 2098 into law on September 30, 2022. Governor Newsom attempted to limit the reach of the Statute when he signed AB 2098, stating it would apply only in "egregious instances in which a licensee is acting with malicious intent or clearly deviating the standard of care." *See* Gov. Gavin Newsom, Signing Message (Sept. 30, 2022).

Section 1 of the Statute sets forth the legislature's findings, stating "[t]he spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence and placed lives at serious risk" and that "news outlets have reported that

some of the most dangerous propagators of inaccurate information regarding COVID-19 vaccines are licensed health care professionals." It also repeats the FSMB warning from the July 2021 press release warning that physicians disseminating COVID-19 vaccine misinformation or disinformation put their medical licenses at risk.

Section 2 of the Statute adds Section 2270 to the California Business and Professions Code and makes it "unprofessional conduct" for any California physician or surgeon "to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines." "Misinformation" is "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." And "dissemination" is "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice." *Id.* The Statute expressly regulates physicians' advice to patients.

**D.  AB 2098 chills Drs. Couris's and Fitzgibbons's advice to patients; they sue and move for a preliminary injunction.**

Some of the exchanges Dr. Fitzgibbons has had with patients regarding HCQ, ivermectin, the vaccines, and other matters related to COVID-19 differed from guidance issued by various public health officials. With the passage of AB 2098, Dr. Fitzgibbons is now extremely wary of what he can or cannot say to patients regarding COVID-19. CER-79-80; CER-97.

Similarly, Dr. Couris is concerned that some of the exchanges he has had with patients regarding COVID-19 could be construed as "misinformation" as defined in

AB 2098 because what he has said may not align with the messages or guidance from public health officials or with the views of a majority of the medical and scientific community. Dr. Couris is now concerned about what information he can convey to patients regarding COVID-19 without jeopardizing his medical license. CER-84; CER-100.

In December, Drs. Couris and Fitzgibbons sued Lawson and other state officials in the Southern District of California, and moved for a preliminary injunction against enforcement of AB 2098. CER-85; CER-27-28. Couris argued that AB 2098 was not just a content-based speech regulation subject to strict scrutiny, but a forbidden viewpoint-based speech regulation. Because California admittedly already had means to discipline conduct, the regulation could not satisfy strict scrutiny. Couris also argued that the statute was unconstitutionally vague, and the governor's nonbinding signing statement deviating from the text of the statute did not create a narrowing construction. CER-45-55.

**E.** ***McDonald v. Lawson*, a parallel case in the Central District of California, denies injunctive relief, and McDonald appeals.**

Other doctors sued in the Central and Eastern Districts of California. On December 28, 2022, after Dr. Couris's motion, *McDonald v. Lawson* denied a preliminary injunction. MER-3. *McDonald* found the plaintiffs had standing and a reasonable fear of prosecution. It rejected plaintiffs' void-for-vagueness concern by interpreting the "false information that is contradicted by contemporary scientific consensus contrary to the standard of care" language as having a conjunction, and accepting defendants' representation that they would not prosecute if the scientific consensus was unclear.

MER-15. It held that AB 2098 incidentally burdens speech as a regulation of professional conduct under *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) and *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022). MER-19. It held that AB 2098 satisfied rational-basis review and fell within the longstanding tradition of regulations on the practice of medical treatments, and thus satisfied *Tingley*. MER-27. There was thus no likelihood of success, permitting the court to deny the injunction. MER-29; MER-32.

McDonald appealed. Case No. 22-56220.

## F. The district court stays proceedings before resolving the motion for preliminary injunction, Couris appeals, and the Ninth Circuit consolidates with *McDonald*.

While Couris's motion was pending, the district court stayed proceedings on January 23:

> Pending before the Court is Plaintiffs' Motion for a Preliminary Injunction (ECF No. 6), currently set for hearing on February 2, 2023. The issues presented in Plaintiffs' Motion are identical to those in a case currently pending in the U.S. District Court for the Central District of California, *McDonald v. Lawson*, Case No. 8:22-cv-1805-FWS-ADS. In *McDonald*, the District Court on December 28, 2022, denied a similar request for a preliminary injunction. That denial is currently on appeal, which has been assigned docket number 22-56220. A ruling on the merits by the U.S. Court of Appeals in *McDonald* will very likely dispose of the issues presented by Plaintiffs' Motion in this case. …
>
> In the interests of judicial economy, the Court therefore ORDERS that this case be STAYED pending a ruling by the U.S. Court of Appeals in Case No. 22-56220, or until further Order of this Court. … The hearing [on Couris's motion for

> preliminary injunction] set for February 2, 2023 is hereby
> VACATED.

CER-3-4.

The same day, Couris appealed the effective denial of his request for injunctive relief. CER-105. This Court on January 25 consolidated Couris's appeal, No. 23-55069, with No. 22-56220.

## G. The Eastern District of California preliminarily enjoins enforcement of AB 2098.

On January 25, *Hoeg v. Newsom* granted plaintiffs' motion for a preliminary injunction against enforcement of AB 2098. No. 22-cv-01980, __ F. Supp. 3d __, 2023 U.S. Dist. LEXIS 13131 (E.D. Cal. Jan. 25, 2023).

*Hoeg* rejected *McDonald*. After finding standing for both individual and organizational plaintiffs, it agreed with them that AB 2098 was unconstitutionally vague. "Defendants provide no evidence that 'scientific consensus' has any established technical meaning." 2023 U.S. Dist. LEXIS 13131 at *17-*25. "Consensus" about COVID-19 has rapidly shifted; thus, "the concept of 'scientific consensus' as applied to COVID-19 is inherently flawed." *Id.* at *25. "[C]ontradicted by contemporary scientific consensus contrary to the standard of care" was "grammatically incoherent"; *McDonald*'s saving interpretation was inconsistent with the text, because "standard of care" applied to *treatment* or "care," rather than "information." *Id.* at *26-*27. "[D]octors reading the statute have no assurance that the statute will be interpreted by courts or applied by the Boards consistently with defendants' proposed interpretation." *Id.* at *28. The statute "is so standardless that it authorizes or encourages seriously discriminatory

enforcement" and was thus unconstitutionally vague. *Id.* at *30 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

Having decided the case on Fourteenth Amendment grounds, *Høeg* did not reach the First Amendment claims. 2023 U.S. Dist. LEXIS 13131 at *30 n.11. As of February 1, 2023, the government has not appealed.

## Summary of Argument

Couris likely succeeds on the merits, so is entitled to a preliminary injunction. The patient-doctor relationship requires open and frank communication so doctors can provide patients the best advice to ensure that a patient is fully informed. *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002). AB2098 unconstitutionally inhibits that communication. It does not merely regulate conduct or treatment, nor does it only incidentally chill speech; its central purpose and operation infringes free speech. *McDonald v. Lawson* is wrong, and wrong in several respects.

*First*, *McDonald* improperly conflates treatment and conduct with a doctor's communication of advice and information. By doing so, *McDonald* effectively writes the word "advice" out of the statute. Under Ninth Circuit law, the advice and information that a doctor provides to a patient must receive the highest protection. *Conant*, 309 F.3d at 634-37; *Tingley v. Ferguson*, 47 F.4th 1055, 1072, 1075 (9th Cir. 2022) "Speech is not unprotected merely because it is uttered by 'professionals.'" *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371-72 (2018) ("*NIFLA*"). Nor should speech lose protection because it defies "the wide scholarly consensus concerning a particular matter." *United States v. Alvarez*, 567 U.S. 709, 752 (2012) (Alito, J., dissenting) (citing

*New York Times Co. v. Sullivan*, 376 U.S. 264, 279 n.19 (1964) and John Stuart Mill, *On Liberty* 15 (R. McCallum ed. 1947)).

Because the statute's design discriminates against viewpoints—suppressing speech with which the state disagrees, rather than regulating doctors' conduct—*McDonald* erroneously concluded that AB 2098 only incidentally burdens doctors' free speech rights. AB 2098 cannot seek refuge due to any long-standing tradition of statutes or common law designed to regulate medical practice and protect patients. Instead, it operates *ex ante* to cast a pall over doctor-patient communications and specifically targets a subset of speech related to a single subject, COVID-19.

*Finally*, AB 2098 is void for vagueness. The statute's reliance on terms such as "misinformation" and "scientific consensus" and an ever-evolving "standard of care" make it next to impossible for a doctor to know what they can say. This is especially true here, for a new viral disease like COVID-19, where any transitory notion of medical or "scientific consensus" defies description. CER-92-93; *Høeg*, 2023 U.S. Dist. LEXIS 13131 at *19-25. *McDonald* errs, and *Høeg* gets this precisely right.

Ninth Circuit law acknowledges both appellate jurisdiction over Couris's appeal, and his entitlement to an injunction given his likelihood of success on the merits of his constitutional claim.

## Argument

### I. Because the stay order has the "practical effect of refusing an injunction," 28 U.S.C. § 1292(a)(1) provides appellate jurisdiction.

28 U.S.C. § 1292(a)(1) "permit[s] appeals from orders that have the 'practical effect' of denying an injunction, provided that the would-be appellant shows that the order 'might have a serious, perhaps irreparable, consequence'" and "can be effectually challenged only by immediate appeal." *United States v. McIntosh*, 833 F.3d 1163, 1171 (9th Cir. 2016) (*quoting*, among other cases, *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981); other citations and quotations omitted).

Couris moved for a preliminary injunction in December 2022 against enforcement of a statute that he contended violates his First Amendment free-speech rights. CER-27-28. On January 23, 2023, before deciding Couris's motion, the district court stayed proceedings until this Court resolves Appeal No. 22-56220. CER-3-4. With briefing in that appeal not scheduled to end before March, this order ensured that Couris could not get any sort of injunction before April at the earliest, and perhaps later. This has the "practical effect of refusing an injunction." *Carson*, 450 U.S. at 84. For example, in *Kahn v. General Motors Corporation*, plaintiff sought a preliminary injunction against a defendant's alleged patent infringement, but the district court stayed proceedings until a parallel litigation in a different court resolved the patent's validity. 889 F.2d 1078 (Fed. Cir. 1989). The *Kahn* stay, like the stay here, had the practical effect of refusing an injunction, and created § 1292(a)(1) appellate jurisdiction. *Id.* at 1080.

28 U.S.C. § 1292(a)(1) "permit[s] appeals from orders that have the 'practical effect' of denying an injunction, provided that the would-be appellant shows that the

order 'might have a serious, perhaps irreparable, consequence'" and "can be effectually challenged only by immediate appeal." *McIntosh*, 833 F.3d at 1171 (*quoting*, among other cases, *Carson*, 450 U.S. at 84; other citations and quotations omitted).

With respect to the first prong, "any First Amendment infringement that occurs with each passing day is irreparable" injury. *Neb. Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975); *accord Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009); *Dayton Area Visually Impaired Persons v. Fisher*, 70 F.3d 1474, 1480 (6th Cir. 1995). This ends the *Carson/McIntosh* inquiry on the second prong. The district court's practical refusal of timely injunctive relief has "irreparable" consequence. *Dayton* is directly on point. *Dayton* plaintiffs sought a preliminary injunction on First Amendment claims, and the district court granted in part a cross-motion to dismiss. *Id.* at 1479. Plaintiffs appealed, and the government protested that there was no § 1291 final decision because other claims remained pending. *Id.* at 1480. No matter: the dismissal "also constituted a refusal to grant the requested injunctive relief sought by the parties." *Id.* And this constituted *per se* "serious, perhaps irreparable, consequence" under *Carson*, because it affected First Amendment freedoms. *Id.* (citation to Supreme Court precedent omitted).

Couris can "effectually challenge[]" the stay order "only by immediate appeal" (*Carson/McIntosh*) because the "potential lengthy and indefinite stay of these claims pending resolution of an entirely different [case] involving different parties will deprive these claims of practical remedy." *Kahn*, 889 F.2d at 1080. It is of no moment that the district court could decide to lift the stay. An order that "is to continue by its terms for an immoderate stretch of time is not to be upheld as moderate because conceivably the court that made it may be persuaded at a later time to undo what it has done." *Id.*

(quoting *Landis v. North Am. Co.*, 299 U.S. 248, 257 (1936)). All the more so in a First Amendment case, because the "irreparable damage" of loss of free-speech rights "necessitates immediate redress to [the appellate] court." *Dayton*, 70 F.3d at 1480.

Additionally, Couris's appeal presents no concerns of "piecemeal litigation" that are sometimes present in section 1292 appeals. *Cf. McIntosh*, 833 F.3d at 1171 (quoting *Shee Atika v. Sealaska Corp.*, 39 F.3d 247, 249 (9th Cir. 1994)). By consolidating his appeal with the existing *McDonald* appeal, Couris's appeal furthers judicial economy and itself avoids splintered litigation.

This Court has appellate jurisdiction over Couris's appeal. It can and—as discussed below—should reverse with directions for the district court to grant the injunction.

## II. When the First Amendment is at issue, a court must grant a preliminary injunction to plaintiffs likely to succeed on the merits.

Courts apply a four-factor test for granting plaintiffs' requests for preliminary injunction: (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm," (3) "the balance of equities tips in [their] favor," and (4) the required injunction "is in the public interest." *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (*en banc*) (citing *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). When First Amendment freedoms are at risk, however, the focus is on a single factor—whether Plaintiffs are likely to succeed on the merits. *Id.* at 758. This is so because even the brief loss of First Amendment freedoms causes "irreparable injury" and tilts the "the balance of hardships . . . sharply in [Plaintiffs'] favor." *Id.* Moreover, "it is always in the public interest to prevent the violation of a party's

constitutional rights." *Id.* "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002). Accordingly, because Plaintiffs are likely to succeed on the merits as discussed in Section III below, the Court should order the district court to grant the motion for preliminary injunction and enjoin enforcement of AB 2098.

## III. Plaintiffs are likely to succeed on the merits; *Høeg* is correct and *McDonald* is incorrect.

### A. AB 2098 impermissibly regulates content and viewpoint and cannot withstand strict scrutiny.

#### 1. AB 2098 is a content-based speech regulation.

Laws that restrict speech based on content are presumptively unconstitutional and must overcome strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also IMDb.com v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020). If enforcement authorities must "examine the content of the message that is being conveyed" to determine whether there has been a violation of the statute, rule or regulation in question, then that law is content-based. *McCullen v. Coakley*, 573 U.S. 464, 479 (2014).

In this instance there can be no doubt that AB 2098 is a content-based restriction. The statute is directly aimed at what doctors say to their patients regarding COVID-19. *See Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020) ("[B]ecause the ordinances depend on what is said, they are content-based restrictions that must receive strict scrutiny."). Authorities must "examine the content" of the doctors' messages to patients to determine if discipline is warranted.

AB 2098 squarely conflicts with the Ninth Circuit's holding in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), in which the Court invalidated a federal policy to revoke the medical licenses of doctors who recommended marijuana to a patient. The Court drew a distinction between a prohibition on treating patients with marijuana and simply recommending marijuana; the former, the Court held was a permissible regulation of doctor conduct, while the latter was based on viewpoint and content and thereby an unconstitutional infringement on free speech. *Id.* at 634-37.

True, *Pickup v. Brown* upheld a statute prohibiting conversion therapy *treatment* for minors, but that case is inapposite because the statute regulated conduct, rather than content, and any effect on free speech was incidental. 740 F.3d 1208, 1231 (9th Cir. 2014). Moreover, *Pickup* used a rational basis standard that *NIFLA* abrogated. *Compare id.* at 1228, 1231 *with NIFLA*, 138 S. Ct. at 2371-72. After *NIFLA*, courts must apply strict scrutiny to restrictions on professional speech. 138 S. Ct. at 2371-72. "Speech is not unprotected merely because it uttered by 'professionals.'" *Id. NIFLA* singled out only "two circumstances" where professional speech may be afforded less than full protection. *Id.* at 2372. First, courts may apply "more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Id.* Second, "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Id.*; *e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) (distinguishing *NIFLA*).

AB 2098 fits in neither of *NIFLA*'s "two circumstances." The Statute directly regulates the content of a doctors' speech to a patient about COVID-19, treatments, and vaccines. The statute is not aimed at prohibiting or restricting what treatments a

doctor can prescribe. Instead, it targets what information a doctor may disseminate to a patient about COVID-19, *i.e.*, content about the "nature and risks of the virus, its prevention, and treatment, and the development, safety, and effectiveness of Covid-19 vaccines." "[W]ords communicating information" are the paradigmatic form of "'speech' within the meaning of the First Amendment." *Giebel v. Sylvester*, 244 F.3d 1182, 1186-87 (9th Cir. 2001).

For example, in *Holder v. Humanitarian Law Project*, the Court expressly rejected the government's characterization of communicating individualized expert advice to a designated foreign terrorists as "conduct." 561 U.S. 1, 27 (2010). A regulation that operates depending on what advice is given is content-based. *Id.* By its plain language AB 2098 prohibits communicating certain information in the form of "advice"— including recommendations that *Conant*, *Tingley*, and *Humanitarian Law Project* protect. Accordingly, the statute violates *Conant*. When *McDonald* holds or Defendants argue that "the only thing actually at issue in this litigation is conduct," they are "wrong." *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer,* 961 F.3d 1062, 1069 (9th Cir. 2020) (quoting *Humanitarian Law Project*, 561 U.S. at 27); *see also Wollschlaeger v. Governor*, 848 F.3d 1293, 1313 (11th Cir. 2017) (*en banc*) (enjoining privacy statute that generally prohibited doctors from asking patients about their household's firearm ownership).

AB 2098, unlike malpractice liability, has no constitutional pedigree. When state actors attempt to use professional licensing to slant the public debate in favor of the government's preferred view on political, social, or scientific issues, courts rule such efforts unconstitutional. At the behest of the National Rifle Association, Florida tried to dissuade doctors from warning patients about potential dangers of firearm

ownership. *Wollschlaeger*. The DEA tried to chill pro-medicinal marijuana views. *Conant*. More recently, Missouri is trying to prevent pharmacists from disputing the efficacy of ivermectin and hydroxychloroquine as treatments for COVID-19. *Stock v. Gray*, No. 22-cv-04104-DGK (W.D. Mo.) (motion for preliminary injunction pending). It's not just doctors. States have targeted teachers with pro-LGBT views. *Nat'l Gay Task Force v. Bd. of Educ.*, 729 F.2d 1270, 1274 (10th Cir. 1984), *aff'd by equally divided court*, *Bd. of Educ. v. Nat'l Gay Task Force*, 470 U.S. 903 (1985). They have targeted attorneys litigating against racial segregation. *NAACP v. Button*, 371 U.S. 415 (1963). At the height of the Red Scare, there were those "among us always ready to affix a Communist label upon those whose ideas they violently oppose." *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 286-87 (1961). Political winds shift, but the First Amendment remains constant.

Even if AB 2098 encompassed only unprotected speech, the statute still "presumptively" violates the First Amendment because it singles out speech by doctors to patients regarding just COVID-19. *See R.A.V. v. St. Paul*, 505 U.S. 377, 387-94 (1992). AB 2098's selective prohibition of communications between doctors and patients regarding COVID-19 is a transparent attempt to suppress speech with which the government disapproves. AB 2098 sweeps in all communications between a doctor and patient that might be construed as the "dissemination" of "misinformation"—but only in the context of COVID-19. Such underinclusiveness demonstrates that the government does not actually pursue the rationale it invokes, rather it is "disfavoring a particular … viewpoint." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

*McDonald* misreads *Tingley* and *Pickup*. MER-19-23. These two cases upheld statutes prohibiting conversion therapy treatment for minors. Both prohibitions fell on the conduct side of the conduct/speech divide because they regulated *treatments*, not merely advice or recommendations. In *Pickup*, "SB 1172 regulates only treatment, while leaving mental health providers free to discuss and recommend, or recommend against" the banned treatment. 740 F.3d at 1231. Not so AB 2098, which expressly reaches "advice." The statute survived in *Pickup* because "the mere dissemination of information" fell outside its prohibition. *Id.* at 1234. Again, not so AB 2098, where the statute defines "unprofessional conduct" to include "disseminat[ing]." *McDonald* committed reversible error in its *Pickup* reading.

AB 2098 does not prohibit a specific treatment, but rather prohibits advice or information about a broad variety of COVID-19 topics that the state disapproves of because it deviates from a fluctuating "scientific consensus." The inclusion of "or advice" in AB 2098's definition of "misinformation" is dispositive: it demonstrates that the legislature intended to regulate more than simply "treatment"; it intended to regulate the content of communications—pure non-incidental speech—between physicians and patients. *Conant* thus controls. 309 F.3d at 636. *McDonald* errs by trying to split hairs between a doctor's "information underlying the [doctor's] advice rather than their particular opinion." MER-21. But that's not the legally relevant distinction. Instead, the line *Tingley* and *Conant* draw is between recommendation and treatment. One cannot reconcile *McDonald* with *Conant* and its First Amendment protection for "information crucial to [patients'] well-being." 309 F.3d at 640 (Kozinski, J., concurring).

*McDonald* relies on *Planned Parenthood v. Casey*, 505 U.S. 833, 882 (1992) (MER-28), but this is wrong. *Casey* concerned requiring *additional* information rather than censoring it. Nothing in AB 2098 obliges doctors to provide any information that would enhance patients' informed consent. In this sense, the invocation of informed consent here is even weaker than the dissent's invocation of the concept in *NIFLA*. *Compare* 138 S. Ct. at 2888 (Breyer, J., dissenting). Ironically, the speech ban in AB 2098 hinders informed consent by impeding the flow of information from doctor to patient, especially when patients can only guess whether their doctor self-censors in fear of disciplinary proceedings.

Unlike the prohibitions at issue in *Tingley* and *Pickup*, AB 2098 does not confine itself to barring a specific treatment or care provided by a physician. The statute's reach is far broader because it covers information and advice from physician to a patient "regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines." Cal. Bus. & Prof. Code § 2270(a). Hence, AB 2098's regulation of speech is a primary feature of the statute, rather than being incidental. The practical effect of AB 2098 is that it will "prevent licensed [doctors] from discussing the pros and cons" of a course of treatment because they will not know if the pros or cons are within or outside the "scientific consensus." *Pickup*, 740 F.3d at 1229. AB 2098 only allows "discussions about treatment, recommendations to obtain treatment, and expressions of opinions" with patients to the extent that there is "scientific consensus" establishing a standard of care, which has been and continues to be elusive. *Id.* at 1056; CER-52-54. The Board admits that it will be "challenging" to prove a standard of care for which there is scientific

consensus (CER-71), and even Defendants acknowledge that a scientific consensus may not be discernible. MER-15. The lack of definitive guidance built into AB 2098 makes it impossible for doctors to know what advice and information they are permitted to discuss with a patient without violating the statute. The result is self-censorship, to the detriment of patient care.

Couris agrees that trust is the cornerstone of the doctor-patient relationship. But AB 2098 works to undermine that trust because it prevents open discussions regarding a particular subject. *Compare Conant*, 309 F.3d at 636 (medicinal marijuana); *Wollschlaeger*, 848 F.3d at 1313 (guns). *McDonald* repeatedly emphasizes that AB 2098 simply prohibits doctors from providing information or advice to a patient "in a manner that violates the standard of care." MER-21. But that standard of care under the statute, compared to previous California law, is dependent upon a "contemporary scientific consensus" that is amorphous at best. Defendants assert that the lack of scientific consensus doesn't invalidate the statute, but instead makes it inapplicable. MER-15. Odd: if the statute will cover nothing, then why fight an injunction of it? In reality, the shadow of AB 2098 enforcement hangs over a physician who, when advising a patient, expresses the slightest contrarian or unorthodox opinion or advice, even if in response to a patient inquiry.

For instance, a doctor who in good faith counsels a patient to avoid the mRNA vaccines and instead choose the more traditional Novavax vaccine would arguably violate the statute. Likewise, a doctor who, in response to a question from a younger male patient who is otherwise healthy, expresses reservations about the safety of the mRNA vaccines, because they may be associated with a higher incidence of cardiac

issues, could find themselves in the crosshairs of AB 2098. And a doctor opining to a 48-year-old patient that the more aggressive Israeli schedule expediting boosters for all ages is superior to the fluctuating age-restricted CDC schedule would be bucking the statute's concept of a "scientific consensus."

These examples of advice are neither incidental speech nor conduct in the form of a treatment. AB 2098 is thus analogous to the regulation in *Conant* that was presumptively invalid because it focused on the content of the doctor-patient communications. 309 F.3d at 637. AB 2098 targets speech and, as *Conant* emphasized, "professional speech may be entitled to the strongest protection our Constitution has to offer." *Id.*; *accord NIFLA*. Defendants argue that AB 2098 relates to the "care" that a doctor provides a patient, citing the statute's definition of dissemination as "the conveyance of information …to a patient under the [doctor's] care in the form of treatment or advice." Cal. Bus. & Prof. Code § 2270(b)(3). But advice will not always translate into treatment—because under California law, the fully informed patient is entitled to choose her own treatment. A young, healthy person may still decide to get a COVID-19 vaccine and may decide to get the mRNA vaccine. Likewise, the patient may prefer not to get a booster that the CDC doesn't recommend. Such interactions exemplify the advice and information conveyed between doctor and patient that *Conant* holds the First Amendment protects. AB 2098 is not limited to the occasion of harm. *Compare Alvarez*, 567 U.S. 709 (affirming Ninth Circuit's invalidation of Stolen Valor Act because of its lack of requirement of cognizable harm). *McDonald* misunderstands *Alvarez* and simply writes "advice" out of AB 2098 when it concludes that its speech

restriction is "incidental to a doctor's … proscribed [*sic*] **treatment** for COVID-19." MER-23 (emphasis added).

*Tingley* draws the line elsewhere, recognizing that *Conant* "distinguished prohibiting doctors from *treating* patients with marijuana—which the government could do—from prohibiting doctors from simply *recommending* marijuana." 47 F.4th at 1072 (emphasis in original) (citing 309 F.3d at 634-37). Under *NIFLA,* 138 S.Ct. at 2371-72, this professional speech regulation is subject to strict scrutiny, and then is presumptively invalid under *Conant.* 307 F.3d at 637. AB 2098 flunks.

## 2. **AB 2098 regulates viewpoint.**

If a government entity chooses to regulate or restrict speech, it may not do so in a way that discriminates against certain viewpoints. *E.g.*, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (where rule "is viewpoint-based, it is unconstitutional"); *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018) ("restrictions…based on viewpoint are prohibited"); *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ("viewpoint discrimination is forbidden"). "[V]iewpoint discrimination is inherent in the design and structure of this Act. This law is a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J, concurring).

AB 2098 not only regulates content, but also viewpoint. The Statute aims to prohibit physicians from conveying certain medical viewpoints (ones "contradicted by contemporary scientific consensus") regarding COVID-19 to patients. As discussed in Section III.B, "scientific consensus" is a vague undefined term without an "established technical meaning"; it "often refers to the pronouncements of public health officials."

*Høeg*, 2023 U.S. LEXIS 13131 at *17-*18. The Statute's reference to the FSMB's July 2021 press release and the emphasis in Section 1 on vaccine "misinformation" and "disinformation" demonstrate that AB 2098 seeks to silence physicians critical of State-propounded views.

AB 2098 seeks to punish or at least censor physicians who may deviate from the State's or the Board's preferred narrative regarding all COVID-19 topics, whether it be mask-wearing, lockdowns, school closures, vaccines, or potential treatments. Any physician who dissents from the government's preferred narrative on any one of the foregoing topics and conveys a contrary opinion to a patient risks discipline from the Board. This is impermissible viewpoint discrimination because it regulates speech according to "the opinion or perspective of the speaker." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see Conant*, 309 F.3d at 637. The Supreme Court cautions against such viewpoint discrimination: "Those who begin coercive elimination of dissent soon find themselves exterminating dissenters." *W. Va. State Bd. Of Educ. v. Barnette*, 319 U.S. 624, 641 (1943).

History abounds in examples of scientists and physicians who expressed contrarian or unorthodox viewpoints, often at great personal cost, only eventually to be vindicated. *E.g.*, David J. Apple M.D., *Sir Harold Ridley and His Fight for Sight: He Changed the World So That We May Better See It* (2006) (pioneering ophthalmologist developed what is now common cataract surgery over fierce opposition from medical community); Nancy Dreger, *Galileo's Middle Finger: Heretics, Activists, and the Search for Justice in Science* (2015).

> A State may not contract the spectrum of available knowledge. However noxious Baird's ideas might have been to the authorities, the freedom to learn about them, fully to comprehend their scope and portent, and to weigh them against the tenets of the conventional wisdom, may not be abridged.

*Eisenstadt v. Baird*, 405 U.S. 438, 467 (1972) (quotations and citations omitted). AB 2098 represents an ill-considered example of stifled scientific inquiry and censoring of contrarians. The Founders designed the First Amendment to prevent this type of government action. *See NIFLA*, 138 S. Ct. at 2375 ("The test of truth is the power of an idea to get itself accepted in a competitive marketplace of ideas and the people lose when the government is the one deciding which ideas should prevail."). *NIFLA* highlighted not restraining the professional speech of medical professionals, "stress[ing] the danger of content-based regulations in the fields of medicine and public health" where "[d]octors help patients make deeply personal decisions and . . . candor is crucial." 138 S. Ct. at 2374 (cleaned up).

The freedom to express countercultural views, especially professional views, is the engine that drives our advancement toward a more culturally aware, scientifically advanced, tolerant, and open society. For example, less than a half-century ago, the prevailing opinion of the medical community (as reflected in the Diagnostic and Statistical Manual of Mental Disorders) considered homosexuality to be a disease. Before that, racial segregationist and anti-miscegenation views held sway in many states. Fortunately, the First Amendment prevented states from cementing these once-dominant views by suppressing private speech. *E.g.*, *Nat'l Gay Task Force*, 729 F.2d at 1274 (invalidating state statute forbidding teachers from "advocating, soliciting,

imposing, encouraging or promoting public or private homosexual activity…"); *Gay Lib v. Univ. of Missouri*, 558 F.2d 848, 854 (8th Cir. 1977) (state university violated First Amendment by denying recognition to student organization wishing to provide a forum to discuss homosexuality); *NAACP v. Button*, 371 U.S. 415 (1963) (striking down Virginia's effort to resist desegregation by extending its barratry statute to outlaw NAACP litigation funding). Had governments been permitted to squelch dissenting speech, it is unclear that society would have made the pluralistic development that it has. *Cf. NIFLA*, 138 S. Ct. at 2374 (cataloging examples of repressive governments "manipulat[ing] the content of doctor-patient discourse" "throughout history"). "[F]or history shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991).

### 3. AB 2098 cannot withstand strict scrutiny.

"Because First Amendment freedoms need breathing space to survive," a cornerstone of free speech jurisprudence is that "government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433. Because AB 2098 is viewpoint-based it is *per se* unconstitutional. *E.g.*, *Minn. Voters Alliance*, 138 S. Ct. at 1885. Content-based restrictions are "presumptively invalid" and can be upheld only if Defendants satisfy strict-scrutiny—proving a law "further[s] a compelling interest and is narrowly tailored." *Reed*, 576 U.S. at 171; *accord Conant*, 309 F.3d at 638; *see also Ashcroft v. ACLU*, 542 U.S. 656, 660-61 (2004) (defendants bear burden of proving both compelling state interest and narrow tailoring at all stages of litigation). This is "the most demanding test known to constitutional law" and only in the "rare case" is it

satisfied. *City of Bourne v. Flores* 521 U.S. 507, 534 (1997); *accord Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015).

California cannot satisfy its burden because although California might have a compelling interest in regulating the conduct of licensed physicians, the State lacks the right to restrict speech by limiting the candid exchange of information between a doctor and a patient. Doing so would not safeguard medical decisions. *NIFLA* recognized some narrow instances where the state may regulate the speech of medical professionals, most notably in the context of providing information allowing a patient to make decisions based on informed consent tied to a procedure or treatment. *NIFLA*, 138 S. Ct. at 2373. Here, a court cannot construe AB 2098's limitation on doctor speech as incidental to California's interest in regulating the conduct of doctors. AB 2098 is not aimed narrowly at what treatments doctors can use or prescribe for COVID-19. Instead, AB 2098 sweeps broadly, regulating everything a doctor may discuss with a patient about COVID-19. The prohibition goes beyond incidental speech about treatment recommendations or prescriptions.

And the statute is not narrowly tailored to promote any proffered compelling interest. While AB 2098 was working its way through the Assembly, the Board weighed in on the bill, and conveyed that it already had authority to investigate physicians for unprofessional or harmful conduct related to COVID-19. *See* Cal. Bus. & Prof. Code § 2234(b) & (e); Medical Board of California Quarterly Board Meeting May 19-20, 2022 (Day 2) (link to video of meeting https://www.youtube.com/watch?v=dz-3h2IEcb4&t=7726s (2:08:48 to 3:03:00)). The Statute singles out only the speech of physicians and surgeons, thus leaving patients

"open to an unlimited proliferation of" the same potentially offending speech provided by other medical professionals, such as nurses or physician assistants. *Victory Processing LLC v. Fox*, 937 F.3d 1218, 1229 (9th Cir. 2019) (statute not narrowly tailored when underinclusive).

Existing law authorizes the Board to act against licensees who engage in unprofessional **conduct** and provides non-exhaustive list of the type of conduct that could precipitate Board discipline, including incompetence, gross negligence, repeated negligence, and acts of dishonesty or corruption "substantially related to the qualifications, functions, or duties of a physician or surgeon." Cal. Bus. & Prof. Code § 2234. This would include gross negligence and any intentionally false and misleading speech a physician utters to a patient incidental to conduct of the physician treating a patient. If a doctor acts as a "quack telehealth provider" prescribing snake oil to patients without a physical examination, the state had the authority to punish her. *Cf.* Vera Bergengruen, *How 'America's Frontline Doctors' Sold Access to Bogus COVID-19 Treatments—and Left Patients in the Lurch*, Time (Aug. 26, 2021). Section 2234 falls within California's "longstanding" and "traditional" regulatory sphere for speech incidental to professional conduct. *NIFLA*, 138 S. Ct. at 2373.

Thus, Defendants cannot carry their burden to show that there were less restrictive alternatives or that those alternatives would have been ineffective. *See United States v. Playboy Ent. Grp. Inc.*, 529 U.S. 803, 817 (2000). The Board already had alternatives and at least some Board members believed that those alternatives were sufficient. The Board already has sufficient "speech-neutral remedies" at their disposal. *IMDb.com*, 962 F.3d at 1125-26; *see also Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184

(9th Cir. 2018) (finding tort laws a lesser restrictive alternative). As additional alternatives, the State can use public relations campaigns and public health broadcast messages to counter messages of which it disapproves and to achieve the stated aim of "show[ing] its unwavering support for a scientifically informed populous [sic]." *See Am. Beverage Ass'n*, 916 F.3d at 762 (Ikuta, J., concurring in the result) (noting that public information campaign is less burdensome).

These less restrictive alternatives *already existed*. Failure to rely on them leads to one inescapable conclusion: the only *marginal* difference AB 2098 makes, and the hope for the legislation, is to chill licensed physicians' speech. One can only view AB 2098 as a content-based regulation of doctor speech, and as *NIFLA* and *Conant* hold, this violates the First Amendment.

The legislative history is thus unsurprisingly transparent that AB 2098 is not aimed at conduct, but rather at those "expressing views"—in other words, speech. An Assembly Committee report analyzing the bill noted opposition to the bill was primarily concerned that the Board "would overzealously prosecute doctors for *expressing views that are outside the mainstream* but not indisputably unreasonable based on the physician's research and training." CER-21. The committee report dismissed this concern by noting that the legislature criticized the Board for not being aggressive enough in investigating and disciplining physicians for such speech. *Id.* The committee report characterizes a controversial doctor as "vociferously promot[ing] hydroxychloroquine as a COVID-19 treatment," "campaign[ing] to stoke public distrust in COVID-19 vaccines," and speaking "at a rally held in conjunction with the attempted insurrection on the United States Capitol on January 6." CER-22. The report notes that "Dr. Gold likely serves as

an illustrative example of the type of behavior that the author of this bill seeks to unequivocally establish as constituting unprofessional conduct for physicians in California." *Id.* Thus, AB 2098 not only targets speech on its face, the legislative record demonstrates that it was "adopted by the government because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 163.

A "bedrock principle underlying the First Amendment . . . is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. at 414; *accord Snyder v. Phelps*, 562 U.S. 443, 458 (2011) ("speech cannot be restricted simply because it is upsetting or arouses contempt"). The State Assembly, Governor Newsom, and members of the Board may all believe quite strongly on how best to manage COVID-19 and they are entitled to their strong opinions, but they may not dictate or constrain what physicians discuss with their patients. *See Conant*, 309 F.3d at 637 (state cannot regulate doctor-patient speech to prevent individuals from making "bad decisions"); *see also United States v. Caronia,* 703 F.3d 149, 166 (2d Cir. 2012) (rejecting "paternalistic[] interfere[nce] with the ability of physicians and patients to receive potentially relevant treatment information" and discussing how "such barriers to information about off-label use could inhibit, to the public's detriment, informed and intelligent treatment decisions."). Consistent with the First Amendment, "the remedy for speech that is false is speech that is true—and not, as [California] would like, the suppression of that speech." *Animal Legal Def. Fund*, 878 F.3d at 1205 (cleaned up). Accordingly, Defendants cannot satisfy strict scrutiny. The district court should have preliminarily enjoined enforcement of AB 2098, and this Court should so order it done.

**B.** **AB 2098 is unconstitutionally vague and overbroad.**

The Statute is unconstitutional for a second, independent reason: its imprecise language combined with its broad sweep of all matters related to COVID-19 render it impossible to know which doctor-patient exchanges are permitted or forbidden. *Høeg v. Newsom*, No. 22-cv-01980, __ F. Supp. 3d __, 2023 U.S. Dist. LEXIS 13131 (E.D. Cal. Jan. 25, 2023). This impossible predicament proves that AB 2098 is overly broad and vague, and a court must invalidate a statute as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation omitted).

"The void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253-54. Thus, a "more stringent vagueness test" applies. *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996) (quoting *Village of Hoffman Estates v. The Flipside*, 455 U.S. 489, 499 (1982)).

Succinctly, a statute "is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). This standard has two components, one from the perspective of the subject party and the other from the perspective of the enforcing party: (1) the statute must "give the person of ordinary

intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly;" and (2) the statute must "provide explicit standards for those who apply them." *Id.*; *accord Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2019). AB 2098 fails both requirements. *Høeg*, 2023 U.S. Dist. LEXIS 13131 at *30.

*First*, the definition of "misinformation" references a "standard of care" that is not contrary to "contemporary scientific consensus." But the history of the COVID-19 pandemic reveals no ascertainable "scientific consensus" regarding a litany of COVID-19 topics from the origins of the virus, its symptoms, transmission, treatments, preventions, and so on. The COVID-19 science has been constantly shifting and evolving, which is not surprising since it is a novel virus, with ever-mutating variants with different attributes. Public health officials frequently have revised or contradicted earlier COVID-related guidance as new data became available, be it on the wearing of masks; whether the virus spread by aerosolization; testing protocols; vaccine efficacy and cost-benefit analysis for various populations; need for booster shots; and which vaccines should be used as boosters.[2] CER-52-54; CER-92; *Høeg*, 2023 U.S. Dist. LEXIS 13131 at *18-*22.

---

[2] *See, e.g.,* Brian Flood, *Contradictions from Fauci, CDC throughout COVID pandemic outlined in viral Twitter thread*, Fox News (July 29, 2021); AJMC 2020 COVID-19 Timeline (noting changing CDC guidance regarding virus transmission and testing protocols); Staff, *Fauci admits that COVID-19 vaccines do not protect "overly well" against infection*, Fox News (July 12, 2022) (Dr. Fauci admitting vaccines don't prevent transmission but do provide protection against serious illness, contradicting his earlier statements that vaccines prevented transmission); Anjalee Khemlani, *CDC guidance exacerbates confusion over COVID-19 boosters*, Yahoo News (Sept. 24, 2021). "For many scientists, the CDC's confusing, disjointed stance on airborne transmission has been discouraging." Dr. Nancy A. Anoruo, *'Aerosol' vs. 'airborne' vs. 'droplets' amid COVID-19: What you need to*

To the extent that "scientific consensus" has a discernible core, it is a term of degree that "vests virtually complete discretion in the hands of the [enforcement official]." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983); *see also Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 500 (9th Cir. 2015) (reasoning that a restriction on material "'objectionable under contemporary community standards' would be too vague and subjective to be constitutionally applied" unless it is "'reduced to objective criteria set out in advance'" (quoting *Hopper v. City of Pasco*, 241 F.3d 1067, 1080 (9th Cir. 2001)); *Høeg*, 2023 U.S. Dist. LEXIS 13131 at *30. Although much has been learned about COVID-19, potential treatments, and the vaccines, many COVID-19 topics are still very much open to debate and there is still much to be researched and learned. This lack of definitive clarity exposes AB 2098's flaws. "[W]here First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required, and courts ask whether the language is sufficiently murky that speakers will be compelled to steer too far clear of any forbidden areas." *Edge*, 929 F.3d at 664 (cleaned up).

AB 2098 also fails the second vagueness requirement because there is no explicit standard to apply that would avoid "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108. In *Forbes v. Napolitano,* this Court addressed a vagueness challenge to a law that contained ill-defined, ambiguous language in a statute that purported to regulate the conduct of medical professionals. 236 F.3d 1009 (9th Cir. 2000). The statute prohibited "experimentation" or "investigation" involving fetal tissue from abortion, unless it was required to perform a "routine" pathological

*know*, ABC News (Oct. 2, 2020) (also noting shift in World Health Organization position).

examination. *Id.* at 1010. In holding that the statute was impermissibly vague, the Court emphasized that there was no common, accepted definition of the terms, and thus the statute lacked sufficient clarity to put doctors and enforcement officials on notice about what was fair or foul. "The dearth of notice and standards for enforcement arising from the ambiguity of the words … thus renders the statute unconstitutionally vague." *Id.* at 1013 (citing *Kolender*, 461 U.S. at 358; *Papachristou v. City of Jacksonville*, 405 U.S. 145, 162 (1972)).

AB 2098 suffers the same flaw. Just as the "distinction between experimentation and treatment changes over time," so too does the "scientific consensus" referenced in AB 2098. *Forbes*, 236 F.3d at 1012. Appellants have essentially acknowledged this. The Board expressed concern that "the definitions of misinformation/disinformation may prove challenging for the Board to prove." CER-71. And the Executive Director's Declaration noted that the "standard of care" frequently is dependent upon a fact-finder's resolution of conflicting expert opinions. CER-10-11. But the "standard of care" component of "misinformation" is dependent upon a "scientific consensus" that the government fails to define and that has been elusive if not nonexistent. "[A]mong whom must the consensus exist…[i]n which geographic area…[with] what level of agreement…[h]ow recently in time…[and from] what source or sources?" *Høeg*, 2023 U.S. Dist. LEXIS 13131 at *21. "The statute provides no means of understanding to what 'scientific consensus' refers." *Id.*

Consequently, physicians incur real risk that their best advice to a patient departs from the contemporaneous consensus on COVID-19, subjecting them to a charge of unprofessional conduct under AB 2098. It is irrelevant under AB 2098 if a physician

made the statement in good faith to provide candid and helpful advice to a patient. It is irrelevant whether that advice was helpful or harmful. And it is even irrelevant if the doctor is ultimately vindicated by a later changed consensus! The fact the statement contradicts current, but perhaps inaccurate, public health guidance would place the doctor in jeopardy. The question is not whether discriminatory enforcement will necessarily occur, "but whether the [Statute] is so imprecise that discriminatory enforcement is a real possibility." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991). In turn, that possibility risks imposing a "chilling effect on the exercise of First Amendment freedoms." *Wunsch*, 84 F.3d at 1119.

Because of AB 2098's chilling effect, doctors will likely refrain from candid discussions with patients about the options for treatment and the benefits and risks associated with the vaccines. This chill may result in doctors failing to meet the required standard of care, particularly the requirement of informed consent under California law. *See Arato v. Avedon*, 5 Cal. 4th 1172, 1186, 1191 (1993) (informed consent dependent on what types of disclosures a physician made to a patient and the types of disclosures a reasonable person in patient's position would have deemed material); *Florio v. Liu*, 60 Cal. App. 5th 278, 293 (2021) (summarizing informed consent standard of care case law in California); *Daum v. SpineCare Med. Group, Inc.*, 52 Cal. App. 4th 1285, 1301-02 (1997) (discussing informed consent standard of care in context of experimental treatments or procedures). For instance, there have been recent reports indicating that there is a higher incidence of cardiac issues for young, healthy males who received mRNA vaccines. *E.g.*, Kevin Bardosh, *et al.*, *COVID-19 vaccine boosters for young adults: a risk benefit assessment and ethical analysis of mandate policies at universities*, J. Med. Ethics (Dec. 5, 2022).

Because it runs counter to the prevailing public health currents encouraging vaccinations, a doctor might refrain from disclosing this information when consulting with a young, male patient (or a parent of such a minor patient). Similarly, a doctor might be hesitant to encourage a vaccine booster to a patient who is more vulnerable to COVID-19, perhaps because of a perceived backlash against the vaccines or uncertainty of guidance related to boosters. This resulting self-censorship will substantially erode the necessary candor between physicians and patients regarding the virus, treatments, and vaccines. *See Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1152 (9th Cir. 2001) ("The touchstone of a facial vagueness challenge is … whether a substantial amount of legitimate speech will be chilled." (citing *Young v. Am. Mini Theaters, Inc.*, 427 U.S. 50, 60 (1976)).

The district court in *McDonald* held that AB 2098's inclusion of the familiar "standard of care" condition remedied the use of the vague "scientific consensus." MER-15. But as *Høeg* recognizes, "the mere inclusion of an entirely separate element does not resolve the definition's vagueness." 2023 U.S. Dist. LEXIS 13131, at *28. Every determination about "misinformation" still turns on the existence or not of a nebulous "consensus." *Compare Forbes*, 236 F.3d at 1012 (rejecting notion that an objective limitation on liability ("occurring after abortions") could rehabilitate an otherwise vague law). Unlike the adult-dancing statute in *Gammoh v. City of La Habra*, 395 F.3d 1114 (9th Cir. 2005), AB 2098's "poorly-defined, subjective term"— "scientific consensus"—defines the prohibited conduct itself: disseminating "misinformation." *Høeg*, 2023 U.S. Dist. LEXIS 13131, at *25.

45

Finally, doctors cannot rely upon any assurances that the State will limit enforcement of AB 2098 to egregious instances or only when there is virtual scientific unanimity. "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige.*" *Stevens*, 559 U.S. at 480. Courts may not uphold an unconstitutional rule just because defendants "promise[] to use it responsibly." *Id.* Nor may a court "write nonbinding limits into a silent state statute" (*Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 770 (1988)) or "rewrite a law to conform it to constitutional requirements." *Iancu*, 139 S. Ct. at 2301 (*quoting Stevens*, 559 U.S. at 481); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1021 (9th Cir. 2013) (limiting application of statute "is a job for the … legislature, if it is so inclined, and not for [a] court"). Courts are "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (quoting *Boos v. Barry*, 485 U.S. 312, 330 (1988)). AB 2098 is hopelessly vague and unenforceable.

Like the statute in *Forbes*, AB 2098 lacks sufficient clarity required by the Constitution and there is no reasonable or readily apparent construction that can salvage the Statute. It is unconstitutionally vague.

## C.   Plaintiffs will sufferable irreparable harm.

As discussed in Section I, it is black-letter law that even a day's infringement on free speech rights is irreparable harm, "even if it results from a threat of enforcement rather than actual enforcement." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). "When an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further showing

of irreparable injury is necessary." 11A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. Apr. 2020 update). Couris is entitled to an injunction.

## D.  The balance of equities and public interest support granting  preliminary relief.

The remaining two factors to be considered—the public interest and whether other interested parties would benefit or be harmed by an injunction—also support granting relief. Because AB 2098 deters not only Plaintiffs' speech, but that of all California licensed physicians and surgeons, "the balance of equities and the public interest thus tip sharply in favor of enjoining the [Statute]." *Klein*, 584 F.3d at 1208. Enforcement of the Statute might result in a physician being suspended or losing his or her license to practice medicine. Thus, "[t]here is a potential for extraordinary harm and serious chill upon protected speech." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014).

AB 2098 also infringes on the First Amendment rights of the listeners: patients. First Amendment protection extends not just "to the communication," but also "to its source and to its recipients both." *Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976). The Statute's logical outcome is physicians self-censoring, perhaps to the detriment of their patients, many of whom will be seeking candid guidance. The practical effect of AB 2098 will be a single, government-approved—but empirically often incorrect—narrative regarding COVID-19 matters. This narrative may be at odds for what is best for a particular patient given her unique circumstances. Confining physicians to a government-approved message is not in the public interest, especially with respect to a novel and controversial disease such as COVID-19. "The Constitution embraces...a heated exchange of views, even (perhaps

especially) when they concern sensitive topics . . . where the risk of conflict and insult is high." *Rodriguez v. Maricopa County Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). Truth is discovered "out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (internal quotation and alteration omitted).

As discussed in Section III.A.3, California already possesses the tools necessary to investigate and discipline physicians who engage in harmful conduct. If Defendants (or any private party for that matter) are concerned about what they perceive to be misinformation regarding COVID-19 or the vaccines, the solution is accurate and truthful speech. "The remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." *Alvarez*, 576 U.S. at 727; *see also Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("If there be a time to expose through discussion the falsehood and fallacies, to avert the evil by the process of education, the remedy to be applied is more speech, not enforced silence.").

When First Amendment freedoms are at risk, the test for a preliminary injunction collapses to the single factor of whether Plaintiffs are likely to succeed on the merits. *American Beverage Ass'n*, 816 F.3d at 758. Both *McDonald* and the district court erred in failing to grant Couris an injunction.

**Conclusion**

This Court should reverse in both this case and *McDonald*, and remand with instructions to grant the preliminary injunction.

Dated: February 2, 2023        Respectfully submitted,

          */s/ Theodore H. Frank*

          HAMILTON LINCOLN LAW INSTITUTE
          Theodore H. Frank
          Adam E. Schulman
          1629 K Street NW, Suite 300
          Washington, DC 20006
          Telephone: (703) 203-3848
          Email: ted.frank@hlli.org

          HAMILTON LINCOLN LAW INSTITUTE
          Neville Hedley
          1440 W. Taylor Street, #1487
          Chicago, IL 60607
          (312) 342-6008

          *Attorneys for Appellants*
             *Michael Couris and Michael Fitzgibbons*

## Statement of Related Cases
## Under Circuit Rule 28-2.6

This case is consolidated with *McDonald v. Lawson*, No. 22-56220, an appeal of a denial of a preliminary injunction against AB 2098.

*Høeg v. Newsom*, No. 22-cv-01980 (E.D. Cal.), granted a preliminary injunction against AB 2098 on January 25, 2023, while this appeal was pending. California has until February 24, 2023, to appeal, but has not done so as of the evening of February 1.

Executed on February 2, 2023      */s/ Theodore H. Frank*
                                          Theodore H. Frank

**Certificate of Compliance**
**Pursuant to 9th Circuit Rule 32-1 for Case Number 23-55069**

I certify that: This brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 12,110 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Executed on February 2, 2023.

*/s/ Theodore H. Frank*
Theodore H. Frank

**Proof of Service**

     I hereby certify that on February 2, 2023, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers.


                      */s/ Theodore H. Frank*